Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Jaime W. Marquart (Bar No. 200344)
  jmarquart@bakermarquart.com
Christian A. Anstett (Bar No. 240179)
  canstett@bakermarquart.com
BAKER MARQUART LLP
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, California 90024
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

Attorneys for Defendant Aereokiller, LLC

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX TELEVISION STATIONS, INC.; TWENTIETH CENTURY FOX FILM CORPORATION; AND FOX BROADCASTING COMPANY, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> BARRYDRILLER CONTENT SYSTEMS PLC.; BARRY DRILLER INC.; AEREOKILLER LLC; and DOES 1 through 3, inclusive, <br><br> Defendants. | CASE NO. CV12-6921-GW (JCx) <br><br> **DEFENDANT AEREOKILLER LLC'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date:   December 6, 2012 <br> Time:   8:30 a.m. <br> Judge: Hon. George H. Wu <br> Place:  Courtroom 10 – Spring Street <br>            Courthouse |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

    A.   Aereokiller's Technology Does Not Infringe Any of the Plaintiffs' Copyrighted Works .................................................................................. 3

    B.   None of the Issues Litigated and Resolved By the Prior Action Between FilmOn and the Networks Are At Issue Here ......................... 6

    C.   Defendants Have Not "Waived" Their Technology Defense in Expedited Discovery ............................................................................... 8

ARGUMENT .......................................................................................................... 11

I.     PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS REQUIRED FOR ISSUANCE OF A PRELIMINARY INJUNCTION ............................ 11

II.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................. 12

    A.   Aereokiller's Technology Assists Consumers in the Lawful Exercise of their Right to Remotely Time-Shift And Play-Back Over the Air Broadcast Programming ......................................... 12

    B.   Aereokiller Does Not Provide or Engage in a "Public Performance" under the Copyright Act ................................................ 14

III.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ................... 19

    A.   Irreparable Harm is No Longer Presumed ......................................... 19

    B.   Plaintiffs' Showing is Speculative, and Any Actual Harm Can be Remediated with Money Damages ..................................................... 19

    C.   Plaintiffs Misstate the History of Their Dispute with FilmOn and Aereokiller in a Failed Attempt to Bolster Their Weak Irreparable Harm Arguments ............................................................................... 20

    D.   The Risk of Wrongful Enjoinment Justifies a Substantial Bond .......... 23

IV.   THE BALANCE OF HARDSHIPS FAVORS DEFENDANTS ................... 23

V.    PUBLIC INTEREST DOES NOT SUPPORT ISSUANCE OF INJUNCTIVE RELIEF ....................................................................... 24

CONCLUSION....................................................................................................... 25

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*ABC v. Aereo*,
  2012 WL 2848158 (S.D.N.Y. July 11, 2012) .................................................... passim

*Alliance for the Wild Rockies v. Cottrell*,
  632 F. 3d 1127 (9th Cir. 2011) ........................................................................ 11

*Aurora World, Inc. v. Ty, Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009) .......................................................... 24

*Cal. Pharmacist's Ass'n v. Maxwell-Jolly.*,
  563 F. 3d 847 (9th Cir. 2009) .......................................................................... 20

*California Dairies, Inc.v. RSUI Indemnity Co.*,
  2010 WL 2598376 (E.D. Cal. 2010) ................................................................ 22

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F. 3d 121 (2d Cir. 2008) ("*Cablevision*") ........................................... passim

*Delphon Industries, LLC v. Int'l Test Solutions Inc.*,
  2011 WL 4915792 (N.D. Cal. Oct 17, 2011) .................................................. 20

*Ebay, Inc. v. Bidder's Edge.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ........................................................... 20

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
  654 F. 3d 989 (9th Cir. 2011) ............................................................................. 3

*Instantcert.com, LLC v. Advanced Online Learning, LLC*,
  2012 WL 3689498 (D. Nev. Aug. 27, 2012) .................................................. 20

*International Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F. 3d 819 (9th Cir. 1993) .............................................................................. 23

*Live Nation Motor Sports, Inc. v. Davis*,
  2007 WL 79311 (N.D. Tex. Jan. 9, 2007) ...................................................... 18

*Lydo Enter, Inc. v. City of Las Vegas*,
  745 F. 2d 1211 (9th Cir. 1984) ........................................................................ 20

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

*MAI Systems Corp v. Peak Computer, Inc.*,
  991 F. 2d 511 (9th Cir. 1993) ............................................................13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................11

*Nintendo of America v. Lewis Galoob Toys, Inc.*,
  16 F. 3d 1032 (9th Cir. 1994) ...........................................................23

*On Command Video Corp v. Columbia Pictures Industries*,
  777 F. Supp. 787 (N.D. Cal. 1991) .............................................. 17, 18

*Random House v. Rosetta Books LLC*,
  283 F. 3d 490 (2d Cir. 2002) .............................................................23

*Religious Technology Ctr v. Netcom On-Line Comm. Svcs, Inc.*
  907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*") ....................2, 12, 13, 18

*Robert Trent Jones II, Inc. v. GFSI, Inc.*,
  537 F.Supp.2d 1061 (N.D. Cal. 2008) ..........................................19, 20

*Seed Services, Inc. v. Winsor Grain, Inc.*,
  2012 WL 1232320 (E.D. Cal. 2012) ...................................................19

*Sionix Corp. v. Moorehead*,
  299 F. Supp. 2d 1082 (S.D. Cal. 2003) ..............................................23

*Softman Prods. Co., LLC v. Adobe Systems, Inc.*,
  171 F. Supp. 2d 1075 (C.D. Cal. 2001) .........................................19, 25

*Sony Corp. of America v. Universal Studios, Inc.*,
  464 U.S. 417 (1984) ("*Sony*") .................................................1, 12, 17, 18

*Twentieth Century Fox Film Corp. v. iCraveTV*,
  2000 WL 255989 (W.D. Pa. Feb. 8, 2000) .....................................9, 10, 19

*Video Pipeline, Inc. v. Buena Vista Home Ent. Inc.*,
  192 F. Supp. 2d 321 (D. N.J. 2002) ...................................................19

*Warner Bros Ent. Inc. v. WTV Systems, Inc.*,
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................................17, 18

*Winter v. NRDC*,
  555 U.S. 7 (2008) ...............................................................................11

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

*WPIX, Inc. v. ivi, Inc.,*
    691 F. 3d 275 (2nd Cir. 2012) .......................................................................18

**FEDERAL STATUTES**

17 U.S.C. § 106(4) ...........................................................................................14

**OTHER AUTHORITIES**

Copyright Act, Section 111 ................................................................................6

Copyright Act, Section 106(1)-(5) .....................................................................8

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This case is the latest battle in an ongoing dispute between various television internet companies and the four major networks – Fox, NBC, CBS and ABC ("the Networks") – over the legality of new technology which allows consumers to individually tune in to free, over-the-air broadcast television and watch it on their computers instead of on their televisions, using an internet connection.  In the first case to test technology similar to Defendant Aereokiller's technology, remote, mini antenna and digital video recorder ("DVR") technology was endorsed as legally valid by the Southern District of New York earlier this year.  *See ABC v. Aereo*, 2012 WL 2848158 (S.D.N.Y. July 11, 2012).  Though Aereokiller's technology differs from Aereo's in important ways that make it better and more legally defensible than Aereo's, the two are similar in that both utilize digital antenna and DVR technology that has been used in consumer homes for years by users to tune in to free over-the-air television and record it to watch later.

Aereokiller allows users to rent their own dedicated mini antenna (the "static" option) or agree to use one of many currently available mini antennas at any given time (the "dynamic" option).  However, at all times, each user tunes in with their own independently operational mini antenna and tuner, and each user transmits and saves the television content to his or her own device, through the use of a dedicated storage space.  In other words, unlike prior streaming content found by some courts to constitute a public rebroadcast of copyrighted works, the mini antenna technology is merely a user-directed private viewing of already available, free over-the-air television content using the same antenna and tuner technology employed by consumers for years.

By providing *individualized* network programming to customers through dynamically allocated mini antennas, which data the user fully controls via computer, Aereokiller complies with the current state of law as set forth in the leading decisions

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

of *Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417 (1984), ("*Sony*"),

and *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008),

("*Cablevision*"); *cf. Religious Technology Ctr v. Netcom On-Line Comm. Svcs, Inc.*

907 F. Supp. 1361 (N.D. Cal. 1995), ("*Netcom*").

In an apparent attempt to bolster what is an otherwise weak irreparable harm

argument against Aereokiller, the Networks misstate the history of their various

litigation battles with Aereokiller's technology partner, FilmOn.com, Inc.

("FilmOn"), and FilmOn's CEO, Alki David.   The Networks claim that the service

they seek to enjoin in this case is a mere "reincarnation" of the service which FilmOn

was previously restrained from employing in a separate New York action, Case. No.

10-CV-7532-NRB, in front of the Honorable Naomi Reice Buchwald (the "New York

Action"), and that Aereokiller is just a ploy by Mr. David to violate, in a superficially

new way, a prior temporary restraining order in the New York Action, which became

permanent by way of the settlement of that action (the "New York Settlement").

The *full* history of that dispute includes the following events: (1) on November 2010,

Judge Buchwald issued a temporary restraining order enjoining FilmOn from

streaming Network content with its then-current technology, which *did not* employ

separate mini antennas, tuners and storage space as Aereokiller does; (2) on July 11,

2012, while the New York Action was being settled, the *Aereo* Decision came out

and Mr. David issued a press release stating FilmOn's intent to license new

technology based upon "mini antenna" technology like that of Aereo; (3) on August

1, 2012, the Networks executed the New York Settlement with the exact same

language as the November 2010 restraining order, making no mention of any mini

antenna technology; (4) on August 3, 2012, Mr. David sent an email to the head

lawyer for the Networks attaching a photograph of a mini antenna farm now used by

Aereokiller explaining why it was non-infringing, yet still informing the Networks of

his companies' intention to pay the Networks a fair license fee for their (just as

FilmOn had offered to do all along).  In response, rather than attempt to enforce the

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1  New York Settlement in that court, the Networks filed this new lawsuit against

2  Aereokiller on August 10, 2012.  They have never made any effort in the New York

3  Action to enjoin the Aereokiller technology that they claim is merely a

4  "reincarnation" of the services enjoined in that case.

5        Plaintiffs cannot establish any of the required elements of their claims. First, as

6  noted above, because the technology Plaintiffs seek to enjoin is legal under the

7  reasoning and ruling of the *Aereo* Decision (and several others upon which it is

8  based), Plaintiffs cannot show a likelihood of success on the merits.  Second, while

9  Plaintiffs make a spirited and lengthy argument regarding irreparable injury, they

10  cannot surmount the reality that monetary damages will be sufficient to remedy any

11  harm proven at trial.  For that reason, irreparable injury is not presumed.  *See, e.g.,*

12  *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F. 3d 989 (9th Cir. 2011). In

13  addition, the balance of hardships and the public interest favor denying this injunction

14  and allowing Aereokiller's nascent competing business to continue to exist.  As long

15  as Aereokiller is allowed to develop and deploy its innovative core technology, which

16  is identical in relevant aspects to Aereo's, there is no concern that Aereokiller will be

17  unable to satisfy any monetary damage award related to any potential infringement.

18        Ddenying the Networks' motions for preliminary injunction would merely

19  further the long-standing public interest in allowing consumers to freely view the

20  content of Networks which were granted broad, exclusive rights to certain over-the-

21  air spectrums.

22        For all of these reasons, Plaintiffs' motion for preliminary injunction should be

23  denied.

24  **STATEMENT OF FACTS**

25      **A.**      **Aereokiller's Technology Does Not Infringe Any of the Plaintiffs'**

26            **Copyrighted Works**

27        Aereokiller's technology is based on mini antennas that, along with routers,

28  servers, adapters, tuners and transcoders and other equipment, receives (among other

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

things) "free-to-air" broadcast television programming, encodes that programming into formats suitable for Internet distribution and then distributes the programming worldwide over the Internet. (*See* Declaration of Alkiviades David ("David Decl.") ¶¶ 6, 8; Declaration of Mykola Kutovyy ("Kutovyy Decl.") ¶ 7.)

The technology is user-friendly and by design allows the user to control the viewing experience at all times. The user starts a viewing session by opening an authorized "client application," including software like the HDi Player, a website like filmonx.com (which is reserved for use by Aereokiller), or a proprietary mobile phone application like the FilmonTVPlus application for Apple's iOS or LiveTV application for Android. (David Decl. ¶ 9; Kutovyy Decl. ¶ 32.) The client applications displays a variety of programming options, including (in the past) local broadcast channels. When the customer clicks on any local channel, it requests a unique, dedicated video stream from Filmon.com. (Kutovyy Decl. ¶ 33.) The client application then shows a message such as "Connecting antenna" while Aereokiller's web service issues a unique antenna stream and tunes the channel frequency. (*Id.*) While this process takes place, the customer sees the message "We are connecting your antenna." (*Id.* ¶ 34.) After the connection is established, the user can is able to view the selected programming.

The technology underlying the user experience is more complicated, and required a substantial investment of time and resources to design and test. (David Decl. ¶¶ 15, 19-24, 32.) The system is comprised of numerous parts which function together holistically. At the core of the design are mini antennas, each no larger than the size of a dime and spaced about six (6) inches apart on a board. (Kutovyy Decl. ¶ 8.) These antennas are either privately owned by individual users (the "static option") or dynamically allocated (assigned to specific individual users for a period of time, ensuring only one user is assigned to a given antenna at a time). (*Id.* ¶¶ 9-10.) Next, the tuner server connects the mini antennas to ATSC ("Advanced Television Systems Committee") adapters to transfer off-air data. (*Id.* ¶ 11.) The

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

encoder server transcodes video/audio data into a format suitable for Internet delivery and/or a format supported by endpoint devices such as iPhone, iPad, Android, and STB devices.  (*Id*. ¶ 12.)  The distribution endpoint is a server or group of servers for end user data delivery, and the encoder server publishes data to the distribution endpoint.  (*Id*. ¶¶ 13-14.)

The technological process of converting television broadcasts to a format that can be distributed via internet begins when a user initiates a request to a web server by clicking on a channel using a "client application" such as the filmonx.com website or applications for mobile devices.  (*Id*. ¶ 15.)  The web server sends the request for a specific channel to the antenna router, while a free antenna is  selected and tuned to the selected channel's frequency band.  (*Id*. ¶¶ 16-17.)  The antenna router processes the request, finds the first free antenna adapter and then schedules a request to tune the selected channel.  (*Id*. ¶ 18.)  The system is designed so that no two users can select the same antenna at the same time.  (*Id*.)  Next, the antenna router finds a free encoder slot and sets up a tuner server to send the data to the free encoder where the unique directory is created and assigned to the user.  (*Id*. ¶ 19.)  The system is designed so that each user has their own unique directory not shared with any other user.  (*Id*.)

Once the user's unique directory is created, data is from the antenna is processed through the tuner server and then the encoder server.  (*Id*. ¶ 20.)  In this process, the data is encoded for an internet delivery format, saved to the user's unique directory (for possible later seek request) and transmitted to the user through the distribution endpoint.  (*Id*.)  All saved data is removed when the user disconnects from the system.  (*Id*. ¶ 21.)

When the user finishes viewing the channel – with user options to stop, pause, close application and/or switch channels – the web user interface generates a "stop" request to the antenna router to stop fetching data and free up the antenna device and encoder slot.  (*Id*. ¶ 29.)  The unique directory and files are then removed.  (*Id*.)

BAKER MARQUART LLP
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, California 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

**B.**     **None of the Issues Litigated and Resolved By the Prior Action Between FilmOn and the Networks Are At Issue Here**

Plaintiffs argue, "Aereokiller is merely a reincarnation of an unauthorized Internet streaming service … which has been enjoined, temporarily and then permanently, since 2010" in the New York Action.   But the injunction entered in the New York Action has no bearing or application to Aereokiller's service because it concerns entirely different technology.

Prior to commencement of the present action, FilmOn operated a different "video on demand" business based on entirely different technology.  On or about September 27, 2010, FilmOn began to stream over the Internet content produced and owned by the primary four "free to air" broadcast networks CBS, NBC, Fox and ABC, as well as their respective corporate entities.  (David Decl. ¶ 10.)  At all times, FilmOn believed it was entitled to stream the network's programming (at a cost) under Section 111 of the Copyright Act, which allows cable systems to do so after paying a statutory licensing fee.  (*Id*. ¶ 11.)[1]  FilmOn offered to pay the licensing fees, but the Networks refused to accept them.  (*Id*. ¶ 12.)

Instead, the Networks brought the New York Action against FilmOn alleging that its streaming service infringed their various copyrights to television programming.  (*Id*. ¶ 13.)  The law firm Arnold and Porter, which represents CBS, ABC and NBC in these motions, represented plaintiffs.  (*Id*.)  During pendency of the action, the NY Plaintiffs applied for and on November 22, 2010 were granted a temporary restraining order preventing FilmOn from "infringing by any means, directly or indirectly, any of plaintiffs' exclusive rights under [the Copyright Act],

---

[1] Section 111 of the Copyright Act defines a cable system as "a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs **by wires, cables, microwaves, or other communications channels** to subscribing members of the public who pay for such service."  (emphasis added).

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

including but not limited to the **streaming** over mobile telephone systems and/or the Internet of any of the broadcast television programming …".  (*Id.* ¶ 14.) (Emphasis added).   On December 2, 2010, the Court issued an order that the temporary restraining order was to remain in place until the Court ruled on Plaintiffs motion for a preliminary injunction.  (*Id.*)

FilmOn strenuously disagreed with the Court's ruling on the temporary restraining order.  However, FilmOn ultimately decided for strategic reasons that its best interests were to settle the New York Action and re-launch a new kind of video on demand business based on *Cablevision* and DVR/antenna technology.  (*Id.*)  (*Id.* ¶ 15.)  For years prior to the temporary restraining order in the New York Action, FilmOn had experimented with mini antenna-based technology like the Aereokiller technology, but it had not decided to deploy it because it would require millions of dollars in investment to develop and implement this technology.  (*Id.*)  After the New York Action was filed, however, and especially after the restraining order, FilmOn began to seriously develop and prepare to deploy the Aereokiller technology.

In June 2012, FilmOn and the Networks engaged in negotiations to settle the New York Action, led by Hadrian Katz of Arnold and Porter on behalf of the Networks.  (*Id.* ¶ 16.)  The Aereo Decision, which FilmOn and the Networks were eagerly awaiting, came out while the New York Settlement was being negotiated, on July 11, 2012.  That day, FilmOn issued a press release entitled "A Victory for Aereo is a Victory for FilmOn" which was covered by news outlets such as Reuters.  (*Id.* ¶ 23, Ex. B.)  The press release lauded the district court decision, stating that "While FilmOn is settling its own dispute with the networks, it is now reinstating its live major Network streams in the state of New York with principally the same application of mini antennas as Aereo uses."  (*Id.*) The press release was publicly available and widely reported.  (*Id.*)  Despite this news, the Networks made no change to the language of the New York Settlement Agreement, executing it with the

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1    exact same language as the November 2010 restraining order on August 1, 2012.[2]

2       Two days later, on or about August 3, 2012, FilmOn CEO Alki David sent an

3    electronic message to Hadrian Katz, attaching a photograph of Mr. David holding an

4    antenna in front of an antenna farm.  (David Decl., Ex. C.)  In the message, he wrote:

5       Please see attached.  This is a picture taken from one of several

6       Antenna/DVR locations across the country.  Like the Aereo system,

7       FilmOn Air X allows audiences to connect to a unique antenna and tune

8       into over the air signals freely available to them to watch them remotely

9       from a DVR.  As we do with the other Content Partners on the

10       FilmOn.com platform, which is different from FilmOn Air X, we will be

11       making regular payments to your clients from all subscribers in the USA

12       . . . .  We have at this time assumed that $0.50 Cents per subscription

13       from each channel that is allowed into the system is appropriate. $0.25

14       Cents to the local affiliate and 25 Cents to the Network.  Even though we

15       recognize that FilmOn Air is not a Cable system, we have made these

16       assumptions based on the practices of the Cable industry.

17    (*Id.*)  After receiving Mr. David's email, Plaintiffs took no action to enforce the New

18    York Settlement, the Stipulated Consent Judgment attached to it, or the permanent

19    injunction in the Southern District of New York (which was the exclusive place of

20    jurisdiction for enforcing these instruments).  They still have not.

21      **C.**    **Defendants Have Not "Waived" Any Defense**

22       Plaintiffs assert that Defendants "cannot assert an 'Aereo' defense (on which it

23    bears the burden of proof) while withholding the technical discovery necessary to test

24

25   [2] The Stipulated Consent Judgment and Permanent Injunction explicitly references the
November 22, 2010 temporary restraining order entered by Judge Buchwald and
26   indeed adopts word-for-word the terms of that order in the permanent injunction
entered in that case: "[Defendants] … are hereby enjoined from infringing, by any
27   means, directly or indirectly, any of plaintiff's exclusive rights under Section 106(1)-
(5) of the Copyright Act, including but not limited to through the streaming over
28   mobile telephone systems and/or the Internet of any of the broadcast television
programming in which Plaintiff owns a copyright."  (David Decl. Ex. A.)

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

that defense." *See* 11/8/12 Memo of P&A's at 3.  This misconstrues Federal civil procedure, the procedural history of these actions, as well as the Court's rulings on Plaintiffs' motions for expedited discovery.

Plaintiffs commenced these actions the second week of August 2012.  (*See* Declaration of Ryan G. Baker ("Baker Decl."), ¶¶ 5-6.)  On August 27, 2012 (in the *Fox* action) and August 28, 2012 (in the *NBC* action), the parties stipulated to a briefing schedule for Plaintiffs' motions to conduct preliminary discovery necessary to support their contemplated motions for preliminary injunction.  (*Id*. ¶ 9.)  Prior to the hearing of those motions, counsel for the parties met and conferred in an attempt to reach a resolution of the issues raised in Plaintiffs' motions.  (*Id*. ¶¶10-11.)  As a result of those discussions, the parties agreed to a schedule for limited discovery.  Of course, the parties agreed at that time to adhere to the Federal Rules of Civil Procedure pertaining to discovery, and counsel for Defendant specifically stated that Defendant reserved the right to object to any of Plaintiffs' preliminary discovery requests.  Following that agreement between the parties, the Court issued its tentative ruling on Plaintiffs' motions.  In those rulings, the Court considered and expressly rejected Plaintiffs' arguments that they are entitled to discovery on Aereokiller's technology at this stage of the litigation.  Specifically, the Court wrote:

> Plaintiffs argue that they should be given the opportunity to obtain
> expedited discovery of the rest of the information they seek because
> of what they anticipate defendants (or at least Aereokiller – the rest of
> the defendants not having been served yet) will argue in response to
> Plaintiffs' *anticipated* preliminary injunction motion, based on the
> outcome of a preliminary injunction motion in a recent Southern
> District of New York case *ABC v. Aereo*, 2012 U.S. Dist. LEXIS
> 96309 (S.D.N.Y. July 11, 2012).  For the Court to determine it is
> appropriate to grant such early discovery on these topics, it would
> have to determine that they were necessary (and sufficiently narrowly

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   tailored) because of the nature of defendants' Aereokiller's *actual*

2   opposition *and* that such an opposition had a colorable chance of

3   convincing the Court of its merit on the face of the unauthorized

4   conduct that gave rise to this litigation.  Unless both of these events

5   come to pass there is no reason why Plaintiffs should be able to

6   achieve by way of expedited discovery what they would otherwise

7   have to wait for in connection with their Rule 26(f) conference.

8   (*Id* ¶¶12-13, Ex. B at 2) (emphasis in original) (9/13/12 tentative ruling in *Fox* action,

9   adopted as final).

In its responses and objections to Plaintiffs' preliminary discovery requests,

Defendant objected to the production of documents regarding technology and to

testimony on that subject.  (*Id*. ¶ 14, Ex. D.)  In addition to those requests being

premature at that stage of the litigation (which was explicit in the Court's ruling),

Plaintiffs' requests were poorly formed such that Defendant could not have possibly

answered them in the allotted time.

Although not designated for that purpose, Mr. David offered some testimony at

his deposition regarding technology.  (Declaration of Jaime W. Marquart ("Marquart

Decl.") ¶ 2.)  Although Mr. David was willing to answer many questions related to

the technology of the Aereokiller service, his testimony was limited to protect

Aereokiller trade secrets, such as the exact location of its antenna farms and the

identity of its prospective business partners.  (*Id*. ¶ 4.)  Plaintiffs' expert, Nigel Jones,

also attended Mr. David's deposition.  (*Id*. ¶ 6.)  The time frame for expedited

discovery in these actions was accelerated, by Plaintiffs' terms and urging.  In

contrast to the rushed process here, in the *Aereo* litigation in the Southern District of

New York (with a similar request for expedited discovery made by plaintiffs in that

action), it took several months for briefing, fact discovery, expert discovery and an

evidentiary hearing.  (*See* Request for Judicial Notice ("RJN"), Ex. A (3/26/12

Scheduling Order).)

1    Finally, as noted in the Declaration of Ryan Baker filed herewith, Aereokiller

2  is willing to permit a site visit to one of the datacenters, from which Aereokiller

3  operates its remote antennas; however, given the briefing schedule on Plaintiffs'

4  motions, it is unlikely the site visit will occur prior to the hearing of Plaintiffs'

5  motions.

6                              **ARGUMENT**

7  **I.     PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS REQUIRED**

8           **FOR ISSUANCE OF A PRELIMINARY INJUNCTION**

9    A preliminary injunction is "an extraordinary and drastic remedy, one that

10  should not be granted unless the movant, by a *clear showing*, carries the burden of

11  persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

12  A plaintiff seeking a preliminary injunction bears the burden of showing "that he is

13  likely to succeed on the merits that he is likely to suffer irreparable harm, that the

14  balance of equities tips in his favor, and that an injunction is in the public interest."

15  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Injunctive relief should be denied where

16  plaintiff fails to carry this burden with respect to any of these factors.  *See, e.g., id.* In

17  light of the Supreme Court's decision in *Winters*, the Ninth Circuit now requires a

18  demonstration of each of those four factors for an injunction to issue.  *See, e.g.,*

19  *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131-32 (9th Cir. 2011)

20  ("For the reasons that follow, we hold that the 'serious questions' approach survives

21  *Winter* when applied as part of the four-element *Winters* test").

22    Here, Plaintiffs cannot establish any of the elements necessary for a

23  preliminary injunction to issue:

24           • Plaintiffs are not likely to succeed on the merits because Aereokiller's

25             service does not infringe Plaintiff's copyrights;

26           • Plaintiff's lengthy "parade of horribles" irreparable injury arguments

27             depend on the incorrect assumption they are likely to prevail on the

28             merits and money damages are sufficient here to remedy any harm to

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

Plaintiffs;

- The balance of hardships tilts decidedly in favor of Aereokiller as wrongful enjoinment would irreparably injure its nascent business; and

- Injunctive relief is decidedly *not* in the public interest as reduced access to material that Congress has decided ought to be freely available to the public is as a matter of logic *against* the public interest.

For a preliminary injunction to issue in this case, Plaintiffs must establish each of those four elements.  Unable to establish any of them, Plaintiffs' motions should be denied.

## II.   <u>PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS</u>

Plaintiffs are unlikely to succeed on the merits of their claim for copyright infringement because:  (1) Aereokiller's technology does not enable infringement but simply assists consumers in the lawful exercise of their right to remotely time-shift over-the-air broadcasts; and (2) Aereokiller's retransmission of over-the-air broadcast content does not constitute a "public performance" of copyrighted works.

### A.   <u>Aereokiller's Technology Assists Consumers in the Lawful Exercise of their Right to Remotely Time-Shift And Play-Back Over the Air Broadcast Programming</u>

The right of individuals to use a technology to record over-the-air broadcasts as a matter of personal convenience is a long-standing and fundamental principle of modern copyright jurisprudence.  464 U.S. 417 at 454-56.  In *Sony*, the Supreme Court held that Sony was **not liable** for secondary infringement for sales of a video recorder, the Betamax, because consumer recording and play-back of television programs was a form of "fair use" and, therefore, did not violate the Copyright Act. *Id* at 455.  Here, Aereokiller's technology performs exactly the same function: it allows the consumer to record and play-back broadcast programming through the convenient medium of the internet, and is therefore functionally (and legally)

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

analogous to the *Sony* Betamax video recorders.

Plaintiffs' brief overlooks the influential Ninth Circuit decision of *Religious Technology Ctr v. Netcom On-Line Comm. Svcs, Inc*. 907 F. Supp. 1361 (N.D. Cal. 1995), which found that an internet access provider was not directly liable for copyright infringement due to making and storing copies of copyrighted material on a computer bulletin board service ("BBS"). On that basis, the Court denied plaintiff's motion for summary judgment. *Id*. The essential technology offered by Netcom was undisputed… Netcom permitted public posting on the BBS which operated through a server for public access to that content. The *Netcom* Court noted that "[u]nlike some other large on-line service providers, such as CompuServe, America Online and Prodigy, Netcom does not create or control the content of the information available to its subscribers. It also does not monitor messages as they are posted." *Id* at 1367-68. Finding that "copies" were made under the precedent of *MAI Systems Corp v. Peak Computer, Inc*., 991 F. 2d 511 (9th Cir. 1993), the court distinguished the negative holding of that case because "Netcom's actions, to the extent they created a copy of plaintiffs' works were necessary to have a working system for transmitting Usenet postings to and from the internet. Unlike the defendants in *MAI*, neither Netcom nor [individual defendant] Klemesrud initiated copying." **The defendants in *MAI* turned on their customer's computers thereby creating temporary copies of the operating system, whereas Netcom and Klemestrud's systems can operate without any human interaction.**" *Id* at 1368-69 (emphasis added).

Here, Aereokiller's technology also operates without human interaction; it is triggered by the initiating commands of the consumer to start recording of broadcast programming that otherwise is freely available to the public. (*See* Kutovyy Decl. ¶¶ 15, 32-33.) The factual background here is parallel to that considered by the Southern District earlier this year, analogizing Aereo's service to a "remote DVR" at least from the user's perspective. 2012 WL 2848158 at *2. To summarize the relevant technology, Aereokiller maintains drives that access unique directories created by the

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   client's initiation.  (*Id.* ¶¶ 15, 19-20, 32-33.)  Then remote antennas are tuned or pre-

2   tuned to select channels and data is trans coded for the user using an antenna and

3   directory solely dedicated to that user.  (*Id.*)  Customers also have the ability to stop

4   or pause programming, as well as to close the application or switch channels.  (*Id.* ¶

5   29.)

6       **B.     Aereokiller Does Not Provide or Engage in a "Public Performance"**

7           **under the Copyright Act**

8       The Copyright Act gives content owners the exclusive right to "perform the

9   copyrighted works publicly."  17 U.S.C. Section 106(4).  In relevant part, the statute

10  provides:

11      [t]o perform or display a work 'publicly' means . . . to transmit or otherwise

12      communicate a performance or display of the work . . . to the public, by means

13      of any device or process, whether the members of the public capable of

14      receiving the performance or display receive it in the same place or in separate

15      places and at the same time or different times.

16  *Id.*  Plaintiffs argue at length that Defendants should be enjoined because Defendants

17  are retransmitting Plaintiffs' programming to the public over the Internet without the

18  copyright holders' permission, thereby violating Plaintiffs' public performance rights.

19  Plaintiffs' argument, however, ignores the particular technological architecture of

20  Aereokiller's service that *by design* focuses on individual user choice and decision to

21  deliver programming to users and therefore does not constitute a "public"

22  performance of any copyrighted work.

23      Aereokiller's technology is similar in relevant legal respects to transmission

24  technologies found by the Second Circuit **not** to constitute public performances for

25  purposes of the Copyright Act.  For example, *Cartoon Network LP, LLLP v. CSC

26  Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008) ("*Cablevision*"), involved a "Remote

27  Storage DVR" ("RS-DVR") system designed to allow customers who did not have a

28  stand-alone DVR in their homes to record cable programming on central hard drives

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

housed and maintained by Cablevision at a remote location.  *Id*. at 125.  The Second

Circuit explicitly rejected the district court's conclusion that the RS-DVR technology

violated the Section 106(4) right of public performance, finding that defendant-

appellant's "embodiments of copyrighted programs" were not fixed copies and also

were not public performances under the transmit clause. The Court's decision

depended on the RS-DVR's particular technological architecture and emphasis on

individual viewer use and control:  "And because the RS-DVR system, as designed,

only makes transmissions to one subscriber using a copy made by that subscriber we

believe that the universe of people capable of receiving an RS-DVR transmission is

the single subscriber whose self-made copy is used to create that transmission."  *Id*. at

137.  Such a technological system enables the **private** transmission of content, not

the public performance of a work under the Copyright Act:

> [T]he transmit clause directs us to identify the potential audience of a given
>
> transmission, i.e. the persons 'capable of receiving' it, to determine whether
>
> that transmission is made 'to the public.'  Because each RS-DVR playback
>
> transmission is made to a single subscriber using a single unique copy
>
> produced by that subscriber, we conclude that such transmissions are not public
>
> performances 'to the public,' and therefore do not infringe any exclusive right
>
> of public performance.

*Id* at 139.

A recent Southern District of New York case re-affirmed the continued vitality

of the Cablevision decision in the second circuit, this time specifically with respect to

remote mini antenna and remote DVR technology like that at issue here.  In *American

Broadcasting Companies, Inc. v. Aereo, Inc.*, 2012 WL 2848158 (S.D.N.Y 2012)

("*Aereo*"), involved a technology that allows users to access "free, over-the-air

broadcast television through antennas and hard disks located at Aereo's facilities."

*Id*. at *2.  From a viewer's perspective, "Aereo's system is similar in operation to that

of a digital video recorder … particularly a remotely located DVR, although Aereo

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

users access their programming over the Internet rather than through a cable connection.  One further difference is that Aereo allows users to view programming on their computers, laptops, or mobile devices, whereas to view to watch television on these devices using a standard DVR, users might need to purchase an additional device like a Slingbox." *Id*.  Ultimately, the Second Circuit found that "Aereo's system is materially identical to that in *Cablevision*, suggesting that the copies that Aereo creates are as significant as those created in *Cablevision*." *Id*. at *11.  As in *Cablevision*, the *Aereo* court found that Aereo's technology did not cause "public performances" of copyrighted works based on a close analysis of how the technological worked:

> First, Aereo's system creates a unique copy of each television program for each subscriber who requests to watch that program, saved to a unique directory on Aereo's hard disks assigned to that user … Second, each transmission that Aereo's system ultimately makes to a subscriber is from that unique copy … third, the transmission of the unique copy is made *solely* to the subscriber who requested it … the overall factual similarity of Aereo's service to *Cablevision* on these facts suggests that Aereo's service falls within the core of what *Cablevision* held lawful.

*Id*. at *11 (internal citations omitted).  Further, the Court found that "the Aereo system is a stronger case than *Cablevision* for attaching significance to such copies because, unlike *Cablevision* in which multiple copies were all created from a *single* stream of data [internal citations omitted] each copy made by the Aereo system is created from a *separate* stream of data." *Id* at *12 (emphasis in original).

Aereokiller's technology is functionally similar to Aereo's technology, as set forth in detail by Mykola Kutovyy (the Chief Technical Officer for licensor FilmOn) in his Declaration in support of Aereokiller's Opposition.  (*See* Kutovyy Decl. ¶¶ 7-35.)  Of most importance to this Court in its analysis are the following facts: (1) Aereokiller's technology is initiated by the user and based on the use of mini

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

antennas; (2) whether the user connects statically or dynamically, each user has their own unique antenna and their own unique directory containing the data that they selected, *e.g.* television programming converted to viewing over the internet via computer or mobile device; and (3) each user has the ability to control that data, including to stop, pause, close the application or switch channels.  (*Id.* ¶¶ 7-10, 15, 19-20, 29, 31-35.)  The unique and dedicated nature of this technology directly parallels the technology offered by Aereo and endorsed in the earlier *Sony* and *Cablevision* decisions.

The authorities cited and relied upon by Plaintiff analyzed technically distinct and/or much simpler technologies than the technologies offered by Aereokiller and Aereo.  One such decision is *Warner Bros Ent. Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011), in which plaintiff owners and producers of copyrighted motion pictures brought suit against a DVD "rental" service company. WTV's service, "Zediva," utilized hundreds of DVD players installed in cabinets at a data center which played purchased copies of plaintiffs' copyrighted works that were offered to consumers by digital service (from the DVDs located in the data center) via internet for 14 day-rentals.  The DVD players were designated to particular movies or copyrighted works which were transmitted to consumers one after another every four hours.  In this business model, the consumer had little control over the movies they received digitally and could not pause, rewind or fast forward while viewing.

The *WTV Systems* Court found that defendants transmitted the copyrighted works even though consumers initiated the process.  824 F. Supp. 2d at 1010 ("As in *On Command*, the fact that Zediva 's customers initiate the transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works they wish to view is immaterial.").  The Court took care, however, to distinguish the facts and its ruling from those in *Cablevision* because of the unique copy made by consumers in *Cablevision* as well as the consumer's ability to control their own unique copy.  *Id* at 1011.  The clear implication of the Court's noting the different facts in *Cablevision* is

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1    that the *WTV Systems* Court would have been guided by the *Cablevision* Court's

2    reasoning if presented with those facts, as are presented here.[3]

3          Another decision heavily relied upon by Plaintiffs is the Second Circuit's

4    decision in *WPIX, Inc. v. ivi, inc.*, 691 F. 3d 275 (2d Cir. 2012).  The entire first half

5    of the *ivi* Court's analysis as to likelihood of success was devoted to a "cable system"

6    affirmative defense that is not being asserted by Defendants in this case and,

7    therefore, is wholly inapplicable.  691 F. 3d at 278-84.  The irreparable harm

8    arguments accepted by the *ivi* Court are basically reiterated here by Plaintiffs.  Yet

9    the key distinction is that the *ivi* irreparable harm facts buttressed a strong showing of

10   likelihood of success based on the unsuccessful assertion of an affirmative defense

11   that has no relevance to this action.  Defendants in this action base their defense on

12   the law in *Sony, Cablevision*, *Aereo*, *Netcom* and other cases which simply are not

13   addressed by Plaintiffs.

14         Plaintiffs' other authorities all are non-Ninth Circuit lower court rulings based

15   on similarly disparate and distinguishable facts.  In *Live Nation Motor Sports, Inc. v.*

16

17   [3]   The technology in the distinguishable *WTV* decision is comparable to that in *On
18   Command Video Corp v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal.
     1991), in which the court granted summary judgment for copyright infringement due
19   to electronic delivery of movie videotape signals in hotel rooms that amounted to a
20   "public performance" under the transmit clause.  Defendants' system in that case was
     based on "a computer program, a sophisticated electronic switch, and a bank of video
21   cassette players ('VCP's'), all of which are centrally located in a hotel equipment
22   room."  777 F. Supp 787 at 788.  The program directed electronic switches to turn on
     a particular VCP for any given hotel room that then played the selected movie to the
23   hotel guest based on their selection via remote control.  Although the video was
24   viewable only by the guest who ordered it, the *On Command* Court observed that
     **"[t]he viewer cannot pause, rewind or fast-forward the video**.  When the movie
25   ends, it is automatically rewound and then immediately available for viewing by
26   another hotel guest." *Id* (emphasis added).  These shared video systems, in *WTV*
     *Systems* and *On Command Video*, differ dramatically from the unique copies made by
27   consumers of Aereokiller's service which are accessible only to the individual
28   consumer and controlled through actions of the consumer.

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

*Davis*, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007), the copyright infringement analysis was based purely on "real time streaming" of live webcasts of car races. *Id.* at *2. There was no sophistication to the technology that would make the case comparable to the use of multiple servers, individualized remote mini antennas, and data stored for each user, as exists in this case. The early decision of *Twentieth Century Fox Film Corp. v. iCraveTV*, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000) was based on technology that involved entry of any Canadian area code and "clicking to other buttons." *Id* at *2. There were no factual allegations of individual copies made by consumers and solely accessible to consumers through personally allocated antennas. Likewise, the technology in *Video Pipeline, Inc. v. Buena Vista Home Ent. Inc.*, 192 F. Supp. 2d 321 (D. N.J. 2002) was streaming of movie trailers that retail customers accessed "by clicking on the 'preview' buttons for a particular motion picture." *Id.* at 328. Findings of public performance in each of these cases were a more straightforward matter of analyzing simple replays or rebroadcasts as if in a public theatre. Defendants' service, however, creates a "remote DVR" for the consumer's convenience in accessing free network programming that is within the consumer's rights and control, and that requires no licensing or special permission.

## III.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

### A.   Irreparable Harm is No Longer Presumed

Under current law, federal courts do not "assume the existence of irreparable injury" in copyright actions. *See, e.g., Seed Services, Inc. v. Winsor Grain, Inc.*, 2012 WL 1232320 (E.D. Cal. 2012). Because Plaintiffs are unlikely to prevail on their Copyright Act claims, Plaintiffs must make an even stronger showing of irreparable injury, and then Plaintiffs must still meet the two additional factors of the Ninth Circuits post-*Winters* "alternative test" for granting injunctive relief . *See, e.g., Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F.Supp.2d 1061, 1068 (N.D. Cal. 2008).

### B.   Plaintiffs' Showing is Speculative, and Any Actual Harm Can be Remediated with Money Damages

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

Speculative losses are insufficient to establish actual harm for purposes of irreparable harm analysis. *See, e.g., Softman Prods. Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075, 1090 (C.D. Cal. 2001) ("There must be evidence of actual injury to support claims of 'irreparable injury.'"). Here, despite offering numerous declarations, Plaintiffs' showing of irreparable injury is thin at best.  There is no specific evidence of imminent harm, aside from pure speculation as to how Defendants' service may hypothetically impact Plaintiffs' future ad revenue.  Since users transmit the copyrighted works through Defendants' technology in their original form, there is little basis for arguments regarding inauthenticity or reputational harm.

Furthermore, "[e]conomic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award." *See Delphon Industries, LLC v. Int'l Test Solutions Inc.*, 2011 WL 4915792 at *3 (N.D. Cal. Oct 17, 2011) (citing *Cal. Pharamcist's Ass'n v. Mawell-Jolly*, 563 F. 3d 847, 852 (9th Cir. 2009)); *see also Instantcert.com, LLC v. Advanced Online Learning, LLC*, 2012 WL 3689498 (D. Nev. Aug. 27, 2012) ("Showing monetary injuries, without more, will not justify granting a preliminary injunction") (citing *Lydo Enter, Inc. v. City of Las Vegas*, 745 F. 2d 1211, 1213 (9th Cir. 1984).  Here, money damages would be sufficient to redress any harm proven at trial.  Lost advertising revenue—if any, should be quantifiable by the time of trial.  And if Plaintiffs' claims bear out over time, Plaintiffs' current assertions as to reputational harm or lost goodwill (if any) likewise would have some factual support or basis by the time of trial.  At present, those assertions are conjecture, not evidence of irreparable harm.

Finally, Plaintiffs' cases offer no support here.  For example, in *Ebay, Inc. v. Bidder's Edge*, Inc., 100 F. Supp. 2d 1058 (N.D. Cal. 2000), plaintiff dismissed its copyright claims and the court based its injunctive relief analysis primarily on the trespass cause of action.  *Id.* at 1065-72.

**C.   Plaintiffs Misstate the History of Their Dispute with FilmOn and Aereokiller in a Failed Attempt to Bolster Their Weak Irreparable**

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1

### Harm Arguments

2  Because their irreparable injury arguments are weak, plaintiffs put forth a

3  number of arguments that attempt to paint Aereokiller as a rogue actor lacking

4  respect for judicial process that *deserves* to have its business enjoined.  During the

5  course of this assault on Defendants' character, however, Plaintiffs dramatically

6  misstate the true history of their disputes with FilmOn and Aereokiller and ironically

7  evidence their own disdain for judicial process and accurate representation of facts.

8  Specifically, Plaintiffs argue that Aereokiller's technology operates in violation of an

9  existing stipulated consent judgment and permanent injunction related to the New

10  York action between Plaintiffs and FilmOn and, equally absurdly, that Aereokiller

11  has somehow *waived* its right to present a "technology defense" because Aereokiller

12  objected to Plaintiffs' abusive and unreasonable preliminary discovery requests.

13  Both arguments are at odds with the facts.

14  Aereokiller's technology and the transmission activity at issue in this lawsuit

15  are not subject to any existing court order or injunction and Aereokiller is not a

16  "reincarnation" of FilmOn's old streaming technology.  Relatively early on in the

17  prior litigation between the Networks and FilmOn, on November 22, 2010, Judge

18  Buchwald issued a temporary restraining order enjoining FilmOn's internet streaming

19  technology.  (David Decl. ¶ 14).  The language of the restraining order was

20  transcribed word-for-word in the Settlement Agreement and permanent injunction.

21  (David Decl. Exs. A, D-E).  Plaintiffs own actions in this case are logically

22  inconsistent with their claim that Aereokiller's conduct violated either the New York

23  settlement agreement or the Court order in the Southern District of New York.  If

24  Plaintiffs really believed Aereokiller violated the Settlement Agreement, Plaintiffs

25  only relief would have been to file an action in the Southern District of New York.

26  (David Decl. Ex. A Section 6.2 ("The Parties expressly agree that the United States

27  District Court for the Southern District of New York shall retain continuing

28  jurisdiction … and that all actions or proceedings arising in connection with this

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1  Agreement shall be tried and litigated exclusively in the United States District Court

2  for the Southern District of New York")(emphasis added)).

3       Without citation to legal authority, Plaintiffs insinuate that Aereokiller's

4  alleged discovery "misconduct" waived its right to present a "technology defense" in

5  this action.  Waiver is the intentional relinquishment of a known right after

6  knowledge of the facts.  *California Dairies, Inc. v. RSUI Indemnity Co.*, 2010 WL

7  2598376 (E.D. Cal. 2010).  Here, there is no evidence that Aereokiller waived a right

8  to present a full defense on the merits, including a defense based on its technological

9  architecture.  In the Court's ruling on Plaintiffs' request for preliminary discovery,

10  the Court denied Plaintiffs' discovery requests concerning Aerokiller's technology

11  because the requests were made prior to Plaintiffs actual request for a preliminary

12  injunction and Aereokiller's actual defense.  (Baker Decl. Ex. B.) The Court also

13  noted that, prior to granting discovery on the technology after Plaintiff's motion for

14  preliminary injunction, it would also need to determine that the requests were

15  "sufficiently narrowly tailored" – implicitly recognizing the common-sense

16  proposition that the normal Federal Rules of Civil Procedure regarding discovery

17  *always* apply to discovery requests (even preliminary requests).  (Id.).  Aereokiller

18  properly objected to discovery requests regarding technology on grounds that they

19  were premature given the Court's ruling and also impermissibly overbroad.

20  (Declaration of Julie Shepard (the "Shepard Decl.") Ex. N).  Instead of pursuing the

21  normal and appropriate meet and confer procedure and in contrast to the Court's

22  preference to conduct technology discovery *after* an actual motion, Plaintiffs sent a

23  series of record-making correspondence to Aereokiller advancing a invented legal

24  rule that Defendants *had* to provide technological discovery in response to Plaintiff's

25  overbroad requests, because Defendants were able to anticipate the grounds for

26  Plaintiffs' preliminary injunction and their likely defenses.  *See*, *e.g.*, (Shepard Decl.

27  ¶ 20 and Exhibit O).  Then, when in the spirit of cooperation, Aereokiller's 30(b)(6)

28  representative did provide *some* technological discovery, Plaintiffs accused

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   Aereokiller of "hiding the ball" because Aereokiller's representative understandably

2   refused to disclose sensitive, highly confidential information on a topic for which he

3   was not designated.  Plaintiffs' argument is absurd – at all times, Defendants acted to

4   *preserve* their legal rights under federal law and the Court's order and never

5   knowingly relinquished any rights.

### D.   <u>The Risk of Wrongful Enjoinment Justifies a Substantial Bond</u>

7       The Ninth Circuit recognizes that the bond posted for preliminary injunctions

8   may be forfeited if a party is wrongfully enjoined.  *Nintendo of America,* 16 F. 3d

9   1032 (9th Cir. 1994).  Here, wrongful enjoinment would deprive Aereokiller of

10  legitimate subscription and advertising revenue at a crucial stage of its growth.

11  Aereokiller also risks losing its substantial technology investment as well as some of

12  its partnerships, and it may also lose key personnel if the injunction issues and the

13  service is put on hold pending the litigation.  All of this supports the requirement of a

14  substantial bond to protect Defendants in the event they are wrongfully enjoined in

15  this action.  *See, e.g., Sionix Corp. v. Moorehead*, 299 F. Supp. 2d 1082 (S.D. Cal.

16  2003) (granting motion for recovery from bond)

## IV.   <u>THE BALANCE OF HARDSHIPS FAVORS DEFENDANTS</u>

18      Plaintiffs' alleged harm must be balanced against the harm to Defendants.  *See,*

19  *e.g., International Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F. 3d 819, 827 (9th Cir.

20  1993) ("In evaluating the balance of hardships a court must consider the impact

21  granting or denying a motion for preliminary injunction will have on the respective

22  enterprises").

23      Defendants have devoted time and resources to developing the remote antenna-

24  based technology and marketing it to consumers.  Moreover, Defendants are not huge

25  multinational entertainment conglomerates like Plaintiff, so have fewer resources to

26  fall back on, comparative to Plaintiffs, if an injunction is issued.  Granting of an

27  injunction now could very well cripple Defendants' business, and, at the very least it

28  sends a strong message to other technology innovators that creativity and novel

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1  approaches to facilitate public access to media may be quashed or killed early on

2  while legal battles ensue against larger players.  These facts tip the scales in favor of

3  Defendants.  *See, e.g., Random House v. Rosetta Books LLC*, 283 F. 3d 490, 491-2

4  (2d Cir. 2002) (affirming denial of preliminary injunction due to serious concerns that

5  Rosetta would go out of business balanced against Random House's alleged loss of

6  goodwill).

7  **V.      PUBLIC INTEREST DOES NOT SUPPORT ISSUANCE OF**

8  **         INJUNCTIVE RELIEF**

9          Plaintiffs bear the burden of proof to show that public interest favors issuance

10 of injunctive relief.  *See, e.g., Aurora World, Inc. v. Ty, Inc.*, 719 F. Supp. 2d 1115,

11 1126 (C.D. Cal. 2009).  While Plaintiffs own anticompetitive interest in restricting

12 competition may be well served by the injunction, the ordinary consumer who merely

13 wants access to broadcast programming in as many convenient forums as possible is

14 harmed.  The consumer will suffer if an injunction is issued because it would restrict

15 consumer choice and convenience when viewing free-to-air broadcast television.

16 Commentators and media advocacy groups have shown a strong interest in protecting

17 broad and convenient consumer access to media, as reflected in amicus briefing

18 submitted by the Electronic Frontier Foundation and Public Knowledge in support of

19 Defendants' opposition to a preliminary injunction motion in the *Aereo* litigation in

20 New York.  (*See* RJN, Ex. B.)  Further, there are no allegations that Defendants have

21 altered or manipulated copyrighted works, which is the type of conduct that may

22 weigh in the public interest.  Rather, the parties here are engaged in a legal debate

23 over the degree to which third parties can profit from providing the public with a

24 service they increasingly desire or demand: internet access to media through a remote

25 DVR.  That legal debate extends to the validity and protections afforded in leading

26 precedents such as the *Cablevision* decision; for that reason, Netcoalition and

27 Computer & Communications Industry Association filed an amicus brief "in support

28 of neither party" but setting forth arguments in support of the *Cablevision* Court's

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

1   reasoning and ruling.  (*See* RJN, Ex. C.)

2       One consequence of Plaintiffs' position would be to enforce a monopoly of

3   licensing or control over their broadcast programming that is otherwise available to

4   the public under the Copyright Act.  Those precise facts have caused federal courts to

5   weight this factor in favor of the technology innovator over the copyright holder.

6   *See, e.g., Softman Prods. Co., LLC v. Adobe Systems, Inc.*, 171 F. Supp. 2d 1075,

7   1091 (C.D. Cal. 2001) ("A system of 'licensing' which grants software publishers

8   this degree of unchecked power to control the market deserves to be the object of

9   careful scrutiny.").

## CONCLUSION

11       Based on the foregoing, Defendants respectfully request that the Court deny

12   Plaintiffs' application for a preliminary injunction.

14   Dated:  November 15, 2012        BAKER MARQUART LLP

16           By:  /s/ Ryan G. Baker_____

          Ryan G. Baker

18           Attorneys for Defendant Aereokiller
        LLC

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850