Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@bakermarquart.com
BAKER MARQUART LLP
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

Attorneys for Defendants and
Counterclaimants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, and FOX BROADCASTING COMPANY, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> FILMON X, LLC, ALKIVIADES "ALKI" DAVID, FILMON.TV NETWORKS, INC., FILMON.TV, INC., FILMON.COM, INC. and DOES 1 through 3, inclusive, <br><br> Defendants. | CASE NO. CV12-06921-GW (JCx) <br><br> Consolidated with Case No. CV12-6950-GW(JCx) <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY ADJUDICATION OF DEFENDANTS' COUNTERCLAIM FOR DECLARATORY RELIEF AND DEFENDANTS' SECTION 111 AFFIRMATIVE DEFENSE** <br><br> [Filed concurrently with Notice of Motion; Separate Statement; Request for Judicial Notice; Declarations of Alkiviades David, Mykola Kutovyy, Dr. Sigurd Meldal, Kim Hurwitz and Kelly Raney; Motion to Seal; Notice of Lodging; and [Proposed] Orders] <br><br> Judge: Hon. George H. Wu <br> Courtroom 10 <br> Hearing Date: July 16, 2015 <br> Time:  8:30 a.m |

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................1

II.     PROCEDURAL HISTORY.................................................3

III.    STATEMENT OF FACTS.................................................4

        A.    The Plaintiffs' Over-The-Air Programming............................4

        B.    FilmOn X's Service................................................................4

        C.    FilmOn X's Facilities And Technology.................................5

        D.    FilmOn X's Preparations To Recommence Retransmissions..........7

        E.    FilmOn X's Statements of Account And Royalty Payments...........8

        F.    The Notice of Proposed Rulemaking Issued By The Federal
              Communications Commission.............................................9

IV.     LEGAL BACKGROUND:  THE 1976 AMENDMENTS TO THE
        COPYRIGHT ACT.........................................................11

V.      ARGUMENT.................................................................12

        A.    FilmOn X Meets The Statutory Definition Of A "Cable System" Under
              The Copyright Act.........................................................12

              1. A Section 111(f) "Cable System" Plainly Includes Internet-Based
                 Retransmission Services..............................................13

              2. The Supreme Court's *Aereo* Reasoning Should Guide This Court's
                 Analysis.................................................................15

              3. Legislative History Confirms Congress Intended A Broad and
                 Technology Agnostic Interpretation of Section 111.................17

              4. *Ivi* Is Not Controlling And Was Wrongly Decided, In Any Event.18

                 a.    *Ivi* Is Not Binding On This Court, And *Aereo* Casts Its
                       Validity Into Doubt.............................................18

                 b.    The Second Circuit Placed Undue Weight On Copyright
                       Office Statements And Policy Recommendations............19

B.   FilmOn X Meets All The Other Statutory Requirements For A Section 111 License......................................................................22

1.   FilmOn X Has Made Royalty Payments And Has Otherwise..22

Complied In Good Faith With Subsection (d)...........................22

2. FilmOn X's Transmissions Were, And Are, "Permissible" Under FCC Rules And Regulations...................................................23

a.   FilmOn X's Secondary Transmissions Are "Permissible" So Long As They Are Not Prohibited By The FCC..............23

b.   FilmOn X Is Prepared To Comply With FCC Rules  And Regulations..............................................................24

VI.   **CONCLUSION................................................................ 25**

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Federal Cases**                                                           **Page(s)**

3

4   *American Broadcasting Companies, Inc. v. Aereo, Inc.,*
       134 S.Ct. 2498 (2014) ......................................................................... *passim*

5

6   *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.,*
       836 F.2d 599 (D.C. Cir. 1988) ........................................................... 12

7

8   *Capital Cities Cable, Inc. v. Crisp,*
       467 U.S. 691 (1984) ............................................................................ 12

9

10  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
       536 F. 3d 121 (2d Cir. 2008) .............................................................. 19

11  *Chevron, U.S.A., Inc. v. NRDC, Inc.,*
       467 U.S. 837 (1984) ............................................................................ 20

12

13  *Children's Hosp. & Health Ctr. v. Belshe,*
       188 F.3d 1090 (9th Cir. 1999) ............................................................ 13

14

15  *Christensen v. Harris County,*
       529 U.S. 576 (2000) ............................................................................ 21

16

17  *Connecticut Nat'l Bank v. Germain,*
       503 U.S. 249 (1992) ............................................................................ 13

18

19  *Ecological Rights Found. v. Pac. Gas & Elec. Co.,*
       713 F.3d 502 (9th Cir. 2013) .............................................................. 24

20  *Est. of Cowart v. Nicklos Drilling Co.,*
       505 U.S. 469 (1992) ....................................................................... 12, 20

21

22  *Fortnightly Corp. v. United Artists Television, Inc.,*
       392 U.S. 390 (1968) ............................................................................ 11

23

24  *Fox Television Stations, Inc. v. FilmOn X, LLC,*
       CV12-6921-GW (C.D. Cal., filed Aug. 13, 2012) ............................. 2

25

26  *Hubbard Broad., Inc. v. S. Satellite Sys., Inc.,*
       593 F. Supp. 808 (D. Minn. 1984) ..................................................... 12

27

28

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

*In re Sky Angel,*
  25 FCC Rcd. 3879 (Media Bur. 2010) .................................................. 23

*Kilby v. CVS Pharm., Inc.,*
  739 F.3d 1192 (9th Cir 2013.) ......................................................... 13

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) .......................................................... 19

*Nat'l Broad. Co. v. Copyright Royalty Tribunal,*
  848 F.2d 1289 (D.C. Cir. 1988) ....................................................... 12

*Nat'l Broad. Co., Inc.*
  940 F.2d 1468 (11th Cir. 1991) ....................................................... 24

*NBCUniversal Media, LLC v. FilmOn X, LLC,*
  CV12-06950-GW (C.D. Cal., filed Aug. 13, 2012) ................................ 2

*Padash v. I.N.S.,*
  358 F.3d 1161 (9th Cir. 2004) ........................................................ 13

*Satellite Broad. & Commc'ns Ass'n of Am. v. Oman,*
  17 F.3d 344 (11th Cir. 2011) ......................................................... 24

*Skidmore v. Swift & Co.,*
  323 U.S. 134 ............................................................................ 21

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.,*
  415 U.S. 394 (1974) ................................................................... 11

*U.S. v. Ron Pair Enterprises, Inc.,*
  489 U.S. 235 (1989) ................................................................... 13

*United States v. James,*
  712 F.3d 79 (2d Cir. 2013) ........................................................... 19

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ................................................................... 20

*Ventura Broad. Co. v. FCC,*
  765 F.2d 184 (D.C. Cir. 1985) ....................................................... 24

*WGN Continental Broadcasting v. United Video, Inc.,*
  693 F.2d 622 (7th Cir. 1982) ......................................................... 14

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

17 U.S.C. § 111 ....................................................................*passim*

17 U.S.C. § 111(c)(1) ....................................................... 22, 23, 24

17 U.S.C. § 111(d)(1) ............................................................... 23

17 U.S.C. § 111(f) .................................................... 13, 17, 19, 20

17 U.S.C. § 111(f)(3) ................................................................. 14

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

FilmOn X, LLC ("FilmOn X") seeks to provide the American public access to over-the-air television programming on any computer or mobile device.  Congress recognized the importance of such access when it enacted the compulsory copyright license regime to "set[] out the conditions, including the payment of compulsory fees, under which cable systems may retransmit broadcasts." *American Broadcasting Companies, Inc. v. Aereo, Inc.* ("*Aereo*"), 134 S.Ct. 2498, 2501 (2014).  To obtain its license, FilmOn X tendered statements of account to the U.S. Copyright Office, along with the payment of the mandatory license fees.  However, the Copyright Office has not processed or refused those filings; rather, because "FilmOn X has raised the [compulsory license] issue before the courts . . . the Office . . . accept[ed] them on a provisional basis."  (SOF 49-51.)  It now falls upon this Court to determine whether or not the Copyright Office should process FilmOn X's filings – and whether or not the American public may experience better access to free, over-the-air television signals retransmitted by companies like FilmOn X, which satisfy all statutory compulsory license requirements.

To qualify as a "cable system" under Section 111, FilmOn X must establish:

- It has one or more facilities located in any state in the United States;

- its facilities receive signals transmitted or programs broadcast by one or more television broadcast stations licensed by the FCC;

- the facilities make secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to paying members of the public;

- compliance with the procedures set forth in Section 111(d), including submission of Account Statements, along with payment; and

- its transmissions are permissible under FCC rules and regulations.

1

1   Because FilmOn X satisfies each of these requirements, this Court should find that

2   FilmOn X is entitled to a Section 111 compulsory license.

3          Previously, FilmOn X, along with Aereo, Inc., litigated the public performance

4   right.  Throughout the course of that litigation, the Networks[1] argued a ***technology***

5   ***agnostic*** interpretation of the Copyright Act.  For instance, in moving this Court for a

6   preliminary injunction, the Fox Plaintiffs argued:

7          the Copyright Act is expressly technology agnostic and prohibits the
           public performance of a work by a transmission to the public "by
8          means of any device or process."  17 U.S.C. § 101.  In other words,
           Congress intended that a service such as Aereokiller's that makes
9          Plaintiffs' copyrighted works available to its subscribers must have a
           license irrespective of any technological gimmickry to deliver the
10         programming to its subscribers.
11

12   (Fox Dkt. 41-1 at 2.)  On appeal to the Ninth Circuit, the NBC Plaintiffs argued,

13   "[j]ust like cable systems and satellite carriers, Aereokiller retransmits broadcasts of

14   copyrighted television programs to numerous subscribers on a live, real-time basis."

15   (NBC Dkt. 45 at 4-5.)  Further, in ruling on the public performance issue, the

16   Supreme Court focused on the "nature of the service" as opposed to "the

17   technological manner in which [Aereo] provides the service."  *Aereo*, 134 S.Ct. at

18   2511.  The Court found Aereo's system – the same as FilmOn X's system in all

19   relevant respects – was "for all practical purposes a traditional cable system."  *Id.* at

20   2507.  The Court then noted that cable companies have a right to publicly perform

21   copyrighted works under the "compulsory licensing scheme" established in Section

22   111.  *Id.* at 2506.  These were arguments advanced by FilmOn X in its *amicus* brief,

23   _____

24   [1] The term "Networks" refers to the Fox plaintiffs in the lead action captioned
25   *Fox Television Stations, Inc. v. FilmOn X, LLC*, CV12-6921-GW (C.D. Cal., filed
     Aug. 13, 2012) (hereinafter, the "Fox Dkt."), and the NBC plaintiffs in the
26   consolidated action captioned *NBCUniversal Media, LLC v. FilmOn X, LLC*,
27   CV12-06950-GW (C.D. Cal., filed Aug. 13, 2012) (hereinafter, the "NBC Dkt.").

28
                                          2

1  filed with the Court.  (Raney Decl., Ex. N.)

2       FilmOn X fits squarely within the definitional parameters of a Section 111

3  cable company.  Based on the Networks' prior "technology agnostic" interpretation

4  of the Copyright Act, it would appear that they should agree.  But the Networks now

5  argue the opposite point – that Section 111 should be interpreted to only apply to

6  cable systems using technologies that have been used in the past to retransmit video

7  programming.  Such an inconsistent reading of the Copyright Act does not withstand

8  the slightest scrutiny.  Moreover, the Networks' shifting arguments are inherently

9  unfair and extremely restrictive of the public's right to access free-to-air broadcast

10  content by "any device or process."  The Court should construe the Copyright Act in

11  a consistent, technologically agnostic manner.  Under such an interpretation, FilmOn

12  X qualifies for a compulsory license.  Because FilmOn X meets each of the "cable

13  system" criteria enumerated in Section 111, this Court should find that FilmOn X

14  qualifies for the Section 111 compulsory license.  The Court should grant

15  Defendants' motion in its entirety.

16  ## II.  PROCEDURAL HISTORY

17       The Networks filed these consolidated actions for copyright infringement in

18  August 2012.  Since then, the litigation has focused on two legal issues:  (1) whether

19  FilmOn X[2] engages in "public performances" within the meaning of the Copyright

20  Act, and, if so, (2) whether FilmOn X is entitled to a statutory copyright license

21  under section 111 of the Copyright Act.

22       On December 27, 2012, this Court granted a preliminary injunction based on

23  its finding that the Networks had shown a likelihood of success on whether FilmOn

24  X engages in public performances of copyrighted works.  (Fox Dkt. 78.)  Following

25  _____

26    [2] The term "FilmOn X" refers to defendants and counterclaimants FilmOn X,
LLC, FilmOn.TV, Inc., FilmOn.TV Networks, Inc., FilmOn.com, Inc. and

27  Alkiviades David.

28

the Supreme Court's *Aereo* decision, FilmOn X amended its pleadings to assert a new affirmative defense and counterclaim for declaratory relief based on Section 111. FilmOn X seeks "[a] judicial declaration that recognizes [it's] right to a compulsory [copyright] license in accordance with Section 111," which "would allow FilmOn X to resume secondary transmissions of plaintiffs' broadcasts without infringing [Plaintiffs'] copyrights." (Fox Dkt. 139 at ¶ 39; NBC Dkt. 135 at ¶ 48.)

### III.   STATEMENT OF FACTS

**A.   The Plaintiffs' Over-The-Air Programming.**

Plaintiffs own copyrights in certain television programs, which are transmitted over-the-air by local broadcast television stations. (SOF 1.) The FCC has licensed these stations the right to broadcast programming over the public airwaves. (SOF 2.) The signals of these broadcast stations are then retransmitted by cable systems, satellite services and other multichannel video programming distributors ("MVPDs"). (SOF 3.)

**B.   FilmOn X's Service.**

FilmOn X operates a website at www.filmon.com where users are (or were) able to access a wide variety of content, including original, licensed and over-the-air broadcast ("OTA" or "broadcast") programming. (SOF 4.)

In August 2012, FilmOn X launched a service using a remote mini-antenna/DVR technology, allowing users to access OTA programming via the Internet. (SOF 5.) It initially launched this service in Los Angeles and subsequently expanded its operations to New York, Chicago, Washington, D.C., Boston, Seattle, Dallas, San Francisco, Miami, Atlanta, Denver, Phoenix and Tampa. (SOF 6.) Customers were able to purchase subscriptions to local channel packages consisting of broadcast channels in a particular market depending upon the location of the subscriber. (SOF 7.)

1    FilmOn X's service provides several advantages to users.  The service

2    provides users convenient access to OTA programming through the Internet without

3    requiring the purchase, installation and maintenance of an antenna.  (SOF 8.)

4    FilmOn X's service is also much cheaper than the plans offered by other established

5    cable or satellite providers.  FilmOn X offered local channel packages on either a

6    monthly or annual basis, which provide users with the ability to watch and record

7    certain broadcast channels from a particular market.  (SOF 9.)  In the past, FilmOn X

8    charged between about $5.95 and $19.95 for monthly local channel packages, and

9    between about $59.95 and $199.00 for annual local channel packages.[3]  (SOF 10.)

10   **C.     FilmOn X's Facilities And Technology.**

11   As with other cable providers, FilmOn X's service operates by capturing

12   broadcast signals on the public airwaves and retransmitting those signals to

13   individual users.  (SOF 13.)  FilmOn X has physical facilities located in different

14   regions of the country where it houses antennas and other electronic equipment used

15   to capture, record and retransmit OTA programming via the Internet.  (SOF 14.)  The

16   antennas in these facilities received primary transmissions of OTA programming

17   made by network stations, such as KTTV Channel 11 in Los Angeles.  (SOF 15.)

18   FilmOn X retransmitted this programming to individual users through secondary

19   retransmissions over the Internet.  (SOF 16.)

20   In Los Angeles, FilmOn X initially created a "trailer" system behind FilmOn

21   X's corporate office in Beverly Hills.  (SOF 17.)  That facility featured an array of

22   ───────────────

23   [3] FilmOn X has experimented with its business model over time.  During certain

24   time periods, it offered over-the-air channels in high definition for a free trial
     period before the user was prompted to purchase a local channel package.  (SOF

25   11.)  At other times those channels were offered for free as part of FilmOn X's

26   Subscriber Activation Strategy, which was a marketing technique to get consumers
     to try broadcast content for free in SD for a period of time, which would terminate

27   at some point.  (SOF 12.)

28

antennas secured to the top of a trailer to capture broadcast signals transmitted over the public airwaves. (SOF 18.)  The signals from these antennas were carried via electronic wiring to servers and other equipment inside the trailer that encoded, saved and retransmitted unique copies of broadcast content to individual users over the Internet. (SOF 19.)  FilmOn X created similar trailer systems in New York, Miami and Chicago. (SOF 20.)

Subsequently, FilmOn X transitioned from the trailer system to a "Lanner" system. (SOF 21.)  For the Lanner system, FilmOn X leased commercial space in data centers in Los Angeles, New York, Chicago, Washington, D.C., Boston, Seattle, Dallas-Ft. Worth, San Francisco, Atlanta, Denver, Phoenix and Tampa. (SOF 22.)

The trailer and Lanner systems both contained similar electronic equipment needed to capture, store and retransmit local broadcast programming. (SOF 23.) Both systems work roughly as follows:

First, when a subscriber wants to watch a show that is currently being broadcast, he visits FilmOn X's website and selects, from a list of the local programming, the show he wishes to see. (SOF 24.)

Second, one of FilmOn X's servers selects an antenna, which it dedicates to the use of that subscriber (and that subscriber alone) for the duration of the selected show.  A server then tunes the antenna to the OTA broadcast carrying the show.  The antenna begins to receive the broadcast, and a FilmOn X transcoder translates the signals received into data that can be transmitted over the Internet. (SOF 25.)

Third, rather than directly send the data to the subscriber, a server saves the data in a subscriber-specific folder on FilmOn X's hard drive. (SOF 26.)

Fourth, once several seconds of programming have been saved, FilmOn X's server begins to stream the saved copy of the show to the subscriber over the Internet. The subscriber can watch the streamed program on the screen of his personal computer, tablet, smart phone, Internet-connected television, or other Internet-

connected device.  The streaming continues, a mere few seconds behind the OTA broadcast, until the subscriber has received the entire show including the commercials in the original broadcast.  Alternatively, the subscriber may direct FilmOn X to stream the program at a later time.  (SOF 27.)

FilmOn X's system uses Internet Protocol technology to deliver OTA content over the Internet.  (SOF 28.)  The video to be transmitted is converted to digital form (if it is not already digital) and broken into smaller packets of data, each representing parts of the original video.  (SOF 29.)  These packets are then transmitted across the network to the receiving device (such as a set-top box, a laptop, a tablet) via coaxial cables, fiber-optic cables, microwave links or any of the other communication channels that make up the physical layer of the Internet.  (SOF 30.)  The device re-assembles the stream by combining the packets in their proper order and then displays it to the user.  (SOF 31.)  FilmOn X secures the URL used for streaming a channel by including an encrypted key, which prevents unauthorized sharing or copying of the stream.  (SOF 36-37.)

**D.      FilmOn X's Preparations To Recommence Retransmissions.**

At present, FilmOn X is not providing users with access to broadcast programming due to preliminary injunctions entered by this Court and the District Court for the District of Columbia.  (SOF 38.)  FilmOn X is prepared to recommence retransmissions as a cable system with the approval of the courts in several geographic markets, including Los Angeles, New York, Chicago, Dallas-Ft. Worth, Boston, Miami-Ft. Lauderdale and Washington, D.C.  (SOF 39.)

FilmOn X users will be required to purchase a local channel subscription package in order to view OTA channels through FilmOn X's service.  (SOF 40.) Each subscription package will only include OTA broadcast channels within a specific designated market area ("DMA").  (SOF 41.)

Since *Aereo* issued, FilmOn X has continued to work on improvements to its system

1   for the retransmission of OTA content over the Internet. (SOF 42.) First, FilmOn X

2   has developed a more robust system to restrict retransmission of OTA content to

3   viewing devices (e.g., televisions, computers and mobile phones) located within the

4   DMA of the original broadcast. (SOF 43.) FilmOn X has adopted a conservative

5   approach to DMA verification – the default is to deny a subscriber access to view the

6   content of an OTA channel, unless there is a positive confirmation that (1) the user

7   has a physical address based on a credit card check within the applicable DMA, and

8   (2) the viewing device is located within the applicable DMA at the time of the

9   retransmission. (*Id.*) FilmOn X also has developed a secure system that uses the

10  HTTPS secure transmission protocol to provide end-to-end encryption (SOF 44),

11  intends to engage a third party proxy detention service (SOF 45), intends to

12  retransmit with closed captioning and without its logo (SOF 46), and likely will use a

13  single master antenna. (SOF 47.)

14  **E.    FilmOn X's Statements of Account And Royalty Payments.**

15        Shortly after the *Aereo* decision, on July 11, 2014, FilmOn X filed 14

16  Statements of Account with the Copyright Office and made royalty payments

17  relating to retransmissions of local broadcast stations. (SOF 48.)

18        On July 23, 2014, the Copyright Office sent a letter in which it accepted

19  FilmOn X's documentation on a "provisional basis." (SOF 49.) It wrote:

20        According to established Copyright Office practice, the Office may
          accept FilmOn's SOA filings without comment; accept them
21        provisionally, either taking no position or commenting upon any
          reservations we may have about the filing; or refuse the filings as not
22        eligible under the compulsory license. See 43 Fed. Reg. 17962, 17963
23        (May 19, 1988).

24  (*Id.*) The Copyright Office took the middle course, accepting FilmOn X's filings on

25  a "provisional basis" in recognition of the fact that "the question of eligibility of

26  internet-based retransmission services for the Section 111 license appears to have

27  been raised again before the courts." (SOF 50-51.)

28

8

Subsequently, FilmOn X made additional royalty payments and filed additional paperwork with the Copyright Office in good faith compliance with the regulatory procedures.  (SOF 52.)  To date, FilmOn X has made royalty payments and filed Statements of Account for each of the six-month reporting periods between July1, 2012, through the present in 14 different markets.  (SOF 53.)

**F.     The Notice of Proposed Rulemaking Issued By The Federal Communications Commission.**

Although the Copyright Office administers the Section 111 license under the Copyright Act, it has indicated that regulatory actions taken by the Federal Communications Commission may influence its treatment of the Statement of Accounts filed by FilmOn X.  In its July 23, 2014 letter to FilmOn X, the Copyright Office wrote that "Section 111 is meant to encompass 'localized retransmission services' that are 'regulated as cable systems by the FCC.'"  (SOF 58.)  In accepting FilmOn X's filings on a provisional basis, it stated that "FilmOn should be aware that, depending upon further regulatory or judicial developments, and/or based upon the Office's own further review of the issue, the Office may subsequently determine that it is appropriate to take definitive action on FilmOn's filings . . . ."  (*Id.*)

On December 17, 2014, the Federal Communications Commission ("FCC") adopted a Notice of Proposed Rulemaking (the "NPRM")[4] in which it "propose[d] to update [its] rules to better reflect the fact that video services are being provided increasingly over the Internet."  (SOF 59.)  It observed that "incumbent cable systems have made plain their intent to use a new transmission standard that will permit cable systems to deliver video via IP, and other innovative companies are also

---

[4] *See Promoting Innovation and Competition in the Provision of Multichannel Video Programming Services*, Notice of Proposed Rulemaking, MB Docket No. 14-261 (rel. Dec. 19, 2014), *available at* http://www.fcc.gov/document/commission-adopts-mvpd-definition-nprm, last accessed Mar. 19, 2015.

experimenting with new business models based on Internet distribution." (SOF 61.)
In considering the definition of a multichannel video programming distributor
("MVPD") under the Communications Act, the FCC proposed "to interpret the term
MVPD to mean distributors of multiple linear video programming streams, including
Internet-based services." (SOF 62.) It reasoned that "our proposed interpretation is
consistent with Congress's intent to define 'MVPD' in a broad and technology-
neutral way to ensure that it would not only cover video providers using technologies
that existed in 1992, but rather be sufficiently flexible to cover providers using new
technologies such as Internet delivery." (SOF 63.) The NPRM also discussed *Aereo*
and observed that the "Copyright Office might revisit" its treatment of Aereo's
statements of account "if the Commission should find Aereo to be an MVPD under
the Communications Act." (SOF 64.)

According to a notice-and-comment schedule set by the FCC, FilmOn X and
other commenters submitted their opening and reply comments to the NPRM on
March 3, 2015 and April 1, 2015, respectively. (SOF 66.) Additionally, FilmOn X
and other interested persons have been engaged in meetings with the FCC
commissioners and staff about the proposed rule change. (SOF 67.) Recently, in a
speech to the Media Institute on June 4, 2015, Gigi Sohn, counselor to FCC chairman
Tom Wheeler, stated:

> I view this issue as a win-win-win for the incumbent MVPD and
> broadcast industries, but most importantly, for consumers. Cable and
> satellite companies that have their own linear over-the-top offerings
> will benefit from the rights that being an MVPD confers. Similarly,
> broadcasters will get another source of retransmission consent revenue
> from those services that choose to carry broadcast stations. And new
> business models that might emerge bring new alternatives to
> consumers already adapting to how they view their programming.

(SOF 68.) Ms. Sohn indicated that it could be expected that the FCC would act on
the NPRM to reclassify some over-the-top video providers as MVPDs within the
next 19 months. (SOF 69.)

## IV. LEGAL BACKGROUND: THE 1976 AMENDMENTS TO THE COPYRIGHT ACT

The statutory copyright license created by Congress in 1976 for cable systems was one of several related amendments to the Copyright Act. Prior to those amendments, the Supreme Court had held that the retransmission of over-the-air television signals by community antenna television ("CATV") systems, which used coaxial cables to carry the signals received by antennas to the home television sets of subscribers, did not constitute a new "performance" of the work. *See Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401 (1968); *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 408-09 (1974). Under these decisions, CATV systems and other cable systems could not be liable for copyright infringement. *See Fortnightly*, 392 U.S. at 401; *Teleprompter*, 415 U.S. at 408-09.

After extensive negotiations between broadcasters, cable systems and other interested persons, in 1976, Congress amended the Copyright Act in part "to overturn th[e] [Supreme] Court's [earlier] determination" that "[CATV] systems (the precursors of modern cable systems) fell outside the Act's scope." *Aereo*, 134 S. Ct. at 2504. Through several related amendments, Congress redefined a public performance, added the Transmit Clause and enacted Section 111 "to achieve a similar end: to bring the activities of cable systems within the scope of the Copyright Act." *Aereo*, 134 S.Ct. at 2505-06. As another court has explained:

> In the 1976 Act, Congress redefined the term performance to include such secondary transmissions [by CATV companies], creating potential copyright liability for cable systems and carriers involved in such retransmissions. At the same time, however, Congress provided complete exemption for certain secondary transmissions, such as those by a passive carrier under § 111(a)(3), and created a compulsory licensing system in § 111(c) allowing cable TV systems to retransmit the copyrighted programming of distant broadcast stations in return for certain royalty payments.

11

1  *Hubbard Broad., Inc. v. S. Satellite Sys., Inc.*, 593 F. Supp. 808, 813 (D. Minn.

2  1984) (internal citations omitted).  These amendments were intended to balance

3  "two divergent national policies.  On the one hand, Congress wished to expand the

4  public's access to diverse programming by encouraging development of the cable

5  TV industry.  On the other hand, Congress clearly sought to protect local

6  broadcasters and . . . reward[] the creators of copyrighted works."  *Id.* (internal

7  citations omitted).

8       Specifically, Congress created Section 111 "to regulate cable companies'

9  public performances of copyrighted works."  *Aereo*, 134 S.Ct. at 2506.  Section 111

10  creates a ***statutory copyright license*** conveyed by operation of law that "permits

11  cable systems to retransmit distant broadcast signals without securing permission

12  from the copyright owner and, in turn, requires each system to pay royalty fees to a

13  central fund based on a percentage of its gross revenues."  *Capital Cities Cable, Inc.*

14  *v. Crisp*, 467 U.S. 691, 709 (1984).  As a result, cable systems are able to

15  "retransmit to [their] customers any primary transmissions made by a broadcast

16  station licensed by the [FCC]."  *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n*

17  *of Am., Inc.*, 836 F.2d 599, 602-03 (D.C. Cir. 1988).  "In exchange for this privilege,

18  however, the cable systems are required to pay a fee, to be distributed to the

19  copyright owners as surrogate for the royalties for which they might have negotiated

20  under a pure market scheme."  *Id.; see also Nat'l Broad. Co. v. Copyright Royalty*

21  *Tribunal*, 848 F.2d 1289, 1291 (D.C. Cir. 1988).

22  **V.**    **ARGUMENT**

23  **A.**    **FilmOn X Meets The Statutory Definition Of A "Cable System" Under**
        **The Copyright Act.**

24

25       "[C]ourts must give effect to the clear meaning of statutes as written."  *Est. of*

26  *Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992).  The court "must analyze

27  the statutory provision in question in the context of the governing statute as a whole,

28  presuming congressional intent to create a coherent regulatory scheme."  *Padash v.*

12

1   *I.N.S.*, 358 F.3d 1161, 1170-71 (9th Cir. 2004).  It must make "every effort not to

2   interpret the provision at issue in a manner that renders other provisions of the same

3   statute inconsistent, meaningless or superfluous." *Children's Hosp. & Health Ctr. v.*

4   *Belshe,* 188 F.3d 1090, 1096 (9th Cir. 1999) (internal quotations omitted).)  "[W]hen

5   the words of a statute are unambiguous, then, this first canon is also the last: 'judicial

6   inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54

7   (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *U.S. v. Ron Pair*

8   *Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (same).  If the statutory language is

9   ambiguous, the court looks to the canons of statutory construction and the legislative

10  history to determine Congress' intent. *Kilby v. CVS Pharm., Inc.*, 739 F.3d 1192,

11  1196 (9th Cir 2013.)

12          In this case, the statutory definition of a cable system is plain.  FilmOn X fits

13  squarely within this definition, which broadly applies to any entity with facilities in

14  any state that receives primary transmissions from broadcast stations licensed by the

15  FCC and retransmits those signals to its customers.  The *Aereo* decision and the

16  legislative history confirm this common-sense reading of the statute.

17      **1.      A Section 111(f) "Cable System" Plainly Includes Internet-Based**
            **Retransmission Services.**
18

19          Based on the plain statutory language, this Court should find that FilmOn X is

20  a cable system under the Copyright Act.  Section 111(f) broadly defines a "cable

21  system" to include three elements, as follows:

22          [1] a facility, located in any State, Territory, Trust Territory, or
            Possession, that [2] in whole or in part receives signals transmitted or
23          programs broadcast by one or more television broadcast stations
            licensed by the Federal Communications Commission, and [3] makes
24          secondary transmissions[5] of such signals or programs by wires, cables,
25

26          [5] Section 101 states that "to 'transmit' a performance or display is to
27  communicate it by *any device or process* whereby images or sounds are received
            (footnote continued)
28                                          13

microwave, or other communications channels to subscribing members of the public who pay for such service.

17 U.S.C. § 111(f)(3).

The statute is completely indifferent as to the mode of retransmission technology.  A broadcast retransmitter can qualify as a "cable system" regardless of the type of communications channels it chooses to use.  Congress' open-ended definition of a "cable system" to include "other communications channels" demonstrates a clear intent that the Act be construed to accommodate evolving technologies. *See WGN Continental Broadcasting v. United Video, Inc.*, 693 F.2d 622, 627  (7th Cir. 1982) ( "Congress probably wanted the courts to interpret the definitional provisions of the new act flexibly, so that it would cover new technologies as they appeared, rather than to interpret those provisions narrowly and so force Congress periodically to update the Act").  In light of the broad and technology agnostic language used in Section 111 and the Copyright Act as a whole, it would be improper and unwise to force Congress to amend the Act every time a new broadcast retransmission technology was adopted by Section 111 retransmitters.

FilmOn X meets each cable system definitional element.  FilmOn X has physical facilities located in various states (SOF 6.), where it receives primary transmissions in the form of over-the-air signals transmitted by one or more television broadcast stations licensed by the FCC.  (SOF 13-15.)  FilmOn X then makes secondary transmissions of those signals by wires, cables or other communications channels to subscribing members of the public who pay for such service.  (SOF 16, 24-32.)  Indeed, the Networks' own expert conceded that video

---

beyond the place from which they are sent."  17 U.S.C. § 101 (emphasis added).  Thus, the technology agnostic "any device or process" language is not limited to the Transmit Clause, but applies to the Copyright Act as a whole including the compulsory licensing scheme.

content delivered over the Internet travels over coaxial cables, fiber-optic cables, microwave links and other communication channels that make up the physical layer of the Internet.  (SOF 32.)  In considering Aereo's similar architecture, Justice Sotomayor stated, "I look at the definition of a cable company, and it seems to fit."  *See* Transcript of Oral Argument at 4:1-13, *Aereo*, 134 S.Ct. 2498 (2014) (No. 13-461).

## 2.    The Supreme Court's *Aereo* Reasoning Should Guide This Court's Analysis.

The Supreme Court based its decision that Aereo publicly performs on the finding that Aereo is "substantially similar to" and "is for all practical purposes a traditional cable system[.]"  *Aereo,* 134 S.Ct. at 2506-07.  Throughout the opinion, the Court focused on the nature of services offered by Aereo and concluded that minor technological differences between Aereo's mini-antenna/DVR technology and the system used by CATV companies in the past were immaterial.  It wrote that "the behind-the-scenes way in which Aereo delivers television programming to its viewers' screens" does not render "Aereo's commercial objective any different than that of cable companies.  Nor do they significantly alter the viewing experience of Aereo's subscribers." *Id.* at 2508.  In adopting a technology agnostic interpretation of the Copyright Act, the Court reasoned that Aereo's internet-based retransmission service still performs the same basic function as a CATV system.  *See id.* at 2507 (comparing "a click on a website" to a "turn of the knob" on a television set—both of which allow a subscriber to watch broadcast programming).

Importantly, in reaching its decision, the Supreme Court found that Aereo's activities were meant to be reached by the entire Act, including the 1976 amendments to address *Fortnightly* and *Teleprompter*. *Id.* at 2511 ("In sum, having considered the details of Aereo's practices, we find them highly similar to those of the CATV systems in *Fortnightly* and *Teleprompter*.  And those are activities that the ***1976 amendments*** sought to bring within the scope of the ***Copyright Act.***")

1  (Emphasis added).

2      Moreover, the *Aereo* transcript reflects the Court's inclination to find

3  companies like Aereo are entitled to a Section 111 license. At oral argument, Justice

4  Sotomayor, who joined in the majority opinion, specifically suggested that Aereo is

5  entitled to a Section 111 license as a cable system. In discussing the plain language

6  of Section 111, the following colloquy took place between Justice Sotomayor and

7  counsel for the plaintiff-networks (many of whom are plaintiffs in this case):

8
9      JUSTICE SOTOMAYOR: . . . But I look at the definition of a
    cable company, and it seems to fit . . . .

10                  \* \* \*

11      . . . Makes secondary transmissions by wires, cables, or other
    communication channels. It seems to me that a little antenna with a

12      dime fits that definition. To subscribing members of the public who
    pay for such service. I mean, I read it and I say, why aren't they a

13      cable company?

14
15      MR. CLEMENT: . . . I think if you're [] already at that point, you've
    probably understood that just like a cable company, they're public—

16      they're publicly performing and maybe they qualify as a cable
    company and maybe they could qualify for the compulsory license

17      that's available to cable companies under Section 111 of the statute.

18
19      JUSTICE SOTOMAYOR: But it just gets it mixed up. Do we
    have to go to all of those other questions if we find that they're a cable

20      company? ***We say they're a c[]able company, they get the compulsory***
    ***license.***

21  RJN, Ex. 5 (Aereo S. Ct. Hrg. Tr. at 4:1–5:4 (emphasis added)). Similarly, Justice

22  Breyer, who authored the majority opinion, expressed concern about "tak[ing] [an

23  internet-based service] out of the compulsory licensing system" because it would

24  limit the public's access to copyrighted material. *Id.* at 53:21–54:5.

25

26

27

28                           16

### 3.  Legislative History Confirms Congress Intended A Broad and Technology Agnostic Interpretation of Section 111.

Legislative history confirms that Congress drafted the definition of a "cable system" in purposefully broad and flexible language that would not become outdated with advancements in technology delivery systems.

During subcommittee hearings on the proposed amendments to the Copyright Act, the former Register of Copyrights, Barbara Ringer, testified that Section 111 "deals with all kinds of secondary transmissions, which usually means picking up electrical energy signals, broadcast signals, off the air and retransmitting them simultaneously by one means or the other—usually cable but sometimes other communication channels, like microwave and apparently laser beam transmissions that are on the drawing board if not in actual operation."  RJN, Ex. 14 (Hearings on H.R. 2223 before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the Comm. On the Judiciary House of Representatives, 94th Cong., 1st Session 1820 (1975) (hereinafter "H.R. 2223 Hearings"), at p. 1820); *see also* RJN Ex. 15 (H.R. 2223 Hearings at 442 ("the technology is so rapidly changing that we cannot really foresee what kind of changes in technology will occur") (statement of Rep. Pattison addressing Ashton R. Hardy of the FCC)).

In 1994, with the passage of the Satellite Home Viewer Act, Congress again demonstrated its intent that Section 111 be interpreted broadly to new emerging technologies when it amended the statutory definition of a cable system to "overturn[] an erroneous interpretation of the definition of 'cable system' by the Copyright Office, an interpretation which denied the license to microwave carriers." RJN, Ex. 9 (H.R. Rep. 103-703, at 7).  In so doing, Congress emphasized that its amendment to section 111(f) was a *clarification* of the scope of the definition, not a change in current law:

> The proposed legislation amends the definition of the term "cable system" contained in section 111(f) *to clarify* that the cable compulsory license applies not only to traditional wired cable

17

television systems, but also to multichannel multipoint distribution service systems, also known as "wireless" cable systems.

RJN, Ex. 10 (S. Rep. 103-407, at 14).  Congress's intent was to overrule a decision of the Copyright Office and to place "wireless cable" on a competitive footing with wired cable for purposes of the compulsory license by adding the phrase "or microwave" to the statutory text.  RJN, Ex. 10 (S. Rep. 103-407, at 14).

In 1994, the Copyright Office amended its regulations in response to Congress and set forth the eligibility of "wireless cable" for the Section 111 compulsory license.  *Cable Compulsory License; Definition of a Cable System;* 59 FR 67635-01 (rel. Dec. 30, 1994).  Significantly, given that the 1994 amendment was a "clarification" of current law, the Copyright Office recognized its retroactive effect, declaring that it "will treat 'wireless' cable operators as being eligible for the cable compulsory license since January 1, 1978, the effective date of the Copyright Act and section 111."  *Id.*  This was the case even though such wireless systems generally served subscribers "without using any public right-of-way" and thus fell within an exception to the Communications Act's definition of "cable system" under Section 522.  Section 111 must be interpreted broadly in this case, as well.

### 4.     *Ivi* Is Not Controlling And Was Wrongly Decided, In Any Event.

In *WPIX, Inc. v. ivi, Inc.* ("*ivi*"), 691 F.3d 275 (2012), the Second Circuit affirmed a preliminary injunction against a service streaming copyrighted television programming over the Internet and found that the service was not likely to prevail on its Section 111 defense.  *Id.* at 284.  But the Second Circuit's conclusion that an Internet-based retransmission service cannot be a cable system misconstrues the plain language of the Copyright Act and its legislative history.  Moreover, *ivi* does not control this case.

### a.   *Ivi* Is Not Binding On This Court, And *Aereo* Casts Its Validity Into Doubt.

Although the Supreme Court did not explicitly overrule *ivi*, its reasoning in *Aereo* effectively abrogates the holding.[6]  In *ivi*, the district court rejected ivi's Section 111 defense on the ground that "ivi's [technical] architecture bears no resemblance to the cable systems of the 1970s."  *See WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 604 (S.D.N.Y. 2011).  The Second Circuit endorsed the district court's technology-centric interpretation of the Copyright Act,[7] reasoning that Congress would have amended the Act to explicitly include "the 'Internet' as an acceptable communication channel under § 111" if it had intended Section 111 to cover secondary transmissions over the Internet.  *ivi*, 691 F.3d at 282.  However, the Supreme Court's decision in *Aereo* rejects this technology-specific interpretative approach, reasoning that the "behind-the-scenes way in which Aereo delivers television programming to its viewers' screens" does not Aereo any less like a cable system.  *See Aereo*, 134 S.Ct. at 2508-09.  Indeed, the Supreme Court's reasoning, as well as the legislative history, clearly suggests that an Internet-based retransmission service fits within a plain reading of the definition of a cable system under Section 111(f).

Moreover, *ivi* is factually distinguishable.  Unlike in this case, ivi did not identify a facility "located in any State, Territory, Trust Territory, or Possession" as

---

[6] A case may be called into doubt by subsequent precedent even where that precedent does explicitly overrule the earlier case.  *See, e.g., Miller v. Gammie,* 335 F.3d 889, 899 (9th Cir. 2003); *United States v. James*, 712 F.3d 79, 94 (2d Cir. 2013).

[7] The Second Circuit also adopted a technology-specific interpretation of the Transmit clause and the definition of a public performance in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F. 3d 121 (2d Cir. 2008) ("*Cablevision*") and *Aereo*.

1   required by the Section 111(f) definition of a cable system. *See ivi,* 691 F.3d at 280,

2   n. 6.  In the absence of a physical facility (like FilmOn X's facilities), the Second

3   Circuit opined that it is "unclear whether the Internet itself is a facility, as it is

4   neither a physical nor a tangible entity; rather, it is a global network of millions of

5   interconnected computers." *Id.* at 280 (internal quotations omitted).  In doing so, the

6   Second Circuit misapplied the plain language of the statute by confusing the

7   "communication channel" (*i.e.,* the Internet) for the "facility" (*i.e.,* the physical

8   location where broadcast signals are received and retransmitted).  Here, the record

9   shows that FilmOn X does not exist only in the metaphorical cloud, but maintained

10  physical facilities in more than a dozen cities around the country.  (SOF 6, 14, 17,

11  20, 22.)  Thus, unlike ivi, FilmOn X had actual facilities, as required by Section 111.

### b.   The Second Circuit Placed Undue Weight On Copyright Office Statements And Policy Recommendations.

14         Invoking the *Chevron* doctrine, the *ivi* court also placed undue reliance on

15  inapposite and unpersuasive statements made by the Copyright Office.  Under this

16  doctrine, a court is obliged to first enforce the plain and unambiguous meaning of a

17  statute, regardless of any agency interpretation of the statute.  *Chevron, U.S.A., Inc.*

18  *v. NRDC, Inc.,* 467 U.S. 837, 842-43 (1984); *Est. of Cowart,* 505 U.S. at 476 ("a

19  reviewing court should not defer to an agency position which is contrary to an intent

20  of Congress expressed in unambiguous terms.").  If the court determines that the

21  statute is ambiguous, then the court may consider the agency interpretations of the

22  statute.  *Chevron,* 467 U.S. at 843; *United States v. Mead Corp.,* 533 U.S. 218, 219

23  (2001) ("the overwhelming number of cases applying *Chevron* deference have

24  reviewed the fruits of notice-and-comment rulemaking or formal adjudication.").

25         Even assuming Section 111 is ambiguous (it is not), the Copyright Office has

26  not issued any rule or regulation after a formal notice-and-comment period on

27  whether internet-based retransmission services are eligible for a Section 111 license.

28

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

1   "Interpretations such as those in opinion letters—like interpretations contained in
2   policy statements, agency manuals, and enforcement guidelines, all of which lack
3   the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris*
4   *County*, 529 U.S. 576, 687 (2000). "Instead, interpretations contained in formats
5   such as opinion letters are 'entitled to respect' under our decision in *Skidmore v.*
6   *Swift & Co.*, 323 U.S. 134, 140 [] (1944), but only to the extent that those
7   interpretations have the 'power to persuade[.]'" Accordingly, opinions expressed by
8   the Copyright Office in policy documents are not entitled to *Chevron* deference. *See*
9   *Christensen*, 529 U.S. at 587.

10       Moreover, consistent with its custom and practice,[8] the Copyright Office has
11   not made a factual determination as to whether FilmOn X is entitled to a Section 111
12   license. Instead of definitively accepting or rejecting the statements of account
13   submitted by FilmOn X, the Copyright Office adopted a "wait-and-see approach." It
14   accepted FilmOn X's submissions on a "provisional basis," reviewed the
15   submissions for obvious errors and omissions, and noted that pending litigation in
16   the courts and regulatory proceedings before the FCC might resolve the dispute or
17   lead to further action by the Copyright Office. (SOF 50.)

18       At present, the FCC is poised to take action to classify certain Internet-based
19   services as MVPDs, which likely would bring FilmOn X's subscription-based
20   service within the scope of the Communications Act. With the advent of high-
21   capacity internet access, the technology available to deliver live video programming
22   to consumers has expanded to include internet-based video transmission. (SOF 33.)
23   Today, several cable systems, including Comcast Cable, AT&T U-Verse and
24
25
26   [8] *See* 42 Fed. Reg. 15065, 15067 (Mar. 18, 1977) (stating that "[f]*actual or*
      *other determinations as to the application of this definition to any particular*
27   *activity or facility are beyond the province of the Copyright Office*").
28

1   Verizon FiOS,[9] use Internet Protocol technology to deliver local broadcast

2   programming.  (SOF 34.)  The FCC has wisely recognized that "nascent, Internet-

3   based video programming services [should] have access to the tools they need to

4   compete with established providers."  (SOF 60.)  In light of these technological and

5   regulatory developments, it would be unwise for this Court to rule that Internet-

6   based services are not entitled to a Section 111 license.  Instead, this Court should

7   recognize that FilmOn X has the same statutory rights as other established cable

8   providers.

9   **B.      FilmOn X Meets All The Other Statutory Requirements For A Section
            111 License.**

10          Under the Copyright Act, a cable system – like FilmOn X – is entitled to a

11  statutory copyright license to retransmit broadcast programming.  Section 111(c)(1)

12  provides that "secondary transmissions to the public by a cable system" of broadcast

13  programming "shall be subject to statutory licensing upon compliance with the

14  requirements of subsection (d) where the carriage of the signals comprising the

15  secondary transmission is permissible under the rules, regulations, or authorizations

16  of the Federal Communications Commission."  17 U.S.C. § 111(c)(1).  FilmOn X

17  has complied in good faith with the statutory procedures set forth in Section 111(d),

18  and FilmOn X's retransmissions of broadcast programming are permissible under

19  FCC rules and regulations.

20  **1.      FilmOn X Has Made Royalty Payments And Has Otherwise
            Complied In Good Faith With Subsection (d).**

21

22          FilmOn X has taken all appropriate steps to file the necessary paperwork to

23  comply with the rules and regulations established by the Copyright Office for the

24  _____

25      [9] Notably, only a couple of years ago, the Copyright Office recognized that

26  AT&T U-Verse and Verizon FiOS – both of which use Internet protocol
    technology to deliver video content[9] – are entitled to a Section 111 license.  (SOF

27  34.)

28

Section 111 program.  Section 111(d)(1) directs that cable systems deposit their compulsory license royalty fees with the Register of Copyrights, "in accordance with requirements that the Register shall prescribe by regulation . . . ."  17 U.S.C. § 111(d)(1).  The Copyright Office has prescribed rules pertaining to "the fees for . . . services performed by the Licensing Division" (37 C.F.R. § 201.3), "the verification of a Statement of Account and royalty fees" (37 C.F.R. § 201.16), and "the deposit of Statements of Account and royalty fees."  37 C.F.R. § 201.17.

In good faith compliance with Section 111(d)(1), FilmOn X has submitted Statements of Account and made the appropriate royalty and filing payments to the Copyright Office for the time period spanning from the launch of its mini-antenna/DVR service in August 2012 to the present.  (SOF 54.)  In particular, FilmOn X has submitted Statements of Account for up to fourteen markets covering 5 different reporting periods for each city in which it operated, including Los Angeles.  (SOF 55.)  It also has supplemented and corrected these filings where it discovered errors and omissions.  (SOF 56.)  The Copyright Office has accepted these filings on a provisional basis.  (SOF 57.)  Accordingly, FilmOn X has complied in good faith with Subsection (d).

### 2. FilmOn X's Transmissions Were, And Are, "Permissible" Under FCC Rules And Regulations.

#### a. FilmOn X's Secondary Transmissions Are "Permissible" So Long As They Are Not Prohibited By The FCC.

Under Section 111(c)(1), a cable system's secondary transmissions must be "permissible under the rules, regulations, or authorizations of the Federal Communications Commission."  17 U.S.C. § 111(c)(1).  To date, the FCC has expressly rejected any regulatory oversight of the transmission of television signals over the Internet, as a matter of policy and in its adversarial decisions.  RJN, Ex. 7 (*In re Sky Angel*, 25 FCC Rcd. 3879, at ¶ 10 (Media Bur. 2010)).

1      It is well settled that where a regulatory scheme does not prohibit a particular

2   action, that action is, as a matter of logic and legal construction, "permissible" under

3   that regulatory scheme. *Ventura Broad. Co. v. FCC*, 765 F.2d 184, 194 (D.C. Cir.

4   1985) (FCC decisions which are not prohibited by statute are permissible); *see also*

5   *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 514 (9th Cir.

6   2013) (where the EPA had chosen not to regulate storm-water runoff from the

7   defendants' utility poles, that runoff was in compliance with the Clean Water Act,

8   even if it was discharged without a permit required by the EPA).

9      This issue has been addressed specifically in the context of Section 111 and

10  the question of what is "permissible" under FCC regulations.  In 1991, prior to

11  Congress' adoption of Section 119 of the Copyright Act, which enacted a

12  compulsory license scheme for satellite television providers, NBC sued Satellite

13  Broadcasting Networks for copyright infringement based on the fact that the

14  company transmitted NBC's signals through its satellite system. *Nat'l Broad. Co.,*

15  *Inc. v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467, 1468 (11th Cir. 1991),

16  *superseded on different grounds by regulation*, 37 C.F.R. § 201.17(k), as recognized

17  by *Satellite Broad. & Commc'ns Ass'n of Am. v. Oman*, 17 F.3d 344 (11th Cir.

18  2011).  In that case, the defendant asserted a compulsory license under Section 111

19  and asserted that it was in compliance with FCC regulations because the FCC had

20  chosen not to regulate satellite television transmissions. *Id.*  NBC objected, arguing

21  that, even if the FCC did not regulate satellite transmissions, the satellite

22  transmission were not "permissible" unless the FCC affirmatively approved of them

23  under its regulations. *Id.* at 1471.  The Eleventh Circuit rejected

24  the argument, noting that "[a] minor issue that remains is that § 111(c)(1) gives SBN

25  rebroadcast rights only if that rebroadcast was "permissible under the rules,

26  regulations, or authorizations" of the FCC. ***The short answer is that the rebroadcast***

27  ***was permissible because no rule or regulation forbade it.***" *Id.* (emphasis added)

28

24

1  (further stating that "to require express approval of the FCC would be to reach a

2  result from the FCC's inaction that the FCC unequivocally does not intend").

3  Because FilmOn X's secondary transmissions over the Internet did not and do not

4  violate FCC rules and regulations, those transmissions are permissible.

### b. FilmOn X Is Prepared To Comply With FCC Rules And Regulations.

6  The FCC is considering rule changes that would treat certain Internet-based

7  services as MVPDs. FilmOn X is prepared to comply with any new FCC rules and

8  regulations, as well as any orders of this Court that might impose conditions or

9  restrictions on the receipt of a Section 111 license.

10  In particular, FilmOn X has designed a more refined geolocation-based

11  system that reliably limits retransmissions of broadcast programming on a DMA-

12  basis. (*See* SOF 43.) While nothing in the text of the Copyright Act requires that a

13  cable system limit secondary transmissions of broadcast programming on a localized

14  basis, FilmOnX is prepared to limit broadcast programming retransmissions to

15  viewers located within a particular DMA. (*See Id.*) It also will limit its

16  retransmissions of broadcast programming to subscribers who paid for a monthly or

17  annual subscription plan. (*See* SOF 40-41.) Additionally, FilmOn X has already

18  designed other technical improvements to its system, which, among other things,

19  anticipate common regulatory issues such as closed captioning, encryption methods

20  and content protection. (*See* SOF 44-46.)

## VI.  CONCLUSION

22  For the foregoing reasons, this Court should grant summary judgment in

23  favor of FilmOn X on its Section 111 affirmative defense and dismiss this action

24  with prejudice. It should further declare that FilmOn X is entitled to a Section 111

25  license based on FilmOn X's counterclaim for declaratory relief.

June 18, 2015                      Respectfully submitted,

                                   By: /s/ Ryan G. Baker
                                       Ryan G. Baker
                                       BAKER MARQUART LLP
                                       10990 Wilshire Blvd., Fourth Floor
                                       Los Angeles, California 90024

                                       Attorneys for Defendants and
                                       Counterclaimants

DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION