JENNER & BLOCK LLP
Richard L. Stone (SBN 110022)
rstone@jenner.com
Julie A. Shepard (SBN 175538)
jshepard@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   213 239-5100
Facsimile:    213 239-5199

Attorneys for Plaintiffs Fox Television Stations,
Inc., Twentieth Century Fox Film Corp., and Fox
Broadcasting Company

(Additional counsel noted in signature block)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| FOX TELEVISION STATIONS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> FILMON X LLC, et al., <br><br> Defendants. | Case No.: 2:12-cv-06921-GW-JCx (consolidated) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION** <br><br> **[CONDITIONALLY FILED UNDER SEAL]** |
| NBCUNIVERSAL MEDIA, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FILMON X LLC, et al., <br><br> Defendants. | Hearing Date: July 16, 2015 <br> Time: 8:30 a.m. <br> Judge: Hon. George H. Wu <br> Courtroom: 10 |

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................1

ARGUMENT ...................................................................................................2

I.    *AEREO III* DID NOT HOLD THAT INTERNET RETRANSMISSION
      SERVICES ARE ENTITLED TO A SECTION 111 LICENSE. ......................2

II.   FILMONX'S INTERNET RETRANSMISSION SERVICE DOES NOT
      FALL WITHIN SECTION 111. ...........................................................4

      A.    The Definition Of "Cable System" Does Not Encompass  Internet
            Retransmission Services.......................................................4

      B.    Legislative And Administrative History Confirm That Internet
            Retransmission Services Are Not Entitled To A Section 111
            License. ............................................................................11

      C.    For Over Fifteen Years The Copyright Office Has Consistently
            Interpreted Section 111 As Not Encompassing Internet
            Retransmission Services Like FilmOnX.....................................12

      D.    The Copyright Office Interpretation Of Section 111 Is Entitled To
            Deference As The *ivi* Courts Correctly Held. ...........................16

      E.    FilmOnX's Service is Not "Permissible" Under FCC Regulations,
            And the FCC's Notice of Proposed Rulemaking Does Not Change
            That....................................................................................19

      F.    FilmOn Improperly Seeks Judicial Legislation Regarding
            Section 111.........................................................................22

III.  FILMONX IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
      SECTION 111 AFFIRMATIVE DEFENSE FOR ITS PAST
      INFRINGEMENTS. ...........................................................................23

CONCLUSION................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
    747 F.3d 673 (9th Cir. 2014) ........................................................................19, 20

*Am. Broad. Cos. v. Aereo. Inc.*,
    134 S. Ct. 2498 (2014)..................................................................................4, 15

*Am. Broad. Cos. v. Aereo, Inc.*,
    No. 12-1540, 2014 WL 5393867 (S.D.N.Y. Oct. 23, 2014) ...........................3, 7

*Am. Cetacean Soc'y v. Smart*,
    673 F. Supp. 1102 (D.D.C. 1987).........................................................................3

*Ashcroft v. Mattis*,
    431 U.S. 171 (1977)............................................................................................23

*Barnhart v. Walton*,
    535 U.S. 212 (2002)............................................................................................18

*Boise Cascade Corp. v. EPA*,
    942 F.2d 1427 (9th Cir. 1991) .............................................................................7

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*,
    836 F.2d 599 (D.C. Cir. 1998)......................................................................18, 19

*CBS Broad. Inc. v EchoStar Commc'ns Corp.*,
    450 F.3d 505 (11th Cir. 2006) .............................................................................7

*CBS Broad. Inc. v. FilmOn.Com, Inc.*,
    No. 10-7532, 2014 WL 3702568 (S.D.N.Y. July 24, 2014) ...............................2

*Chevron USA, Inc. v. Natural Resources Def. Council*,
    467 U.S. 837 (1984)............................................................................................18

*Christensen v. Harris*,
    529 U.S. 576 (2000)............................................................................................18

*Commissioner v. Clark*,
    489 U.S. 726 (1989)..............................................................................................9

*FDA v. Brown & Williamson*,
    529 U.S. 120 (2000)............................................................................................18

*Greenhorn Farms v. Espy*,
39 F.3d 963 (9th Cir. 1994) ...................................................................18

*Imperial Irr. Dist. v. Nev.-Cal. Elec. Corp.*,
111 F.2d 319 (9th Cir. 1940) .................................................................23

*King v. Burwell*,
No. 14-114, 2015 WL 2473448 (U.S. June 25, 2015) ...........................5, 18, 21

*N.Y. Times Co. v. Tasini*,
533 U.S. 483 (2001).................................................................................9

*Nat'l Broad. Co. Inc. v. Satellite Broad. Networks, Inc.*,
940 F.2d 1467 (11th Cir. 1991) .........................................................12, 21

*Pac. & S. Co. v. Satellite Broad. Networks, Inc.*,
694 F. Supp. 1565 (N.D. Ga. 1988).......................................................21

*Rangel v. United States*,
155 F. Supp. 2d 949 (N.D. Ill. 2001).......................................................3

*Satellite Broad. & Commc'n Ass'n of Am. v. Oman*,
17 F.3d 344 (11th Cir. 1994) ...........................................................12, 18, 21

*Tasini v. N.Y. Times, Inc.*,
206 F.3d 161 (2d Cir. 2000) ...................................................................9

*United States v. Mead Corp.*,
533 U.S. 218 (2001).................................................................................18

*WGN Continental Broadcasting Co. v. United Video, Inc.*,
693 F.2d 622 (7th Cir. 1982) ...................................................................9

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275 (2d Cir. 2012) ...........................................................passim

*WPIX, Inc. v. ivi, Inc.*,
765 F. Supp. 2d 594 (S.D.N.Y. 2011) ................................................5, 11

*WTGD 105.1 FM v. SoundExchange, Inc.*,
No. 14-15, 2015 WL 631255 (W.D. Va. Feb. 13, 2015)...................23

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) .................................................................10

- 3 -

**STATUTES**

17 U.S.C. § 101 .................................................................................... 8, 9

17 U.S.C. § 111 ..................................................................................passim

17 U.S.C. § 119 ............................................................................ 7, 12, 13

17 U.S.C. § 122 .......................................................................................... 7

47 U.S.C. § 522 ........................................................................................ 22

Satellite Home Viewer Extension and Reauthorization Act § 109 Report (2008)..19

Satellite Television Extension and Localism Act, § 302 Report (2011) ................ 19

**OTHER AUTHORITIES**

51 Fed. Reg. 36705 .................................................................................. 19

53 Fed. Reg. 17962 .................................................................................. 19

57 Fed. Reg. 3284 .............................................................................. 14, 21

62 Fed. Reg. 18705 .................................................................................... 5

H.R. Rep. No. 108-660 (2004) ............................................................. 12, 21

H.R. Rep. No. 94-1476 (1976) ................................................................... 21

H.R. Rep. No. 94-1476 (1976) ..................................................................... 9

S. Rep. No. 103-407 (1994) ....................................................................... 17

S. Rep. No. 106-42 (1999) ......................................................................... 13

## **INTRODUCTION**

In FilmOnX's Opening Brief, it argues that the "plain statutory language" of Section 111 is "completely indifferent as to the mode of retransmission technology" and, thus, anyone with a computer, an Internet connection and a TV antenna can qualify as a "cable system" entitled to a compulsory license. The Copyright Office, courts and Congress have squarely rejected that view. They have concluded that Internet services — like satellite services — are not eligible for a Section 111 license but must instead petition Congress to determine if they should be afforded their own narrowly-tailored compulsory license. *See* Dkt. No. 162-1 (Plaintiffs' Memo ISO Partial Summary Judgment) at 9-19. Nothing in FilmOnX's Memorandum provides a proper basis for reaching a different conclusion.

The nearly forty-year history of Section 111 detailed in Plaintiffs' Opening Brief contradicts FilmOnX's position. Had Congress determined that the public interest would be served by having anyone and everyone retransmit broadcast programming, it could easily have written Section 111 to accomplish that result. According to FilmOnX, every individual with a computer and Internet access would be able to avail themselves of compulsory licensing. But Congress never intended such a result when it adopted the Section 111 license in 1976. As discussed below and in Plaintiffs' Opening Brief, Congress accorded compulsory licensing to a recognized and localized cable industry that developed and controlled (at great cost) its own infrastructure — and that, in Congress' view, would not have been able to provide diverse programming to the communities they were franchised to serve absent a compulsory license. The language and legislative history of Section 111, the pronouncements of the Register of Copyrights (the government official entrusted by Congress with administering the Section 111 license), sound policy considerations and common sense make clear that Internet retransmission services like FilmOnX's are not the "cable systems" for which Congress created the Section 111 license.

In apparent recognition that it has no unfettered right to a Section 111 compulsory license, FilmOnX offers in the alternative to craft a future system in accordance with whatever technical requirements this Court selects, such as requiring FilmOnX to retransmit broadcast signals only within their local DMAs, to add closed captioning, to remove FilmOnX's logo, and to implement limited security measures FilmOnX deems appropriate.  Dkt. No. 165 at 25:6-20.  FilmOnX misses the point.  No Internet service qualifies for the Section 111 license, regardless of the restrictions imposed on its offerings.  In any event, the proper role of this Court is to determine whether an actual system comes within the scope of Section 111, and not to provide FilmOnX with an advisory ruling on how it might devise a new system to comply with Section 111.

FilmOnX's systems — past and future — do not fall within the Section 111 license.  Plaintiffs respectfully request that the Court deny FilmOnX's motion and instead grant Plaintiffs' motion for partial summary judgment on FilmOnX's Section 111 affirmative defense and counterclaim.

## ARGUMENT

I.    ***AEREO III* DID NOT HOLD THAT INTERNET RETRANSMISSION SERVICES ARE ENTITLED TO A SECTION 111 LICENSE.**

In its Opening Brief, FilmOn X argued that *Aereo III* somehow supports FilmOnX's claim that it is entitled to a Section 111 license and that *Aereo III* "effectively abrogate[d]" *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013) ("*ivi II*").  Dkt. No. 165 at 15-20.  It does neither.

First, *Aereo III* did not even mention, let alone overrule, *ivi II*.  Indeed, Judges Buchwald and Nathan in the Southern District of New York reached that very conclusion last year when confronted with the same argument about *Aereo III* abrogating *ivi II*.  *See CBS Broad. Inc. v. FilmOn.Com, Inc.*, No. 10-7532, 2014 WL 3702568, at *4 (S.D.N.Y. July 24, 2014) (Buchwald, J.), *appeal docketed*, No. 14-

2

3123 (2d Cir. Aug. 26, 2014); *Am. Broad. Cos. v. Aereo, Inc.*, No. 12-1540, 2014 WL 5393867, at *3-6 (S.D.N.Y. Oct. 23, 2014) (Nathan, J.) ("*Aereo IV*").

Second, *Aereo III* did not hold that Internet retransmission services are entitled to a Section 111 license. *See* Dkt No. 162-1 (Plaintiffs' Memo ISO Partial Summary Judgment), at 7-9. As Judge Nathan found when Aereo made the same argument as FilmOnX, "while all cable systems may perform publicly, not all entities that perform publicly are necessarily cable systems, and nothing in the Supreme Court's opinion indicates otherwise." *Aereo IV,* 2014 WL 5393867, at *4. It does not follow "that simply because an entity performs copyrighted works in a way similar to cable systems it must be deemed a cable system for all other purposes of the Copyright Act. The Supreme Court's opinion in *Aereo III* avoided any such holding." *Id.* at *3.

FilmOnX's reliance upon isolated remarks of individual Justices during the *Aereo III* oral argument to suggest otherwise is misplaced. It is axiomatic that "the Justices' questions and commentary at oral argument have no legal effect." *Aereo IV*, 2014 WL 5393867, at *4. *See also Rangel v. United States*, 155 F. Supp. 2d 949, 954 (N.D. Ill. 2001) (the "questions and statements that justices and other judges make at oral argument . . . do not represent binding statements of law. . . . The law is in the holdings of the published opinions voted on by the Court in the cases"); *Am. Cetacean Soc'y v. Smart*, 673 F. Supp. 1102, 1104 (D.D.C. 1987) ("[I]t is clear that plaintiffs have misread the Supreme Court's decision and have placed undue emphasis on particular questions asked by several of the Justices during oral argument.")

If anything, the Justices' statements during the *Aereo* oral argument "cut against" FilmOnX's position because they indicate that the Justices were fully aware of Section 111 but chose not to address it in the Court's opinion. *Aereo IV*, 2014 WL 5393867, at *4. "This awareness at oral argument coupled with silence in the opinion could just as easily imply that the Court did not conclude that the defense was applicable on the facts here." *Id.* Indeed, the Court's opinion in *Aereo III* expressly

3

states that Aereo's retransmissions "infringe" the program owner's exclusive right of public performance.  134 S. Ct. at 2503.  That statement cannot be reconciled with FilmOnX's contention that the Supreme Court considered Internet retransmissions as non-infringing because they are licensed under Section 111(c).

## II.   FILMONX'S INTERNET RETRANSMISSION SERVICE DOES NOT FALL WITHIN SECTION 111.

### A.   The Definition Of "Cable System" Does Not Encompass  Internet Retransmission Services.

FilmOnX asserts that based on the "plain statutory language" its Internet retransmission service meets each element of the definition of "cable system" in Section 111(f)(3). Dkt. No. 165 at 13:19-20.

As Section 111(f)(3) does not mention Internet retransmission services, FilmOnX resorts to claiming that the definition of cable system is "technology agnostic" and an "open ended" definition that is "completely indifferent to the mode of retransmission technology."  Dkt. No. 165 at 3:3-11, 14:3-8.  The language of statute, as well as legislative history, proves otherwise.

*First*, FilmOnX's "plain language" interpretation of Section 111(f)(3) is based on a deliberately truncated quotation of the definition of cable system in its brief. Section 111(f)(3) states:

> A "cable system" is a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service.  *For purposes of determining the royalty fee under subsection (d)(l), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.*

17 U.S.C. § 111(f)(3).  FilmOnX omitted the italicized language from its brief.

The Supreme Court recently explained that, "when deciding whether the language is plain, we must read the words 'in their context and with a view to their

place in the overall statutory scheme.'  Our duty, after all, is 'to construe quotations and statutes, not isolated provisions.'"  *King v. Burwell*, No. 14-114, 2015 WL 2473448, at *8 (U.S. June 25, 2015)  (internal citations omitted).  The Court further noted that "often-times the 'meaning — or ambiguity — of certain words or phrases may only become evident when placed in context.'"  *Id.* at *8 (internal citations omitted).  As the Second Circuit concluded in *ivi II*, the same is true here:  The meaning of "cable system" is only evident when placed in context of the overall statutory scheme.  *ivi II*, 691 F.3d at 283-84.  And that meaning is not "technology agnostic" as FilmOnX claims.

The Register of Copyrights relied on the statutory language omitted by FilmOnX to support the conclusion that Section 111 traditional cable systems are "inherently localized transmission media of limited availability."  Copyright Office, Cable Compulsory Licenses; Definition of Cable Systems, 62 Fed. Reg. 18705, 18707 (Apr. 17, 1997) (citing 1991 Rulemaking, 56 Fed. Reg. at 31594); *see WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 609 (S.D.N.Y. 2011) (Buchwald, J.) ("*ivi I*"); *ivi II*, 691 F.3d at 284.  As the Register explained, terms such as "head end" and "contiguous communities" in Section 111(f) simply have no relevance to entities that provide service nationwide.  *See* 57 Fed. Reg. at 3290 ("[S]ection 111 is clearly directed at localized transmission services.  The second part of the section 111(f) definition of a cable system refers to 'headends' and 'contiguous communities,' two concepts which do not have any application to a nationwide retransmission service such as satellite carriers"); *id.* (discussing definition of "distant signal equivalent" in Section 111(f) which also has no application to a nationwide service).  This conclusion is further supported by the reference to "any State, territory, trust territory or possession" in the first sentence of the definition.

FilmOnX does not meet that definition as the Internet — just like satellite — is not an "inherently localized transmission media of limited availability."  An Internet retransmission service like FilmOnX's is national — even international — in scope as

content placed upon the Internet can be distributed worldwide. *See ivi II*, 691 F.3d at 282, 285.  Indeed, as noted in Plaintiffs' Opening Brief,

█████████████████████████████████

████████████████████ Statement of Genuine Disputes ("SGD")

43. █████████████████████████

███████████████████████ *Id.*[1] ████████

███████████████████████████████████

███████████████████████████████ *Id.*

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████ *Id.*  Further, while FilmOnX claims it can restrict its broadcast retransmissions to a local geographic areas, FilmOnX indicates it will only do so if required by this court or the Federal Communications Commission ("FCC") 19 months from now. Dkt. No. 165 at 25:6-15.

The fallacy of FilmOnX's argument that the definition of "cable system" is technology agnostic is further demonstrated by legislative history. If FilmOnX were correct that Section 111 is indifferent to the retransmission technology used, then satellite retransmission would fall within Section 111.  It does not.  Congress enacted separate compulsory licenses for satellite carriers, with terms and conditions significantly different from those in Section 111. *See* 17 U.S.C. §§ 119 (involving retransmission of out-of-market (or "distant") signals) & 122 (involving retransmission of in-market (or "local") signals).  These statutory amendments



confirm that not all entities that retransmit are entitled to the Section 111 license.  *See Aereo IV,* 2014 WL 5393867, at *6.[2]

*Second*, a "cable system" is defined, in part, as making "secondary transmissions of such signals or programs **by cable, wires, microwaves or other communications channels**."[3]   17 U.S.C. § 111(f)(3) (emphasis added).   If Section 111 were technology agnostic or indifferent to the mode of retransmission technology as FilmOnX claims, then Congress would not have included "by cable, wires, or other communications channels" in the definition of cable system enacted in 1976 nor would it have added only "microwaves" to the definition when it amended the statute in 1994.  FilmOnX's proffered reading of Section 111(f)(3) violates the fundamental tenet of statutory construction to make "every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."  *See, e.g., Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991).   Specifically, FilmOnX's reading would render meaningless and superfluous "by cable, microwaves, wires, or other communications channels." The complete definition in Section 111(f)(3) makes it clear that a "cable system" must use a "communication channel."   But the Internet is not a communications channel, (Supp. Jones Decl. ¶ 4), ████████████████ *See generally* Meldal Decl. ███████████████ ███████████████████████████████ ███████████        FilmOnX is therefore incorrect when it states otherwise in

---

[2]   In enacting the Section 119 license, Congress took account of the nationwide scope of the satellite industry by including provisions designed to protect the exclusivity of local network affiliates by limiting the importation of duplicating network programming from distant markets.  *See* 17 USC § 119(a)(2)(B); *CBS Broad. Inc. v EchoStar Commc'ns Corp.,* 450 F.3d 505 (11th Cir. 2006).  Although FilmOnX's service is also situated to distribute on a nationwide basis, the Section 111 license to which it claims entitlement includes no such protections for the exclusivity rights of local television stations, and FilmOnX asserts it is currently exempt from any FCC rules which would provide those protections.
[3]   Section 111 defines "secondary transmission" as "the further transmitting of a primary transmission simultaneous with the primary transmission[.]"   17 U.S.C. § 111(f)(2).

its Opening Brief.  (Dkt. No. 165 at 20:5-11).  FilmOnX goes even farther afield when it suggests that it can meet the definition of cable system because the "physical layer" of the Internet — *i.e.*, a global network of millions of interconnected computers  and servers — contains within that global network wires, cable, or microwaves.  *See* Dkt. No. 165 at 14:22-15:3.  The physical layer (*i.e.*, physical medium) of satellite TV providers also includes cable, wire, and microwave.  Supp. Jones Decl. ¶ 6.  Nevertheless satellite providers are not entitled to a Section 111 license.  *See* supra at 6.

*Third*, FilmOnX suggests that it is "inconsistent" for the phrase "to transmit" in Section 101 of the Copyright Act to be read in a broad, technology neutral manner while construing the term "cable system" in Section 111 in a technologically specific manner.  Dkt. No. 165 at 3:3-11.[4]  Congress, however, defined "to transmit" as including all transmissions by "any device or process."  17 U.S.C. § 101.  By contrast, the Section 111 license is limited to "cable systems" — not any retransmission system — and further includes the limiting language "by wires, cables, microwave, or other communications channels."

Moreover, it is consistent with Congress' intent when enacting the Copyright Act of 1976 to protect copyright holders' public-performance rights to provide a broad definition of "to transmit" in Section 101 while Congress kept narrow the Section 111 compulsory license derogating some of those rights.  Indeed, as noted in Plaintiffs' Opening Brief, the legislative history of the 1976 Act explains that the "approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow."  H.R. Rep. No. 94-1476 at 61 (1976).  *See also* Dkt. No. 162-1 at 16 n.4. *See also Tasini v. N.Y. Times, Inc.,* 206 F.3d 161, 168 (2d Cir. 2000) ("when a statute sets forth exceptions to a general rule, we generally construe the exceptions 'narrowly in order to preserve the primary operation of the

---

[4] Unless otherwise stated, all "Section" references are to the Copyright Act.

8

[provision]'") (quoting *Commissioner v. Clark,* 489 U.S. 726, 739 (1989)), *aff'd on other grounds, N.Y. Times Co. v. Tasini,* 533 U.S. 483 (2001).

*WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622 (7th Cir. 1982), which FilmOnX cites, does not support its position that Section 111 should be read in a broad, technology neutral manner. First, *WGN* does not even concern the cable compulsory license in Section 111(c)(1); instead, it addresses the defendant's eligibility for the "passive carrier" exemption set forth in Section 111(a)(3). Second, *WGN* supports the proposition set forth above — that under the Copyright Act, the rights of copyright holders are to be read expansively, while limitations on those rights are construed narrowly. The *WGN* court considered whether WGN's copyright in its television programs included the teletext in the vertical blanking interval. The court concluded it did and found defendant infringed by altering the vertical blanking interval. In doing so, the court analyzed what it called the "broad definition" of "audio visual work" in Section 101 and noted that "there is a sense the Act is 'pro' copyright holder" even though the Act also includes certain provisions that limit those rights. *Id*. at 627. Further, the language of the opinion immediately following the section quoted by FilmOnX shows that the *WGN* court found it appropriate to expansively interpret the rights of copyright holders, not exceptions to those rights. *Id*. at 628.

*Fourth*, FilmOnX argues that it can satisfy the statutory requirement that it operate from a "facility" which is "located in any State." FilmOnX claims it operates "physical facilities" in multiple states because it rents space, puts up one or more antennas and servers, and sets up an Internet-connected computer.[5] That construct



ignores that FilmOnX cannot make secondary transmissions to any subscribers without doing so over the Internet.  The "facility" at issue is not simply FilmOnX's antenna and streaming server placed in rented space but also the millions of computers that make up the Internet itself.  It is that network of computers — which are located throughout the world and not just in "any State, trust, territory or possession" and which are not under FilmOnX's control — that completes the "secondary transmissions" to "subscribing members of the public."   Accordingly, FilmOnX does not have a "facility" under Section 111(f)(3).[6]

FilmOnX also suggests that it is factually distinguishable from ivi, claiming that it has "physical facilities" while ivi did not.  In truth, the system created by ivi bears a marked resemblance to FilmOnX's system — past and future.  As described by the district court in *ivi I*, ivi "capture[d] over-the-air broadcasts of plaintiffs' programming and simultaneously, without plaintiffs' consent, stream[ed] those broadcast signals over the Internet to subscribers . . ." 765 F. Supp. 2d at 598.  This similarity is not an accident — FilmOn was started as a copycat service mimicking that of ivi.  Dkt. No. 162-3, Ex. B at 28 (FilmOn brief from the New York litigation describing ivi as "a similar Internet based network television program viewing service as FilmOn").  Indeed, in arguing Section 111 in response to Plaintiffs' TRO Application, FilmOn simply incorporated by reference the arguments made in the

------

[6] FilmOnX also contends that the *ivi II* court made a mistake because it did not consider the Internet as a communication channel (which it is not) but rather considered whether the Internet was a facility in any State, territory or possession as required by the definition of "cable system."  *See* Dkt. No. 165 at 20:5-11.  *ivi II* made the correct inquiry.  As used in the statute, a "facility" is the system that receives and retransmits broadcast signals.  For an Internet based system, those facilities include the entire network of computers that make up the Internet which are necessary for FilmOnX's retransmissions to take place.  Thus, *ivi II*'s focus on the question of whether the Internet is a "facility" "located in any State" was correct.

companion *ivi* case.  *Id*.  Based on FilmOn's own conduct, the *ivi* courts' holdings with respect to ivi should apply equally to its copycat service.

In sum, FilmOnX's service does not come within the definition of "cable system" set forth in Section 111(f)(3).  At best, FilmOnX can assert is that Section 111 is ambiguous, which then necessitates the Court's consideration of the Copyright Office's interpretation of Section 111 as well as the statute's legislative history and Congress' intent — all of which demonstrate that FilmOnX is not entitled to a Section 111 license.  *See, e.g., ivi II*, 691 F.3d at 280-84; *ivi I*, 765 F. Supp. 2d at 602–17.

**B.** **Legislative And Administrative History Confirm That Internet Retransmission Services Are Not Entitled To A Section 111 License.**

In FilmOnX's Opening Brief, it cherry picks a couple of snippets of the legislative record that it takes out of context to argue that the legislative history of Section 111 "confirms" it is technology agnostic and applies to new delivery systems like Internet retransmission services.  Dkt. No. 165 at 17-18.  The nearly forty-year history of Section 111 detailed in Plaintiffs' Opening Brief contradicts FilmOnX's position.  *See* Dkt. No. 162-1 at 9-14.

As discussed in detail in Plaintiffs' Opening Brief, Congress could have written Section 111 to include anyone and everyone who retransmits broadcast programming. But Congress did not do so.  It accorded the compulsory license to the industry that it knew and adopted a simple definition of cable system tailored to that industry.  As the Register of Copyrights has repeatedly and correctly observed,

> Congress did not intend to extend the cable compulsory license to every video delivery system capable of retransmitting broadcast signals to subscribers.  The cable compulsory license was the subject of intensive debate and controversy from 1966 to 1976.  Nothing in the legislative history suggests that Congress intended an open-ended definition of the entities qualifying for the license.

56 Fed. Reg. at 31592; *see also* 56 Fed. Reg. at 31590 (Section 111 "should not be given a wide-scale interpretation which could, or will, encompass any and all new

---

11

forms of retransmission technology. An overbroad interpretation exceeds the intent of Congress in creating the compulsory license as a response to a specific legislative policy issue").

Since enacting Section 111, Congress has made clear that it, and not the courts, should delineate the terms on which to accord compulsory licensing to new retransmission technologies. For example, Congress did not allow the Eleventh Circuit's 1991 decision holding that a satellite carrier was a cable system covered by Section 111 to stand. To the contrary, instead of incorporating satellite television under Section 111 in response to the Eleventh Circuit's decision, Congress codified a separate statutory license for satellite carriers as set forth in section 119 of the Copyright Act. *ivi II*, 691 F.3d at 281 (citing *Nat'l Broad. Co. Inc. v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467, 1471 (11th Cir. 1991), *superseded by statute*, 17 U.S.C. § 119, *as recognized in Satellite Broad. & Commc'n Ass'n of Am. v. Oman*, 17 F.3d 344, 348 n.9 (11th Cir. 1994) ("*Oman*")).[7]

Accordingly, legislative history demonstrates Internet retransmission services are not entitled to a Section 111 license.

### C. For Over Fifteen Years The Copyright Office Has Consistently Interpreted Section 111 As Not Encompassing Internet Retransmission Services Like FilmOnX.

FilmOnX suggests that the Copyright Office has not taken a position on whether FilmOnX is entitled to a Section 111 license and that the Office's position is somehow in flux. *See* Dkt. No. 165 at 21-22. To the contrary, the Copyright Office's response to FilmOnX's filings has been unequivocal: In the Copyright Office's view,

---

[7] *See, also* H.R. Rep. No. 108-660 at 8-9 (2004) ("In enacting each [compulsory] license, Congress has traditionally considered the unique historical, technological, and regulatory circumstances that affect each industry. Among other differences, the local character of cable systems and the national business model of DBS [Direct Broadcast Satellite] have resulted in differential public service, carriage, and taxation obligations that ought to be objectively reviewed before Congress enacts sweeping changes."); S. Rep. No. 106-42 at 10 (1999).

---

Internet retransmission services do not fall within Section 111.  Dkt. No. 162-3, Ex. A.  The Office's acknowledgement of the pendency of this proceeding does not change the Office's position on the matter.  *Id.*

As detailed in Plaintiffs' Opening Brief, Dkt. No. 162-1 at 9-14, the Copyright Office's position that Internet retransmission services do not qualify for Section 111 is long-held and has never wavered.  The Register of Copyrights testified before Congress, unequivocally, that the streaming of broadcast programming to subscribers over the Internet, like FilmOnX's service, does *not* qualify for the cable compulsory license:

> [T]he cable compulsory license could not reasonably be interpreted to include Internet retransmissions . . . . I believe that the section 111 license does not and should not apply to Internet transmissions . . . . [I]f there is to be a compulsory license covering such retransmissions, it will have to come from newly enacted legislation and not existing law.

Dkt. 162-4, Ex. 2 (Statement of Marybeth Peters, Register of Copyrights Before the House Subcommittee on Courts and Intellectual Property, 106th Congress, 2d Sess., at 9 (June 15, 2000) ("2000 Hearings").

Consistent with that testimony before Congress, in 2008 the Copyright Office issued the Satellite Home Viewer Extension and Reauthorization Act Report ("SHVERA Report") after receiving comments in response to its formal Notice of Inquiry seeking comment, on among other issues, "on whether the current licensing schemes should be expanded to include the delivery of broadcast programming over the Internet.'"  *ivi I*, 765 F. Supp. 2d at 611.  That report makes clear the Copyright Office's interpretation regarding Internet retransmission services remains the same:

> The Office continues to oppose an Internet statutory license that would permit any website on the Internet to retransmit television programming without the consent of the copyright owner.  Such a measure, if enacted, would effectively wrest control away from program producers who make significant investments in content and who power the creative engine in the U.S. economy.  In addition, a government-mandated Internet license would likely undercut private negotiations leaving content owners with relatively little bargaining power in the distribution of broadcast programming.  Further, there is no proof that the Internet video market is failing to thrive and is in need of government assistance through a licensing system.  In fact, the lack of a statutory license provides an incentive for parties to find

13

new ways to bring broadcast programming to the marketplace and that market, by all accounts, continues to grow.

Dkt. No. 164-4, Ex. 4 (SHVERA Report at 188).

In 2014, in response to FilmOnX's  Statement of Account filings, the Office again stated its unequivocal view that, like all other Internet retransmission services, FilmOnX falls outside the Section 111 license:

> We understand FilmOn to be an internet-based service that retransmits broadcast television programming.  In the view of the Copyright Office, such a service falls outside the scope of the Section 111 license.  Significantly, in *WPIX, Inc v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), the Second Circuit deferred to and agreed with the Office's interpretation of Section 111.  As explained in that case, Section 111 is meant to encompass "localized retransmission services" that are "regulated as cable systems by the FCC."  *Id.* at 284 (quoting 57 Fed. Reg. 3284, 3292 (Jan. 29, 1992)).  We do not see anything in the Supreme Court's recent decision in *American Broadcasting Cos. v. Aereo. Inc.*, 134 S. Ct. 2498 (2014), that would alter this conclusion.
> . . .
> For the reasons discussed above, the Office does not believe FilmOn qualifies for the Section 111 statutory license, and will not process FilmOn's filings at this time.  In recognition that the question of eligibility of internet-based retransmission services for the Section 111 license appears to have been raised again before the courts, however, the Office will not refuse FilmOn's filings but will instead accept them on a provisional basis.

Dkt. No. 164-4, Ex. 1 (footnotes omitted).

In FilmOnX's Opening Brief, FilmOnX ignores the Register's testimony, reports and statements in the letter quoted above and tries to create the impression that retransmission services like it have been afforded Section 111 license.  FilmOnX does so by directing the Court to inapplicable pages from the SHVERA Report concerning services like ATT U-verse (Dkt. No. 167 at 20-21) that do not transmit over the Internet like FilmOnX, but rather transmit over their own managed network.  FilmOnX RJN, Ex. 6 ("Watching U-verse TV is different than streaming videos over the public Internet.  With U-verse, programming is carried over our managed network.")  FilmOnX has no control over its transmissions over the Internet.  SGD 34.  This is a key distinction as FilmOnX knows.  *See* Dkt. No. 164-4, Ex. 4 (SHVERA Report at 181-89, 194-200).

14

FilmOnX also ignores the distinction between the "Internet," on the one hand, and use of "Internet Protocol" ("IP") to deliver video programming ("IPTV"), on the other hand.   *See* SGD 34.   The Internet is a global system of millions of interconnected private, public, academic, business and government computer networks, to which content providers and end-users connect using their own respective Internet Service Providers ("ISP.").   *ivi II*, 691 F.3d at 280; Supp. Jones Decl. ¶ 4.   IPTV is a term for a transmission protocol or format in which video is delivered in digital "packets" that include an IP address header.   Despite the inclusion of the word "Internet" in the term and consistent with FilmOnX's own examples, IPTV-formatted video is typically delivered through a closed, "end-to-end" system in which the distributor owns and/or controls the wires and routers in the entire delivery network at every point.   *See* Dkt. No. 169 (FilmOnX RJN, Ex. C) and Ex. B (NPRM); Supp. Jones Decl. ¶¶ 3-4; Dkt. No. 164-4, Ex. 4 (SHVERA Report at 181-89, 194-200).   Unlike FilmOnX, these services that deliver IPTV-formatted video do not relinquish control over the content and distribution path to the worldwide interconnected networks that form the Internet.   This is clear from the documents that FilmOnX submitted to the Court.   *See, e.g.*, Dkt. No. 169 (FilmOnX RJN, Ex. B (NPRM), at 2 n.2, 32 ¶ 32 & n.19 (drawing a distinction between companies transmitting video content over the Internet and companies providing video content over their own managed facilities using IP delivery within the companies' footprint); *id.*, Ex. C (drawing a distinction between AT&T U-verse's managed network and the Internet); *see also ivi I*, 765 F. Supp. 2d at 612 n.24 ("Using 'Internet Protocol' to deliver video programming (commonly referred to as 'IPTV') is distinct from using the Internet.").   The Register recognized these important distinctions in determining Section 111 eligibility.   *See* Dkt. No. 164-4, Ex. 4 (SHVERA Report at 181-89, 194-200).   The Register concluded that the retransmission of programming using IP technology is a new and competitive technology that does not in and of itself make a service ineligible for the Section 111 license.   *See id.* (SHVERA Report at xi-xii &

194-200).   However, a service such as FilmOnX's that chooses to stream programming over the Internet (regardless of whether it uses IPTV or some other format) is not eligible for the Section 111 license.  *See id.* at xii & 181-89.  As the Register explained, use of IPTV as a new distribution technology does not raise any issues that would have concerned Congress in enacting Section 111.  But the use of the Internet to distribute programming is quite different because, as the Register noted, the Internet is wholly unregulated, poses serious questions about signal security, reflects none of the market failures that justified the original Section 111 compulsory license and is the subject of separate international treaty obligations which prohibit retransmissions of broadcast programming over the Internet.  *See id.*

Accordingly, the Copyright Office has consistently found that Internet retransmission services like FilmOnX's fall outside the Section 111 license.

### D.   The Copyright Office Interpretation Of Section 111 Is Entitled To Deference As The *ivi* Courts Correctly Held.

FilmOnX suggests that the Copyright Office's interpretation of Section 111 should not be accorded deference and that *ivi II* should not be considered persuasive because the *ivi II* court afforded undue deference to the Office's interpretation.  Dkt. No. 165 at 20-22.  FilmOnX is wrong.

The Register has expressed the consistent view – for over fifteen years – in testimony and reports to Congress rendered after a period for comment that Internet services such as FilmOnX's are not and should not be eligible for the Section 111 compulsory license.  During that period, Congress has amended the Copyright Act (including Section 111) on several occasions, without expressing any disagreement with the Register's view.  *See* Dkt. No. 162-1 at 12-13.  Tellingly, Congress has taken no action in response to the Register's longstanding interpretation that Internet retransmission services are not entitled to the Section 111 license.  That contrasts directly with Congress's decision to add microwaves to the definition of cable systems in 1994, which shows that Congress will act where it believes the definition

of cable system needs to be expanded in response to the Register's interpretation or otherwise.[8]   And when amending Section 111 to include microwaves, Congress targeted its amendment to microwaves and did not to amend the statute to provide that all retransmission services are entitled to a Section 111 license.  As Congress has acquiesced to the Register's interpretation that Internet retransmission services fall outside Section 111, it is entitled to deference.  *See, e.g., Greenhorn Farms v. Espy*, 39 F.3d 963, 965 (9th Cir. 1994); *see also* Dkt. No. 162-1 at 13.

Deference to the Office's interpretation is also warranted under *Chevron USA, Inc. v. Natural Resources Def. Council*, 467 U.S. 837 (1984) ("*Chevron*").   As explained by the Supreme Court: "When analyzing an agency's interpretation of a statute, we often apply the two-step framework announced in *Chevron*, 467 U.S. 837. Under that framework, we ask whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable.  *Id.* at 842-43.  This approach 'is premised on the theory that a statute's ambiguity constitutes an explicit delegation from Congress to the agency to fill in the statutory gaps.'" *King*,  2015 WL 2473448, at *8 (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 159 (2000)).

Relying on *Christensen v. Harris*, 529 U.S. 576 (2000), FilmOnX claims that *Chevron* deference is inappropriate because the Office has not "issued any rule or regulation after a formal notice and comment period," Dkt. No. 165 at 20:25-27, even though three separate circuits have held that the Office's interpretation of Section 111 warrant such deference.   *ivi II,* 691 F.3d at 284; *Oman,* 17 F.3d at 347-48; *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 608 (D.C. Cir. 1998).   However, in *Barnhart v. Walton*, 535 U.S. 212 (2002), the Supreme Court held that the fact that an agency previously reached its interpretation

---

[8]   FilmOnX suggests that Congress amended Section 111 to add microwaves to correct a misinterpretation of the statute by the Office.  Dkt No. 165 at 17-18.  But legislative history that FilmOnX put in the record indicates otherwise by describing the amendments to Section 111 as "designed to broaden the scope of that license and adapt it to the realities of the current marketplace."  Dkt. No. 169-2, Ex. J at 264, 269 (S. Rep. No. 103-407 (1994)).

through means less formal than "notice and comment" rulemaking does not deprive that interpretation of the judicial deference otherwise its due. *Id.* at 221-22. The *Barnhart* court expressly rejected the very proposition advanced by FilmOnX here — that *Christensen* creates an absolute bar to *Chevron* deference in the absence of formal rulemaking. *Id.* at 222 ("If this Court's opinion in [*Christensen*] suggested an absolute rule to the contrary, our later opinion in [*United States v. Mead Corp.*] denied the suggestion."); *see also United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001) ("[A]s significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons to afford *Chevron* deference even when no such administrative formality was required and none was afforded.")

With respect to Section 111, the Copyright Office has developed and set forth its interpretation regarding Internet retransmission services in a much more involved and formal process than in opinion letters and internal agency manuals which are excluded from Chevron deference (although still eligible for *Skidmore* deference). *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 684-85 (9th Cir. 2014). Congress repeatedly has requested the Office to submit reports and to testify concerning the implementation of Section 111. *E.g.*, Satellite Television Extension and Localism Act, § 302 Report (2011); Satellite Home Viewer Extension and Reauthorization Act Section 109 Report (2008); 2000 Hearings; A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals (1997). The Office has also engaged in notice-and-comment processes concerning the scope of Section 111 and its applicability to different types of services, including the Internet. *See, e.g.*, *ivi I*, 765 F. Supp. 2d at 606-09 (citing 51 Fed. Reg. 36705 (Oct. 15, 1986); 53 Fed. Reg. 17962 (May 19, 1988)). Even though the Office did not issue a formal regulation on the precise issue before the Court, its conclusions at the end of that process make clear the Copyright Office's position that only localized services of inherently limited availability are eligible for a Section 111 license. *See*

18

*ivi I*, 765 F. Supp. 2d at 605 n.11.  Moreover, the Office — the agency charged with administering Section 111 for over forty years — has significant expertise in this technical area of law.  *See Cablevision v. MPAA*, 836 F.2d at 608-09; *ivi II*, 691 F.3d at 283.  Given this, it is appropriate to afford *Chevron* deference to the Office's reasonable interpretation that Internet retransmission services fall outside Section 111.

Even if *Chevron* deference were not applied, *Skidmore* deference to the Office's interpretation would be warranted.  *See Alaska Stock*, 747 F.3d at 685 n.52 (noting that it did not need to decide whether *Chevron* deference applied as "we conclude that the Copyright Office's position is persuasive under the less stringent *Skidmore* deference").  As evidenced by the Office's reports and testimony cited above and as detailed in *ivi I*,[9] the Office has exercised care in thoroughly analyzing the issues and taking and responding to comment, has consistently interpreted Section 111 for over 15 years, has rendered its interpretation in formal testimony and reports to Congress, and possesses acknowledged expertise in this technical area of the law as the agency administering Section 111.  765 F. Supp. 2d at 605-16.  And, most importantly, the Office's interpretation is persuasive.  *Id.*

For these reasons, the Court should afford deference to the Office's interpretation that Internet retransmission services like FilmOnX's fall outside the Section 111 license.

**E.     FilmOnX's Service is Not "Permissible" Under FCC Regulations, And the FCC's Notice of Proposed Rulemaking Does Not Change That.**

A cable operator is entitled to rely on the Section 111 license for the retransmission of broadcast signals only where, among other things, "the carriage of signals comprising the secondary transmission is permissible under the rules,

_____

[9] The *ivi I* court ultimately applied *Skidmore* deference in its Section 111 analysis.  *ivi I*, 765 F. Supp. 2d at 605 ("The interpretations of the Copyright Office merit substantial weight when the *Skidmore* factors are applied.").

regulations, or authorizations" of the FCC.[10]   FilmOnX argues that its Internet retransmissions are "permissible" under FCC regulations because the FCC does not currently have any regulations on the books with respect to the Internet-based retransmission of broadcast signals.  The Section 111 license cannot, by definition, apply to such retransmissions because, as the Copyright Office and courts have made clear, "the compulsory license applies only to localized retransmission services *regulated* as cable systems by the FCC."  *ivi II*, 691 F.3d at 284 (emphasis added) (quoting 57 Fed. Reg. at 3292); s*ee also Pac. & S. Co. v. Satellite Broad. Networks, Inc.*, 694 F. Supp. 1565, 1571 (N.D. Ga. 1988) (plain meaning of "permissible" is that carriage must be affirmatively authorized); H.R. Rep. No. 94-1476, at 89 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5704 (retransmissions must be "authorized" by FCC rules).[11]   As the Supreme Court recently counseled, the meaning of the phrases used in a statute "may only become evident when placed in context."  *King*, 2015 WL 2473448, at *8.  Here the context is that when Congress enacted Section 111 it had before it the heavily regulated cable TV industry.  *ivi I*, 765 F. Supp. 2d at 615-16; *see also* H.R. Rep. No. 108-660 at 8-9 (2004).  FilmOnX's contention that Internet retransmission services are not FCC regulated, Dkt. No. 165 at 23, thus provides another reason why it cannot be eligible for the Section 111 license.

---

[10]  17 U.S.C. § 111(c)(1) (statutory licensing available to cable system where signal "carriage" is "permissible under the [FCC's] rules, regulations, or authorizations."); *see also* 17 U.S.C. § 111(c)(2)(A) ("willful or repeated secondary transmission" by a cable system is an infringement "where the carriage of the signals comprising the secondary transmission is not permissible under the rules, regulations of authorizations of the [FCC]").

[11]  As FilmOnX is aware, its reliance on *National Broadcasting Co., Inc. v. Satellite Broadcasting Networks, Inc.*, 940 F.2d 1467, 1468 (11th Cir. 1991), to argue otherwise is misplaced.  Dkt. No. 165 at 12. The Eleventh Circuit disavowed that decision (*see Oman*, 17 F.3d at 346-47) after the Copyright Office had "roundly criticized" it in a "thorough, point-by-point refutation" expressly rejecting its prior analysis.  *See ivi I*, 765 F. Supp. 2d at 607-08 & n.16 (rejecting ivi's citation to the Eleventh Circuit's 1991 decision for this point, quoting Copyright Office view that "the operation of Section 111 was 'hinged on the FCC rules regulating the cable industry'" and concluding "[s]ince satellite carriers were not regulated by the FCC, Congress did not intend for them to be covered" (quoting 57 Fed. Reg. 3284)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FilmOnX also relies heavily on a Notice of Proposed Rulemaking ("NPRM") by the FCC seeking comment on whether the FCC's definition of multi-channel video programming distributor ("MVPD"), which currently encompasses both cable operators and satellite services (47 U.S.C. § 522(13)), should be expanded to include certain providers of Internet-delivered streams of linear video programming, including retransmission of broadcast signals.   FilmOnX suggests that a determination to include such Internet-delivered linear video programming services within the MVPD definition will somehow necessitate a different interpretation of Section 111.   Dkt. No. 165 at 23-25.   But the FCC — and the majority of parties commenting on the copyright issue in the rulemaking proceeding — recognize that any action the FCC may take in the proceeding will not result in the Section 111 license being automatically extended to Internet retransmission services like those offered by FilmOnX.   To the contrary, this is a determination that can only be made by Congress.   Moreover, the FCC recognizes that MVPDs are obtaining the rights for online distribution of content at an accelerating pace through private licensing.   If the FCC ultimately adopts its proposal to classify certain online video programming distributors as MVPDs, this action will extend certain rights and obligations within the FCC's jurisdiction to these providers under the terms of whatever rules the FCC may adopt, but it will not extend the Section 111 license to them, and parties to online distribution transactions will continue to rely on private copyright licensing as they do today.   *See* Dkt. No. 169 (FilmOnX RJN, Ex. B at 6, ¶ 11 n.20).

If anything, the FCC's proposed rulemaking merely confirms that the FCC does not currently have any regulations with respect to Internet retransmission of broadcast signals — a fact that FilmOn admits.   Dkt. No. 165 at 23:23-27.   Therefore, FilmOnX's fails to meet the requirement under Section 111 that it be "permissible" under FCC regulations.

21

### F.     FilmOn Improperly Seeks Judicial Legislation Regarding Section 111.

At bottom, FilmOn argues for an unrestricted Section 111 license, one that would apply equally to the proverbial kid in the dorm room as it would to Time Warner Cable.  Congress clearly never intended the Section 111 license to be so broadly construed.  *See supra* at 4-12; Dkt. No. 162-1 at 9-15.

Implicitly recognizing the overreach of its core position, FilmOnX's brief characterizes — incorrectly — its past system, and identifies some limited, self-selected geolocation and security features and closed captioning that it purportedly is prepared to implement if ordered to do so by the court or the FCC.  Dkt. No. 165, at 25 ("FilmOn is prepared to comply with any new FCC rules and regulations, as well as any orders of this Court that might impose conditions or restrictions on the receipt of a Section 111 license.").[12]

FilmOnX's position — based on the assumption that it can build whatever system the Court instructs it to construct — improperly seeks legislative or administrative rulemaking by the Court.  The Court's role is to determine the scope of Section 111 and whether or not an actual system complies with it, not to provide an advisory ruling to FilmOn on how a hypothetical future system might comply with Section 111.  *See, e.g., Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) ("For a declaratory judgment to issue, there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but of an adjudication of present right upon established facts.'"); *Imperial Irr. Dist. v. Nev.-Cal. Elec. Corp.*, 111 F.2d 319, 321 (9th Cir. 1940) (explaining that a declaratory judgment cannot be an "advisory

---

[12]   The Copyright Office has concluded that even a local-into-local Internet retransmission service would not — and should not — qualify for the Section 111 license.  Dkt. No. 164-4, Ex. 4 (SHVERA Report at 192-200).  The provider's assertion that its retransmissions would be confined to in-market subscribers through a"triple-secured, fail-safe system" did not alter the Copyright Office's analysis.  *Id.* (expressing concerns with Internet distribution, despite provider's "[m]assive signal security").  ███████████████████████████  *See* Supp. Jones Decl. ¶¶ 7-1

22

decree [based] upon a hypothetical state of facts," and reversing decision based on stipulated facts where neither party was bound by the assumed facts); *WTGD 105.1 FM v. SoundExchange, Inc.*, No. 14-15, 2015 WL 631255, at *7 (W.D. Va. Feb. 13, 2015) ("In essence, the stations ask the court to assume that geofencing of Internet broadcasts can keep signals within 150 miles of their broadcast transmitters and to render an advisory opinion base on those assumed facts. Given the hypothetical nature of the stations' allegations, this the court cannot do.").

## III. FILMONX IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS SECTION 111 AFFIRMATIVE DEFENSE FOR ITS PAST INFRINGEMENTS.

FilmOnX's concessions regarding its past system establish that Section 111 cannot provide it a defense to infringement.

FilmOnX admits it offered its retransmission service for free in Standard Definition and did not limit its retransmission service to paying subscribers. *See* Dkt. No. 165 at 5 n.3, 25:6-7. *See also* SGD 7, 9-10. FilmOnX therefore cannot be a cable system because, by definition, the secondary transmissions of a cable system may only be provided to paying subscribers. *See* 17 U.S.C § 111(f)(3).

FilmOnX also admits it altered the content by embedding FilmOnX's logo in broadcasts and by omitting closed captioning. David Decl. ¶¶ 24-25. Willful alteration of the content in this manner forecloses FilmOnX from trying to shield itself from liability for its past infringement. 17 U.S.C. § 111(c)(3). FilmOnX also willfully altered the content of the retransmitted broadcasts by inserting advertising that would play after a subscriber selected a local broadcast program and before they could view the selected program. SGD 25. FilmOnX's pre-roll advertisement insertion continues to this day in its non-broadcast streaming on the FilmOnX Websites and FilmOnX has also commenced inserting its advertisements a minute or two into the program viewing experiences. Supp. Jones. Decl. ¶ 18 & Lodged DVD. Notably, while FilmOnX represents to the Court a number of ways that it may change

its retransmission service if ordered to do so, FilmOnX does not mention stopping its insertion of advertisements into the broadcast stream as one of those changes.

Finally, as set forth in Plaintiffs' Opening Brief, FilmOnX's Statement of Account ("SOAs") filings with the Copyright Office do not include the ABC, CBS, FOX and NBC broadcast stations for the locations within the Ninth Circuit where FilmOnX retransmitted broadcast programming (*e.g.*, Los Angeles, San Francisco, Seattle and Phoenix) as well as numerous other cities.  For this additional reason, FilmOnX cannot show entitlement to a Section 111 license.[13]  *See* 17 U.S.C. § 111(d)(1)(A).

## CONCLUSION

Based on Section 111's text, its legislative history and the Copyright Office's interpretation of the statute, which is persuasive in addition to being reasonable, FilmOnX's Internet retransmission service is not entitled to a Section 111 license. Moreover, FilmOnX also cannot assert Section 111 as an affirmative defense for its past infringements because FilmOnX has failed to meet numerous statutory requirements.  Plaintiffs respectfully request that the Court deny FilmOnX's motion and grant Plaintiffs' motion in its entirety.

---

[13] In its Opening Brief and the Hurwitz declaration, FilmOnX claims that on June 18, 2015 — the day the parties' summary judgment briefs were due — FilmOnX filed amended or corrected SOAs with the Copyright Office.  FilmOnX did not produce in discovery any amended filings that it claims to have filed on June 18, 2015, and FilmOnX did not include these purported filings in the evidence submitted in support of its motion.  On July 1, 2015, the day before Plaintiffs had to file their opposition, FilmOnX produced certain documents that appear to pertain to its Copyright Office filings.  Plaintiffs have not had sufficient time to review and analyze the materials produced on July 1.  *See* Supp. Shepard Decl. ¶ 20.

Dated:  July 2, 2015                    JENNER & BLOCK LLP


                                        /s/ Julie A. Shepard
                                        Julie A. Shepard

                                        *Attorneys for Plaintiffs NBCUniversal*
                                        *Attorneys for Plaintiffs*
                                        *Fox Television Stations, Inc.,*
                                        *Twentieth Century Fox Film Corporation,*
                                        *and Fox Broadcasting Company.*


Dated:  July 2, 2015                    ARNOLD & PORTER LLP


                                        /s/ James L. Blackburn
                                        James L. Blackburn

                                        *Attorneys for Plaintiffs NBCUniversal*
                                        *Media, LLC, Universal Network*
                                        *Television, LLC Open 4 Business*
                                        *Productions, LLC, NBC Subsidiary*
                                        *(KNBC-TV), Telemundo Network Group*
                                        *LLC, WNJU-TV Broadcasting LLC,*
                                        *American Broadcasting Companies, Inc.,*
                                        *ABC Holding Company Inc., Disney*
                                        *Enterprises, Inc., CBS Broadcasting Inc.,*
                                        *CBS Studios Inc., and Big Ticket*
                                        *Television, Inc.*

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.