UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 12-6921-GW(JCx) | Date | July 16, 2015 |
| Title | Fox Television Stations, Inc., et al. v. AereoKiller, et al. | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Robert A. Garrett | Ryan G. Baker |
| Julie A. Shepard | Scott M. Malzahn |
| James S. Blackburn | Jaime W. Marquart |

**PROCEEDINGS:** PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [162]

DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF DEFENDANTS' COUNTERCLAIM FOR DECLARATORY RELIEF AND DEFENDANTS' SECTION 111 AFFIRMATIVE DEFENSE [164]

The Court DENIES without prejudice Defendant's Ex-Parte application to stay [201].

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. The Court orders counsel to meet and confer and file a joint form of partial summary judgment by July 23, 2015. The Court continues the matter to **July 27, 2015, at 8:30 a.m.,** unless the Court grants the proposed order by 4:00 p.m. on July 24, 2015, at which point, the hearing will be vacated.

:   34

Initials of Preparer   KSS

*Fox Television Stations, Inc. v. FilmOn X, LLC*, Case No. CV-12-6921, consolidated with
*NBCUniversal Media, LLC v. FilmOn X, LLC*, Case No. CV-12-6950
Tentative Rulings on Cross-Motions for Summary Judgment as to Compulsory License
Eligibility under 17 U.S.C. § 111

## I. Introduction

Plaintiffs Fox Television Stations, Inc., Twentieth Century Fox Film Corp., Fox Broadcasting Co., Inc., NBCUniversal Media LLC, Universal Network Television LLC, Open 4 Business Productions LLC, NBC Subsidiary (KNBC-TV) LLC, Telemundo Network Group LLC, WNJU-TV Broadcasting LLC, American Broadcasting Companies, Inc., ABC Holding Company Inc., Disney Enterprises, Inc., CBS Broadcasting Inc., CBS Studios Inc., and Big Ticket Television, Inc. (collectively, "Plaintiffs") move for summary judgment that Defendants FilmOn X LLC, Alkiviades "Alki" David, FilmOn.TV Networks, Inc., Filmon.TV, Inc., FilmOn.com, Inc., and DOES 1-3 (collectively, "Defendants") are not entitled to a compulsory license under § 111 of the Copyright Act, 17 U.S.C. § 111. Docket No. 183. Defendants cross-move for summary judgment that they are so entitled. Docket No. 167. The Court would, for reasons stated herein, DENY Plaintiffs' motion, GRANT Defendants' motion, and hold that Defendants are entitled to a § 111 compulsory license if they meet the applicable requirements.

However, because: (1) the legal issues are close and of significant commercial importance, both to these parties and to others; (2) this Court disagrees with the Second Circuit's decision in an analogous case; and (3) the resolution of the issues presented on summary judgment is likely to be determinative in this action, the Court would authorize an immediate appeal to the Ninth Circuit pursuant to Fed. R. Civ. P. 54(b), Fed. R. App. P. 5, and 28 U.S.C. § 1292(b). For the same reasons, and because Defendants have not yet been able to timely or consistently comply with the procedures attendant to a § 111 license, the Court would preserve the status quo, and maintain the existing preliminary injunction pending the outcome of the appeal. Finally, because of the relative importance of the issues decided here compared to those remaining in the case, the Court would stay this action pending the outcome of the appeal.

## II. Background
### A. Procedural Background

The same parties were before this Court in December 2012, when it granted Plaintiffs' motion for a preliminary injunction. *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1139 (C.D. Cal. 2012). At that time, Defendants expressly disclaimed the argument that they were entitled to a § 111 license, so the Court did not rule on the question now presented. *Id.* at 1147, n.14. But after losing here at the preliminary injunction stage, and after having any hope of a different result on appeal dashed by the Supreme Court in *American Broadcasting Companies v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) ("*Aereo III*"), Defendants asserted that their business is, in fact, a cable company, and thus entitled to a § 111 license.

This case is not the first between the parties concerning a similar service. In 2010, a group of plaintiffs who overlap with Plaintiffs here sued FilmOn.Com, an entity related to Defendants here, in the Southern District of New York. *CBS Broadcasting, Inc. v. FilmOn.Com, Inc.*, No. 1:10-cv-07532 (filed Oct. 1, 2010). Plaintiffs in that case asserted that FilmOn.Com was operating a broadcast retransmission system similar to that operated by the defendants in a companion case, *WPIX, Inc. v. ivi, Inc.*, No. 1:10-cv-07415-NRB (S.D.N.Y., filed Sep. 28, 2010). In that companion case, the Southern District of New York later held that the defendants' internet retransmission system did not qualify as a "cable system," and was thus not entitled to a § 111 compulsory license. *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617 (S.D.N.Y. 2011) ("*ivi I*"). Shortly before that decision was affirmed on appeal, 691 F.3d 275 (2d Cir. 2012) ("*ivi*

1

*II*"), *cert. denied*, 133 S.Ct. 1585, FilmOn.Com stipulated to a consent judgment and permanent injunction. Docket No. 49 in 1:10-cv-07532 (S.D.N.Y. Aug. 9, 2012).

The record does not state why FilmOn.Com did not wait for the appeal in the companion case before stipulating to a judgment. Nor does it state why, when Defendants here launched a new internet retransmission service a few months later in 2012, Plaintiffs did not seek a finding of contempt from the Southern District of New York, and instead, filed this case. The reason for both of those strategic choices was likely a decision handed down by the Southern District of New York on July 22, 2012: *American Broadcasting Companies v. AEREO, Inc.*, 874 F. Supp. 2d 373, 382 (S.D.N.Y. 2012) ("*Aereo I*"). In that case, the court held that, under *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (the "*Cablevision*" case), Aereo's use of a separate antenna and a separate data stream for each user meant that Aereo did not infringe the networks' public performance rights. In filing this case, Plaintiffs hoped for a different result under the law of the Ninth Circuit. And they got one. *See Fox Television Stations*, 915 F. Supp. 2d at 1151.

After this Court preliminarily enjoined Defendants, the Second Circuit affirmed the decision in *Aereo I*. *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013) ("*Aereo II*"). But the Supreme Court then reversed, agreeing with this Court that using separate antennas and data streams did not avoid "transmit" clause liability. *Aereo III*, 134 S. Ct. at 2503.[1]

After the Supreme Court's *Aereo III* decision, Defendants switched theories. They argued to the Southern District of New York, as they argue here, that statements in *Aereo III* implied that Defendants' system qualified as a "cable system," and thus, for a compulsory license. The Southern District of New York rejected that argument for several reasons, including, prominently, the Second Circuit's *ivi II* decision. *CBS Broad. Inc. v. FilmOn.com, Inc.*, No. 10 CIV. 7532 NRB, 2014 WL 3702568, at *2 (S.D.N.Y. July 24, 2014) ("*Aereo* did not mention, let alone abrogate, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) [ ]. That case established the law in the Second Circuit that 'Internet retransmission services do not constitute cable systems under § 111' of the Copyright Act.").

Plaintiffs, satisfied with the trajectory of the case in New York and the rule of *ivi II*, then argued here that any further litigation of the compulsory license question should take place in the Second Circuit. *See* Reply Mem. of Plaintiffs Responding to the Court's Request for Briefing on Defendants' Section 111 Defense, Docket No. 133. This Court declined that suggestion, holding that "Plaintiffs wanted a fresh look at the Second Circuit's conclusions in *Cablevision/Aereo*, and they will now get a fresh look at the Second Circuit's conclusions in [*ivi II*], which is the case which they feel should be dispositive as to the Section 111 issue." Mins. of Sept. 8, 2014 Status Conference, Docket No. 136.[2]

### A. Factual Background
#### 1. *Defendants' System*

Defendants have used two different systems to receive and retransmit broadcast programming: a "trailer system" and a "Lanner system." Meldal Decl. in Supp. of Defs.' Mot., Docket No. 177 at ¶ 14. The trailer system involved an array of small antennas on the roof of a trailer. *Id.*[3] The Lanner system used a single master antenna on the roof of a commercial data

---

[1] *Aereo III* also relieved the Ninth Circuit of having to decide the appeal from this Court's grant of a preliminary injunction, which is still in effect. In the wake of *Aereo III*, the parties stipulated to dismiss the appeal without prejudice. *See* Dismissal Order, No. 13-55156 (July 29, 2014), Docket No. 125.

[2] For the same reason, Plaintiffs' argument that *res judicata* applies here fails to the extent that Ninth Circuit law differs from Second Circuit law.

[3] Defendants have apparently destroyed their trailer systems. Supp. Shepard Decl., Docket No. 189-2, Ex. 31 at 638:20-639:4, 664:8-665:20. Plaintiffs note that these systems were destroyed without allowing Plaintiffs to inspect them, as Plaintiffs had requested, and therefore ask the Court to strike this evidence. Pls.' Opp'n, Docket No. 189 at

center, which then routed the signals to an antenna box where the signals were amplified and captured by small antennas. *Id.* When a user accessed the FilmOn X website, the user's computer requested a list of available programming, and the FilmOn X server responded with the list. *Id.* at ¶ 15. When a user picked an over-the-air broadcast channel, the request was directed to and managed by the local facility in the user's region. *Id.* at ¶ 16. Defendants employed a system that attempted to restrict a user's access to programming based on the user's location. *Id.* at ¶ 32. Defendants also used an encryption "token" to protect the transmitted content, which was supposed to ensure that only the user with the authorized IP address is able to view the broadcast stream, and only for a limited time. *Id.* at ¶ 49.

FilmOn X's system modified the broadcast program by inserting FilmOn X's logo and omitting the closed captioning. Jones Decl. in Supp. of Pls.' Mot., Docket No. 182 at ¶¶ 10, 14-15. FilmOn X also made available local major channels in standard definition format for free. *Id.* at ¶¶ 5-6. FilmOn X also played an advertisement before the user could view the selected program. *Id.* at 10.[4]

Defendants have also modified their system in anticipation of being permitted to restart operations. Now, FilmOn X's geolocation system is designed to attempt to deny access to a broadcast channel unless the user's physical credit card address is within the relevant designated market area. *Meldal* Decl. at ¶¶ 34-35. However, Plaintiffs' expert examined this portion of Defendants' code, but was unable to find any code that actually implemented the function. Suppl. Jones Decl. at ¶ 8.[5] Also, as Plaintiffs' expert points out, users can subscribe with a billing address that is not where they are physically located. *Id.* at ¶ 9.

In addition to the credit card check, Defendants say that their system now also requires the viewing device to be located within the designated market area at the time of transmission. Meldal Decl. at ¶¶ 34-35. For a mobile device, this requires that the geolocation services on the device be turned on; if not, the system is supposed to deny access to the broadcast channel. *Id.* at ¶ 36. Whether or not this actually happens, or whether instead, the system just uses the device's IP address, is genuinely disputed. Suppl. Jones Decl. at ¶ 10. For a non-mobile device, such as a desktop computer, without a geolocation service, the system checks the IP address of the network connection and looks up its geolocation through a third-party database. Meldal Decl. at ¶ 36. The accuracy of that third-party database depends on the type of connection: for a wired device in a metropolitan area, the accuracy can be within a mile or two. *Id.* For a device connected by a satellite system, the location could be off by hundreds of miles. *Id.* Additionally, it is not clear whether Defendants actually try to place the user within the boundaries of a designated market area, as they claim, or whether they only restrict a user to a radius around a certain point, which is usually 100 miles, but for New York City is 250 miles, and which Defendants have set as high as 1000 miles. Suppl. Jones Decl. at ¶¶ 12-13.

Previously, users could employ proxy servers to access broadcast content through FilmOn X from outside of their designated market areas. For example, from 2012 to 2014, Plaintiffs' expert regularly connected to FilmOn X from Maryland using a Virtual Private Network proxy server, which allowed him to watch local broadcast content in Los Angeles, New

---

9, n.5. For the reasons described, *infra*, this evidence is not material to the Court's determination. However, as also described, *infra*, various of Defendants' actions raise serious questions about Defendants' reliability.

[4] § 111(c)(3) provides that a performance of a work embodied in a primary transmission made by a broadcast station is actionable as an act of infringement "if the content of the particular program in which the performance or display is embodied, or any commercial advertising or station announcements transmitted by the primary transmitter during, or immediately before or after, the transmission of such program, is in any way willfully altered by the cable system through changes, deletions, or additions . . . ." The parties dispute whether FilmOn X's playing an advertisement before the rebroadcast ran afoul of this provision. Whatever the answer to that question, it does not affect the more basic question of whether Defendants' operation qualifies as a cable system.

[5] Jones notes that he made this observation in his rebuttal report, and that Defendant's expert, Meldal, did not rebut it in his surrebuttal report. Suppl. Jones Decl. at ¶ 8.

3

York, Chicago and other locations. Suppl. Jones Decl. at ¶ 7. To prevent this, Defendants also plan to engage a third party proxy detection service. Meldal Decl. at ¶ 37. However, Plaintiffs' expert examined Defendants' source code, and determined that the third-party detection service was not actually being "called": in other words, the software did not actually implement this portion of code. Suppl. Jones Decl. at ¶ 7.[6] Plaintiffs' expert also points out that even in the code that Defendants have written, but not implemented, many proxy servers will be allowed, including all corporate servers, and any IP address with a 60% or less chance of being a proxy, using the algorithm provided by the third-party service. *Id.*

Defendants also claim to have prepared a system for encrypting the broadcast stream using the HTTPS standard. Meldal Decl. at ¶ 50. Plaintiffs' expert points out that Defendants' prior system encrypted only the internet address of the stream, and not the user's IP address, the identity of the channel the user may access, or the expiration time after which access is no longer granted. Suppl. Jones Decl. at ¶ 15. And Defendants' streams have previously been redirected, contrary to Defendants' expressed intent. *Id.* at ¶ 21 (citing May 12, 2013 email from David to Kharchevin, AK002643, postulating that Defendants' stream was taken by "simply reus[ing] links generated by our website or maybe pars[ing] website responses as some xbmc enthusiast did before.").

Other than the proxy detection feature, Defendants' expert has tested this new system, *id.* at ¶ 39, but it has not been made available to Plaintiffs' expert for testing. From the inspections performed by Plaintiffs' expert and the limited window into the actual system performance provided by discovery, it appears that while Defendants have attempted to develop a more robust geolocation and content protection system, that system: (1) has not been fully developed, (2) makes approximations and compromises that result in access being granted outside of the designated market area, (3) is not immune to manipulation, and (4) has not always been accurately described by Defendants to the Court.[7]

### 2. *Defendants' Royalty Submissions*

As part of their effort to comply with the rules applicable to cable systems, Defendants submitted Statements of Account to the Copyright Office for each six-month period between August 2012 and July 2014, the period in which it retransmitted over-the-air broadcast content to users, and paid the corresponding fees. Hurwitz Decl. ISO Defs.' Mot., Docket No. 167-6 at ¶ 5. However, Defendants "inadvertently omitted" "some stations" in the filings, and so submitted corrected statements on June 18, 2015, *i.e.*, not until the summary judgment briefs were being filed in this case. *Id.* ¶¶ 13, 17-18, 20, 25, 30, 35. Remarkably (but in the end perhaps not surprisingly), the omitted stations were "the main ABC, CBS, FOX, and NBC broadcast stations" for locations including Los Angles, San Francisco, Seattle, and Phoenix. Defs.' Responsive Separate Statement, Docket No. 191-1 at ¶ 24. Thus, Defendants managed to not pay the required royalties for the very networks with whom they were then in litigation.

### 3. *Defendants' "Free Trial"*

During the period that Defendants were operating, they retransmitted Plaintiffs' local broadcast programming to the public in standard definition without charge. Defs.' Responsive Separate Statement, Docket No. 191-1 at ¶ 19. Defendants now say that they did so "as part of [their] Subscriber Activation Strategy, which was a marketing technique to get consumers to try broadcast content for free in standard definition for a period of time, which would terminate at some point." *Id.* This self-serving explanation is unencumbered by any evidentiary support

---

[6] Jones also notes that he made that observation in his rebuttal report, and Meldal did not rebut it in his surrebutal report. Suppl. Jones Decl. at ¶ 7.

[7] The Court takes this system as it finds it for purposes of ruling on the cross-motions, and does not find the detail to be material for the present discussion. Certainly, the performance of the proposed safeguards impacts some of the policy arguments underlying Plaintiffs' position. And the precise system performance may be an appropriate subject for regulation by, *e.g.*, the FCC, should it choose to affirmatively authorize systems like Defendants'.

other than David's assertion. No evidence has been presented that this "trial period" had any defined period, or that it actually terminated "at some point" other than this Court's preliminary injunction in 2012 or the Southern District of New York's ruling in 2014.

### 4. Defendants' Outreach to Local Broadcasters

In October 2014, Defendants mailed approximately 130 letters to broadcasters informing them of Defendants' intent to restart operations as a MVPD in certain markets, and requesting the broadcasters to inform Defendants if they elect "must-carry status." Hurwitz Decl., Docket No. 167-6 at ¶ 40, Ex. Q. "Several" broadcasters elected "must carry status" or retransmission consent. *See, e.g.,* Letter from KTBN-TV, Los Angeles (Trinity Broadcasting Networks, provider of "wholesome, family oriented and inspirational programming"). Hurwitz Decl. Ex. R, Docket No. 167-7.[8]

### III. Legal Standards

Summary judgment shall be granted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### IV. Analysis

#### A. The Genesis of Section 111 and Related Provisions

In 1968, the Supreme Court considered the case of a cable television system. That system included antennas located on hills above the cities of Clarksburg and Fairmont, West Virginia, "with connecting coaxial cables, strung on utility poles, to carry the signals received by the antennas to the home television sets of individual subscribers." *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 392 (1968). The system also contained "equipment to amplify and modulate the signals received, and to convert them to different frequencies, in order to transmit the signals efficiently while maintaining and improving their strength." *Id.* The Supreme Court held that the cable system did not infringe, since it:

> no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's television set. It is true that a CATV system plays an 'active' role in making reception possible in a given area, but so do ordinary television sets and antennas. CATV equipment is powerful and sophisticated, but the basic function the equipment serves is little different from that served by the equipment generally

---

[8] Broadcasters are free to arrange for Defendants to retransmit their content regardless of the outcome of this case.

> furnished by a television viewer. If an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set. The result would be no different if several people combined to erect a cooperative antenna for the same purpose. The only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur.

*Id.* at 399-400 (footnotes omitted).

In 1974, the Supreme Court again addressed cable television, which had evolved in the preceding six years. Cable systems were by that time originating their own programs, selling commercials, and interconnecting with other cable television systems – features that allowed cable systems "to compete more effectively with the broadcasters for the television market." *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394, 405 (1974). None of those features changed the result: the Court held the systems non-infringing. The Court also rejected an argument based on the fact that the cable systems imported 'distant' signals, which the broadcasters argued had a "deleterious impact" on the economics and structure of copyright licensing. The Court held that "a reallocation of the potential number of viewers each station may reach" is "a fact of no direct concern under the Copyright Act." *Id.* at 413. The Court concluded:

> These shifts in current business and commercial relationships, while of significance with respect to the organization and growth of the communications industry, simply cannot be controlled by means of litigation based on copyright legislation enacted more than half a century ago, when neither broadcast television nor CATV was yet conceived. Detailed regulation of these relationships, and any ultimate resolution of the many sensitive and important problems in this field, must be left to Congress.

*Id.*

Congress acted in short order. The 1976 Copyright Act adopted the § 111 compulsory license for cable systems. As described in the House report:

> In general, the Committee believes that cable systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and that copyright royalties should be paid by cable operators to the creators of such programs. The Committee recognizes, however, that it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner whose work was retransmitted by a cable system. Accordingly, the Committee has determined to maintain the basic principle of the Senate bill to establish a compulsory copyright license for the retransmission of those over-the-air broadcast signals that a cable system is authorized to carry pursuant to the rules and regulations of the FCC.

H.R. REP. 94-1476, 89-90, 1976 U.S.C.C.A.N. 5659, 5704. The compulsory license was conditioned on reporting requirements, payment of royalty fees, a ban on the substitution or deletion of commercials, and geographic limits on the license for programs broadcast by Canadian or Mexican stations. *Id.*

The 1976 Copyright Act thus established a compulsory license for cable systems, defined as "a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other

communications channels to subscribing members of the public who pay for such service." 17 U.S.C. § 111.

This was not the last time Congress legislated in response to judicial decisions concerning new forms of broadcast retransmission. It did so again in the field of satellite retransmission. In *Pacific & Southern Co. v. Satellite Broadcast Networks, Inc.*, 694 F. Supp. 1565, 1574 (N.D. Ga. 1988), the court held that a satellite broadcaster was not entitled to the § 111 license as a "cable system" because its facilities were not located entirely within a single state. In response, Congress passed the Satellite Home Viewer Act in 1988, which enacted a six-year statutory license in 17 U.S.C. § 119. S. Rep. 103-4017 (1994), 1994 WL 577581 at *5. However, because "[t]he Congress was very careful to note that the Satellite Home Viewer Act is not to be interpreted as impacting [Satellite Broadcast Networks's] alleged status as a cable system in the current lawsuit," the litigation continued in the Eleventh Circuit. *Nat'l Broad. Co. v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467, 1469 n.2 (11th Cir. 1991). The Eleventh Circuit reversed the district court's decision, holding that it read "located in any state" too narrowly, and held that a statutory "facility" can exist partially in one state and partially in another. *Id.* at 1470. And, the court rejected the argument that no specific FCC rules, regulations, or authorizations covered the rebroadcast, holding that the rebroadcast was permissible because no FCC regulation forbade it. *Id.* at 1471.[9]

After oral argument in *Satellite Broadcast*, the Copyright Office promulgated regulations denying satellite broadcasters the right to the § 111 license because they did not "receive and transmit signals from within a single state." 56 Fed. Reg. 31,580 (1991); 57 Fed. Reg. 3283 (1992). The Copyright Office also reasoned that § 111 was "clearly directed at localized retransmission services," due to the provision that "two or more cable systems in contiguous communities . . . operating from one headend" constitute one "cable system" for royalty calculations. 57 Fed. Reg. at 3292. The Eleventh Circuit noted this regulation in *Satellite Broadcast Networks*, but held that it did not apply retroactively. 940 F.2d at 1469, n.4. And the court disagreed with the Copyright Office's analysis:

> NBC laments that because of SBN's broad geographic reach, SBN threatens the major television networks. For instance, an SBN subscriber in Arizona could view the WXIA broadcasts of L.A. Law or Cheers hours before the NBC affiliate in Arizona broadcasted these episodes. NBC may have a legitimate gripe, but protecting the network system is not a concern of § 111. "[T]he retransmission of network programming, including network programming in 'distant' markets, does not injure the copyright owner. The copyright owner contracts with the network on the basis of his programming reaching all markets served by the network and is compensated accordingly." 1976 U.S. Code Cong. & Adm. News at 5704; *see also Cablevision Sys. Dev. [v. Motion Picture Ass'n of Am.*, 836 F.2d 599, 603 (D.C. Cir. 1988)[10]]; *Hubbard [Broadcasting, Inc. v. Southern Satellite Sys., Inc.*, 777 F.2d 393, 396 (8th Cir. 1985)[11]]. NBC's concerns are more about

---

[9] Plaintiffs cite the district court's contrary conclusion concerning FCC authorization without noting that it was reversed by the Eleventh Circuit. Pls.' Opp'n, Docket No. 189 at 20. As described, *infra*, the issue then bounced back and forth between the Copyright Office, Congress, and the courts.

[10] *Cablevision v. MPAA* held that a Copyright Office regulation requiring cable companies to pay copyright owners of non-network distant programming a percentage of subscription revenues of any tiers that contained such programming was within the Copyright Office's authority as a reasonable interpretation of the statute.

[11] *Hubbard* affirmed the dismissal of a copyright infringement action brought by a local broadcaster against a satellite common carrier and a superstation. The local broadcaster held local copyright licenses for the content retransmitted by the satellite carrier, and so the satellite service negatively impacted the local station's viewership. *Hubbard* held that a microwave signal, like a broadcast signal, was a "transmission made to the public," such that

> communications policy than about copyright infringement and are more
> appropriately directed to the FCC.

*Id.* at 1471, n.7.

While the Eleventh Circuit disagreed with the Copyright Office's restrictive interpretation, it noted that the Office's view might nonetheless be entitled to deference prospectively. *Id.* And that is just what happened a few years later in *Satellite Broadcasting & Communications Association of America v. Oman*, 17 F.3d 344 (11th Cir. 1994), where satellite operators sued to invalidate the regulations criticized by the Eleventh Circuit in *Satellite Broadcast Networks*. But the Eleventh Circuit held that while the regulations conflicted with that court's previous interpretation of "cable system," they were neither arbitrary, capricious, nor in conflict with the clear meaning of the statute, and were therefore "valid exercises of the Copyright Office's statutory authority to interpret the provisions of the compulsory licensing scheme." *Id.* at 345.

And that was not the end of it. In 1999, Congress enacted § 122, which authorizes satellite carriers to retransmit local broadcast programming back into a local market. 2 *Nimmer on Copyright* § 8.18. § 122 was then amended in 2002, 2004, 2008, 2010, and 2014. In short, Congress continues to actively legislate in this area. One lesson from this history is that, until the Copyright Office issued regulations, courts tended to leave to Congress the task of adjusting the statute in response to changing technology.[12]

### B. Aereo

The *Aereo* cases involved a competitor of Defendants that structured its retransmission system to comply with Second Circuit law. Aereo did so by using one antenna per subscriber, such that each retransmission of the broadcast signal was made to only a single subscriber. That sufficed to avoid infringing the broadcaster's public performance rights in the Second Circuit, but not in the Ninth Circuit. *See, respectively, Aereo II*, 712 F.3d 676; *Fox Television Stations, Inc.*, 915 F. Supp. 2d 1138. Like this Court, the Supreme Court disagreed with the Second Circuit and held that the one-antenna-per-person approach system did not avoid transmit clause liability. *Aereo III*, 134 S. Ct. 2498 (2014). In so holding, the Supreme Court noted that Aereo bore an "overwhelming likeness to the cable companies targeted by the 1976 amendments." *Id.* at 2507.

> Of course, in *Fortnightly* the television signals, in a sense, lurked behind the
> screen, ready to emerge when the subscriber turned the knob. Here the signals
> pursue their ordinary course of travel through the universe until today's "turn of
> the knob" – a click on a website – activates machinery that intercepts and reroutes
> them to Aereo's subscribers over the Internet. But this difference means nothing
> to the subscriber. It means nothing to the broadcaster. We do not see how this
> single difference, invisible to subscriber and broadcaster alike, could transform a
> system that is for all practical purposes a traditional cable system into "a copy
> shop that provides its patrons with a library card."

*Id.* Plaintiffs now contest this rationale, arguing that the technological differences between a cable company and Defendants' internet rebroadcasting system are exceedingly meaningful to

---

the compulsory license system applied. This was before Congress expressly amended § 111 to expressly mention microwave transmission.

[12] It may be the case, as Plaintiffs urge, that one reason Congress has not acted on internet retransmission to date is that many popular television shows are available online via at least one licensed service. Pls.' Br. at 14 (citing http://www.kpmg.com/US/en/IssuesAndInsights/ArticlesPublications/Documents/film-tv-report.pdf, a document published in 2014 at the request of NBCUniversal). But neither has Congress moved to codify Plaintiffs' preferred approach.

the broadcaster. Because the Supreme Court was not answering the question at issue in this case, *Aereo III* does not control the result here. *See N.L.R.B. v. Hotel & Rest. Employees & Bartenders' Union Local 531*, 623 F.2d 61, 68 (9th Cir. 1980).[13] It is, however, about as close a statement directly in Defendants' favor as could be made, and the decision's reasoning continues the trajectory started in *Fortnightly* and seen again in the satellite decisions: courts consistently reject the argument that technological changes affect the balance of rights as between broadcasters and retransmitters in the wake of technological innovation. Instead, courts have left such rebalancing to Congress.[14] By contrast, one entity has consistently acted and opined in favor of the broadcasters and against the compulsory license: the Copyright Office.

### C. The Copyright Office Approach

When Defendants tendered their statutory license fees to the Copyright Office in 2014, the Office neither accepted them without comment nor rejected them, but instead, accepted them on a provisional basis, given that "the question of eligibility of internet-based retransmission services for the Section 111 license appears to have been raised again before the Courts." Letter from J. Charlesworth, Copyright Office General Counsel (July 23, 2014), Pls.' Appx. Ex. 1 at 3. The letter noted that the Office does not believe that internet retransmission services qualify for the § 111 license, and that the Second Circuit's *ivi II* decision agreed with the Office's interpretation. *Id.*[15] Yet, the letter also notes that the FCC's current rulemaking concerning "multichannel video programming distributors" may "impact the analysis under Section 111." *Id.* at 4, n.3.

The Office's restrictive view concerning § 111 was no surprise, although the gentle and tentative nature of the letter perhaps was. "The Copyright Office has long been a critic of compulsory licensing for broadcast retransmissions." Statement of Marybeth Peters, Register of Copyrights, before the Subcommittee on Courts and Intellectual Property, Committee on the Judiciary (June 15, 2000). In the Office's view, "[a] compulsory license is not only a derogation of a copyright owner's exclusive rights, but it also prevents the marketplace from deciding the fair value of copyrighted works through government-set price controls." *Id.* The Copyright Office has consistently held this view, and has been calling for the *repeal* of § 111 since 1981. *Id.* The Copyright Office has also been consistently opposed to the satellite compulsory licenses. *Id.*

To be sure, the Office, acknowledging its general opposition to compulsory licensing, sees "a fundamental difference" between internet retransmissions, on the one hand, and cable and satellite retransmissions, on the other. The Office believes that "the nature of the delivery platform for the retransmissions" is substantially different in the sense that cable and satellite provide a channel that the broadcasters cannot practicably do by themselves, but broadcasters are able to transmit their programs over the internet if they wish. *Id.* Further, the Office's "principal concern is the extent to which internet retransmissions of broadcast signals can be controlled geographically." *Id.*

As a policy matter, these views may be correct. But it can hardly be overlooked that the Supreme Court held that any such considerations did not control in *Fortnightly* and *Teleprompter*, and that Congress in response passed the compromise regime to which the Office

---

[13] Defendants argue that certain statements made during the Supreme Court oral argument should be considered as views of the court. For many reasons, colloquy at argument is not part of the decision of the Court. Had the Supreme Court wanted any of the cited statements to have controlling effect, it would have included them in the decision.

[14] *ivi* is perhaps an exception, but by the time certiorari was denied in that case, the *Aereo* case had begun wending its way to the Supreme Court. And the result in *Aereo III* was more about unwinding a convoluted legal doctrine than protecting broadcasters from changing technology.

[15] Given the Office's view, discussed further in the following paragraph, its provisional acceptance of Defendants' fees was an appropriate acknowledgement that it does not have the last word on this issue.

objects. Given that the Office disagrees with Congress, it is no surprise that it seeks to cabin the statute whenever possible. However, this administrative opposition to Congressional text requires a particularly close look at any assertion that courts should defer to the agency's interpretation. Further, the Office has itself acknowledged that "although the statutory licenses at issue are copyright provisions, they are intertwined with equally complex provisions of communications law and policy – the implications of which are outside the expertise of the Copyright Office and require further consideration by Congress." Copyright Office STELA Report (Aug. 29, 2011), Pls.' Appendix, Ex. 3 at 16.

Unlike in the satellite context, the Office has not issued regulations concerning internet retransmissions after a notice and comment process. Administrative statements not arrived after "a formal adjudication or notice and comment rulemaking" do not necessarily receive the same deference as more formal conclusions. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). *Christensen* stated that "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." *Id.* "Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade[.]'" *Id.* at 587. However, the Supreme Court later clarified that formal notice and comment rulemaking is not determinative concerning the application of *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 231 (2001) (declining to defer to agency, but noting that the court has "sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded) (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995) (deferring because "[t]he Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants" deference "with respect to his deliberative conclusions as to the meaning of these laws," where the National Bank Act gave the Comptroller "personal authority")).

The first question in considering whether to defer to an agency interpretation is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 841-43 (1984). In other words, "a reviewing court should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). Thus, "[t]he most reliable guide to congressional intent is the legislation and an agency may not disregard clear language because it would prefer what it considers a better policy." 33 Fed. Prac. & Proc. § 8381 (citing *Sierra v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (holding that agency policy preference cannot not trump clear statutory language)). The question is not merely whether there is some "linguistic ambiguity," but instead, whether "Congress had delegated gap-filling power to the agency." *United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1844 (2012).

Again, the Office noted its view that internet retransmission is even more harmful to copyright holders than cable and satellite retransmission. *Id.* But if in the Copyright Office's view § 111 is "bad," and "really bad" if applied to internet transmission, we must ask what the Office's view of internet retransmission would be if it considered § 111 to be "good," as Congress deemed it.[16] That question is impossible to answer precisely. At least, the Copyright Office would not be as hostile to internet retransmission as it is. It might even support it.

---

[16] Just as Defendants attempt to rely on Supreme Court oral argument colloquy, Plaintiffs point out that in 2000, the then-Chairman and Ranking Member of the Senate Judiciary Committee, along with a Copyright Professor, provided statements in the Congressional Record in 2000 agreeing with the Copyright Office's approach. 145 Cong. Rec. 30980-82, S14991 ("I would say that certainly under current law, internet and similar digital online communications services are not, and have never been, eligible to claim the cable or satellite compulsory licenses created by sections 111 or 119 of the Copyright Act. To my knowledge, no court, administrative agency, or authoritative commentator has ever held or intimated to the contrary. . . . The Copyright Office studied this issue

10

The Office's policy views appear to have found expression in a very strange reading of the words "facility" and "communications channels" in § 111. It is questionable whether, even if *Chevron* applied, it would be appropriate to defer to the Office's interpretation. The Second Circuit did so, and whether such deference was correct is the question to which we now turn.

### D. The *ivi I* and *ivi II* Approaches

At the preliminary injunction stage, Plaintiffs argued that "the Copyright Act is expressly technology agnostic and prohibits the public performance of a work by a transmission to the public 'by means of any device or process.'" Preliminary Injunction Mot., Docket No. 49 at 2. Plaintiffs argue that "Congress intended that a service such as [FilmOn X's] that makes Plaintiffs' copyrighted works available to its subscribers must have a license irrespective of any technological gimmickry . . . ." *Id.* Here, the question is whether Defendants are *entitled* to a license "irrespective of any technological gimmickry."

Essentially, at the preliminary injunction stage, unhappy with the consideration of the details of the "technological gimmickry" by the Second Circuit and the Southern District of New York, Plaintiffs asked this Court to paint with a broader brush. And the Court agreed with Plaintiffs that *Cablevision* was wrongly decided because the Copyright Act applies to "any device or process." By the same token, another case upon which Plaintiffs rely, *ivi II*, might also be wrongly decided because it also employs an overly narrow reading of the Copyright Act. *ivi II* held that an internet re-transmission service was not entitled to the compulsory license for cable systems established by 17 U.S.C. § 111 in the 1976 Copyright Act because it was not a "cable system." 691 F.3d at 277.

Recall that the 1976 Copyright Act defines a "a cable system" as:

> a facility, located in any State, territory, trust territory, or possession of the United States, that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations . . . and makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service. For purposes of determining the royalty fee under subsection (d)(1), two or more cable systems in contiguous communities under common ownership or control or operating from one headend shall be considered as one system.

In finding that ivi's internet streaming service did not qualify for the § 111 compulsory license, the Second Circuit affirmed the district court's determination that it was unclear whether ivi was a "facility" that receives broadcast signals and makes secondary transmissions, or whether the "internet" qualified as a "communications channel." 691 F.3d at 280. The Second Circuit held that the statutory text was unclear as to whether the defendant operated a "facility" because "it is

---

exhaustively in 1997 and came to the same conclusion . . . valid exercises of the Office's statutory authority to interpret the provisions of those compulsory licensing schemes are binding on the courts.").

While legislative history aids the interpretation of a statute's language and effect, courts "cannot ignore clear statutory text because of legislative floor statements." *United States v. Hall*, 617 F.3d 1161, 1167 (9th Cir. 2010), *aff'd*, 132 S. Ct. 1882 (2012). Additionally, these statements were made decades after § 111's enactment. Plaintiffs argue that "[w]hen Congress is aware of an agency's interpretation of a statute and takes no action to correct it while amending other portions of the statute, it may be inferred that the agency's interpretation is consistent with congressional intent." Pls.' Br., Docket No. 183 at 13 (quoting *Greenhorn Farms v. Espy*, 39 F.3d 963, 965 (9th Cir. 1994)). That certainly applies in some circumstances, but *Greenhorn* involved an agency's actual refusal to pay a farmer under a disaster relief program, which differs from the mere opinion given by the Copyright Office in the present arena, which had no direct effect on the ability of an internet restransmitter to operate. Plaintiffs also cite *Utah v. Evans*, 536 U.S. 452, 472 (2002), but there, the Court ultimately did "not rely" on the agency interpretation, even though the statute in question expressly delegated authority to the Secretary of Commerce to conduct the census "in such form and content as he may determine." No such express gap-filling delegation has been identified here.

certainly unclear whether the Internet itself is a facility, as it is neither a physical nor a tangible entity; rather, it is 'a global network of millions of interconnected computers,'" thus, there is "uncertainty as to whether an Internet retransmission service is or utilizes a facility that receives and retransmits television signals." *Id.* And the Second Circuit noted that while Congress added "microwave" as an "acceptable communications channel for retransmissions," it had not "included the 'Internet'" as an acceptable communications channel under § 111. *Id.* at 282.[17] The Second Circuit did not purport to find any ambiguity in the phrase "or other communications channels," but nonetheless deferred to the Copyright Office's view that it should not be read broadly to include "future unknown services." *Id.* at 284. In any event, the Second Circuit deferred to the agency's determination under *Chevron*.[18]

This is all at loggerheads with the thrust of Plaintiffs' prior "technology agnostic" argument in this case. And it is difficult to recognize the ambiguity the Second Circuit saw in the statute, at least as applied to the facts of this case. *See United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1844 (2012) ("linguistic" ambiguity insufficient to invoke *Chevron*). The "internet" is not the "facility" urged by Defendants here. And it can't be a "facility" for purposes of the § 111 analysis because without Defendants' facilities, the internet does not receive Plaintiffs' public broadcast signal. Thus, the undisputed facts in this case are that the signals are not received by "the internet." They are received by antennas, located in particular buildings wholly within particular states. They are then retransmitted out of those facilities on "wires, cables, microwave, or other communications channels." We know that they are so communicated because Defendants' users received them. Hence, the preliminary injunction.

Thus, the nebulous nature of the internet does not seem to bear on whether *Defendants operate equipment* that "receives signals transmitted or programs broadcast by one or more television broadcast stations," reformats those signals, and then sends them out to the viewing public. In the language of *Buck v. Jewell-La Salle Realty Co.*, 283 U.S. 191 (1931), the Second Circuit's *ivi II* opinion focuses on the mysterious "ether" (then spelled "either") through which the retransmission is made, but the "facility" that Defendants have control over and operate consists of the "complicated electrical instrumentalities" used for retransmission, which precede "the internet" in Defendants' retransmission scheme.

Thus, contrary to the Second Circuit's conclusion, it is unnecessary to turn to the legislative history or the administrative interpretation: "if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93-94 (2007) (citing *Chevron*, 467 U.S. at 842-43). Here, no matter how strong the policy arguments for treating traditional cable services and Defendants' service differently, 17 U.S.C. § 111(f)(3) simply does not draw the distinction Plaintiffs urge.

The Second Circuit also followed the Copyright Office in seizing on the words "headends" and "contiguous communities" in the second sentence of the statutory definition, *ivi II* 691 F.3d at 282, n.8, and agreed with the district court that "[t]hese two concepts 'do not have any application to a nationwide retransmission service such as satellite carriers.'" *ivi I*, 765 F.

---

[17] In fact, "microwave" was added to the statute in 1994 in response to "an unnecessarily restrictive interpretation by the Copyright Office of the phrase 'or other communications channels' in the same definition," well after the courts had determined that microwave transmissions fell into the category established by the "other communications channels" language. H.R. Rep. 103-73 (1994), 1994 WL 454551, at *17; S. Rep. 103-407 (1994), 1994 WL 577581 at *14 ("The proposed legislation amends the definition of the term 'cable system' contained in section 111(f) to clarify that the cable compulsory license applies not only to traditional wired cable television systems, but also to multichannel multipoint distribution service systems, also known as 'wireless' cable systems."); *accord*, *Hubbard Broadcasting, Inc. v. Southern Satellite Sys., Inc.*, 777 F.2d 393, 396 (8th Cir. 1985). Plaintiffs' argument that "only retransmission made over the type of 'communications channels' specified," Pls.' Br. at 16, would make a nullity of the phrase "or other communications channels."

[18] The S.D.N.Y. had applied *Skidmore* deference. *ivi I*, 765 F. Supp. 2d at 605.

12

Supp. 2d at 607-08, *ivi II* at 284. But the second sentence is not a "definition" of "cable system." The definition is contained in the first sentence. The second sentence merely provides that certain commonly owned cable systems will be treated as a single system for purposes of computing a royalty. To be sure, such language could have some bearing on the meaning of "cable system" if it required understanding "cable system" in a way that excluded Defendants' service. But it does not. It merely provides that certain groups of cable systems will be treated as a single system for royalty computation purposes. It appears that the purpose of the second sentence was to ensure that larger cable systems, required to make larger per-subscriber compulsory royalty payments, would not be able to artificially lower their royalty obligation by treating themselves as multiple, smaller systems. *See Columbia Pictures Indus., Inc. v. Liberty Cable, Inc.*, 919 F. Supp. 685, 688 (S.D.N.Y. 1996). A "headend" appears to merely be the facility that receives broadcast signals and transforms them into a format for further distribution. *See id.* at 689 (holding that where defendant received all broadcasts at a single location and then transmitted them to a network of buildings for further re-transmission, it was using a single headend and liable to pay the larger royalty due from a single, larger cable system).

  Whether nominally separate cable systems were served by a common headend or operated under common ownership in contiguous communities logically bears on whether they should be considered a single, larger system for purposes of the royalty determination. But whether systems are contiguous or noncontiguous, or use a single or multiple headends, simply does not bear on whether they meet the definition provided in the first sentence of § 111(f)(3). Nothing about the usage of "headend" in the statute indicates that Defendants' system here does not employ one. Nor does anything about Defendants' system prevent it from operating in "contiguous communities" or frustrate the ability to treat two or more units of Defendants' system as a single system for royalty calculation purposes.

  *ivi I* also relied, as Plaintiffs do here, on the Copyright Office's "concern that an 'expansion' of the statutory license to the Internet could potentially place the United States in violation of international treaties." 765 F.Supp.2d at 613 (quoting Satellite Home Viewer Extension and Reauthorization Act Section 109 Report (2008) at 188). If that is correct, corrective legislation or formal regulation may be in order.

  The *ivi* cases are authority in this Circuit only insofar as they are persuasive, as Plaintiffs identify nothing in Ninth Circuit law that adopts their rules or reasoning. For the reasons stated, they are not persuasive.

### E. Paying Customers

  The *ivi* decisions did not address the language in the § 111(f)(3) definition stating that a cable system is a facility that rebroadcasts programs "to subscribing members of the public who pay for such service." Plaintiffs point out that Defendants streamed standard-definition programming for free. Defendants do not contest that they *did* so, but contend that they did so only as a "free trial" that would be terminated at some unspecified date. Defendants argue that these free retransmissions are not disqualifying. Defendants rely on *San Juan Cable LLC v. Telecommunications Regulatory Bd. of Puerto Rico*, 598 F. Supp. 2d 233 (D.P.R. 2009). In *San Juan Cable*, the plaintiff challenged a plan for the Puerto Rico Telephone Company to provide cable service, arguing that the Cable Act, 47 U.S.C. §§ 521 et seq., and 17 U.S.C. § 111 require paying subscribers, while the challenged plan called for a temporary beta-testing phase during which service would be provided to two hundred of the company's employees free of charge for a minimum of eight weeks. The court rejected that argument, holding that "[b]ecause the trial phase is designed to advance PRTC's construction of a cable service for commercial purposes, the court finds that PRTC is indeed offering a 'cable service,' as defined in the Cable Act, through the implementation of its limited test trial." *Id.* at 236.

  Although *San Juan Cable* is only persuasive authority, and is not on all fours with this case, its reasoning is generally sound. While a system that operated without receiving fees from subscribers would not meet the plain language of the statute, neither does the statute suggest that subscribers must pay for each retransmission made. To the extent that the failure to collect fees for transmissions disqualifies those transmissions from the compulsory license, that does not

13

affect the character of the transmissions for which Defendant has obtained, or will obtain, payment.[19]

### F. Current FCC Rulemaking

The Copyright Office is not the only agency involved in this issue. As the Copyright Office acknowledged, the FCC is considering new regulations in this area. Those potential regulations are relevant in two ways to this case: one direct and one indirect. The direct way is that § 111 requires that the retransmission be permissible under FCC regulations. Currently, Plaintiffs point to no ways in which Defendants are in violation of FCC regulations. There simply do not appear to be any that address Defendants' particular transmissions, and Plaintiffs have made no showing that Defendants are in violation of any more general regulations, for example, of the type we all comply with by operating devices bearing this familiar inscription: "This device complies with part 15 of the FCC Rules. Operation is subject to the following two conditions: (1) This device may not cause harmful interference, and (2) this device must accept any interference received, including interference that may cause undesired operation." 47 CFR 15.19. Indeed, even the Copyright Office has taken the position that transmissions need not be affirmatively authorized by the FCC to qualify for § 111 purposes. See ivi I, 765 F. Supp. 2d at 616 n.33 ("the Copyright Office's tentative endorsement of the AT&T U-Verse system, which does not appear to be subject to the Communications Act, implies that the Office does not believe that in order to qualify as a cable system under Section 111, an entity must be governed by the FCC.").

The indirect way that the FCC proceedings are relevant is that the FCC is considering whether internet-based services qualify as "multichannel video programming distributors" under communications law. Media Bureau Seeks Comment on Interpretation of the Terms "Multichannel Video Programming Distributor" and "Channel" as Raised in Pending Program Access Complaint Proceeding, MB Docket No. 12-83, DA 12-507 (released Mar. 30, 2013), available at http://www.fcc.gov/document/media-bureau-seeks-comment-interpretation-mvpd-and-channel. Plaintiffs argue that the FCC's potential future rules are irrelevant, as they will not extend a § 111 license to anybody. Pls.' Opp'n, Docket No. 189 at 21. That might be literally true, but nevertheless the Copyright Office thinks the FCC proceedings are relevant to that question. Letter from J. Charlesworth, Copyright Office General Counsel (July 23, 2014), Pls.' Appx. Ex. 1 at 4, n.3. In any event, the proposed rules appear to provide a parallel path to program access for internet retransmitters. FCC Chairman Wheeler summarized the proposed regulations as follows:

> With this Notice of Proposed Rulemaking, the Commission moves to update the Commission's rules to give video providers who operate over the Internet – or any other method of transmission – the same access to programming that cable and satellite operators have. Big company control over access to programming should not keep programs from being available over the Internet.

Notice of Proposed Rulemaking ("NPM"), In the Matter of Promoting Innovation and Competition in the Provision of Multichannel Video Programming Distribution Services, MB Docket No. 14-261, FCC 14-210, at 51 (Dec. 19, 2014). Thus, the NPM proposes to modernize the FCC's interpretation of the term "multichannel video programming distributor ("MVPD") by including with its scope services that make available for purchase, by subscribers or customers, multiple linear streams of video programming, regardless of the technology used to distribute the programming. Id. at 2. This is intended to "enable cable operators to untether their video offerings from their current infrastructure, and could encourage them to migrate their traditional

---

[19] Intriguingly, 47 U.S.C. § 541(b) provides that "[e]xcept to the extent provided in paragraph (2) and subsection (f) of this section, a cable operator may not provide cable service without a franchise." Paragraph (2) exempts cable services in operation before July 1, 1984. Subsection (f) exempts local or municipal authorities who operate as a multichannel video programming distributor. Plaintiffs raise no argument under 47 U.S.C. § 541(b).

services to Internet delivery." *Id.* at 3. The NPM also requests comment on whether the proposed retransmission consent rules would "force broadcasters to negotiate with and license their signals to potentially large numbers of Internet-based distributors." *Id.* at 34.

  Defendants emphasize this second, indirect involvement by the FCC, and represent that they will comply with any applicable regulations that arise out of this rulemaking. Defs.' Reply, Docket No. 191 at 22. What the FCC might or might not do does not directly impact the analysis here, which is necessarily grounded in current law. Nonetheless, the rulemaking again emphasizes that this is not the only forum in which these issues are being debated, and that this is not the only forum for resolving them.

### G. Courts and Congress

  Given the historic interplay between the courts and Congress concerning broadcast retransmission, nothing the courts say in this litigation is likely to be the last word on the issue. Indeed, the Satellite Television Extension and Localism Act of 2010, Pub. L. No. 111-175, 124 Sat. 1218 (2010) ("STELA") directed the Copyright Office to submit recommendations to Congress to achieve the phase-out and eventual repeal of Sections 111, 119, and 122, including proposals for timing and marketplace alternatives. Copyright Office STELA Report (Aug. 29, 2011), Pls.' Appendix, Ex. 3 at 16. And as discussed above, the FCC is actively working on new regulations that could impact the availability of the § 111 license. Plaintiffs' policy may be the better one, but this Court does not presume to make policy. With apologies to John Marshall, who said it in a much stronger sense, the Court's role here is merely "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Courts have rejected interpretations that "would largely freeze for section 111 purposes both technological development and implementation," and "force both primary and secondary transmitters alike to forego available, economically feasible technology." *Hubbard Broad., Inc. v. S. Satellite Sys., Inc.*, 777 F.2d 393, 400 (8th Cir. 1985). It will ultimately be up to Congress to say what the law will be.

  For now, the Court would hold that (setting aside the above noted compliance failings for which Defendants may need to pay damages for infringement), once compliance under the statute is achieved, Defendants would be entitled to a § 111 license.

## V. <u>Conclusion</u>

  For the foregoing reasons, the Court would DENY Plaintiffs' motion, GRANT Defendants' motion, and hold that Defendants are potentially entitled to a § 111 license. However, because: (1) the legal issues are close and of significant commercial importance, both to these parties and to others, (2) the Court disagrees with the Second Circuit's decision in an analogous case, and (3) the resolution of the issues presented on summary judgment is likely to be determinative in this action, the Court would authorize an immediate appeal to the Ninth Circuit pursuant to Fed. R. Civ. P. 54(b), Fed. R. App. P. 5, and 28 U.S.C. § 1292(b). The Court would also preserve the status quo because Defendants have not yet been able to timely or consistently comply with the procedures attendant to a § 111 license. The Court therefore would maintain the existing preliminary injunction pending the outcome of the appeal. Finally, because of the relative importance of the issues decided here compared to those remaining in the case, the Court would stay this action pending the outcome of the appeal.

  The Court would order the parties to collaborate on a joint form of judgment and file it no later than July 23, 2015, or if they are unable to agree, to submit redline comparisons of their competing versions no later than that date.